## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-00016 (DLF)** |
| | : | |
| **WILLIAM McCALL CALHOUN,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### MOTION FOR RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the defendant's "Motion for Reconsideration of Detention" (ECF No. Pending). For reasons stated below, the government submits that the motion should be denied. In support, the government relies on the following factual and legal authority, as well as any that may be offered at a hearing on these motions.

### PROCEDURAL HISTORY

The defendant was arrested on January 15, 2021, after having been charged by Complaint with one count of entry to Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a),one count of Violent Entry or Disorderly Conduct in violation of 40 U.S.C. § 5104(e)(2),  and one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2).

The defendant appeared before the Court in the Macon Division of the Middle District of Georgia for an initial appearance following his arrest on January 15, 2021, and then for a combined preliminary hearing pursuant to Rule 5.1 of the Federal Rules of Criminal Procedure and detention hearing on motion by the United States in MDGA matter 5:21-mj-00008-CHW.  A written ruling

1

issued under the MDGA caption (Det. Order) entered ordering the Defendant's detention at ECF
10 (Ex. 1).

The Defendant was subsequently charged by Indictment in the District of Columbia in the
instant matter on February 12, 2021, and arraigned before this Court on Monday, March 1, 2021.
At that hearing, the Defendant, through counsel, notified the Court of his intent to appeal the order
of Detention.  The Court set a briefing schedule whereby the Defendant's pleading was due on
Wednesday March 3, the Government's opposition following on March 4, with oral argument on
the motion calendared for March 5, 2021.

## ARGUMENT

A defendant must be detained pending trial, if the Court determines that no condition or
combination of conditions "will reasonably assure the appearance of the person as required and
the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider
its decision regarding pretrial detention "at any time before trial if the judicial officer finds that
information exists that was not known to the movant at the time and that has a material bearing on
the issue" of whether there exist conditions for release that would "reasonably assure the
appearance of such person as required." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C.
2014) (citing 18 U.S.C. § 3142(f)(2)(B); accord *United States v. Moore*, No. 13–330, 2014 WL
1273439, at *1 (D.D.C. Mar. 31, 2014)).

### I.      The Bail Reform Act factors remain in favor of detention.

The Bail Reform Act requires the judicial officer to assess various factors, as described
below, before releasing or detaining a defendant. 18 U.S.C. § 3142(g). The determination that a
criminal defendant must be detained pursuant to subsection (g) "may be reopened" at any time

prior to trial if new information surfaces that has a material bearing on the potential conditions of release that may reasonably assure the defendant's appearance in court and the safety of the community. 18 U.S.C. § 3142(f).

Section 3142(i) also provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that does not revisit the initial bond determination, but rather if a court finds that such release is "necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). Before turning to the defendant's claim that his health concerns and the COVID-19 pandemic generally are an adequate basis to revisit detention, we first assess the §3142(g) factors as summarized by the detaining Magistrate in his detention order attached as government's Exhibit 1, with the exhibits introduced in that proceeding as Exhibit 2 for the purposes of this motion.  The exhibit list from that hearing is attached as Exhibit 3, and a full transcript of the January 21 detention hearing has been attached as Exhibit 4.

### a.  The January 21, 2021 Detention Hearing

At that hearing, the court found as a threshold matter that "the weight of the evidence [against the defendant] is likely to be strong and indicates an ongoing and escalating pattern of threats and threatening behavior culminating in the violent entry of a mob on the United States Capitol."  Ex. 1 p. 2.  The magistrate found that the defendant "made a series of violent and threatening statements on social media, including threats to 'storm' Washington, D.C., and wage a civil war against political opponents whom he described as Democrats, communists, the Deep State, and BLM-Antifa."  Id.

The court found that the defendant's threats included statements (all attached as Exhibit 2) such as ""I have tons of ammo. Gonna use it, too - at the range and on racist democrat communists"

3

. . . "we're loading AR15 magazines and getting range time in. My AR15 set up will do head shots at 200 meters no problem. You have no clue what's coming" . . ."For my part, I'll be slinging enough hot lead to stack you commies up like cordwood" . . . "War is coming. It's the only way to deal with our domestic Communist problem. Ruthlessness is in order" . . . "The only remedy for BLM-Antifa communism is violent retribution against the media and the democrats." . . . "You won't be laughing when Patriots go door to door executing you commies" and, "I won't struggle pulling a head shot at 200 meters day or night. Smoke that over commie bitch." Ex. 1 p. 2-3.

The detaining magistrate further found that the defendant made comments regarding his activity in the United States Capitol on January 6, 2021, including the statement "the first of us who got upstairs kicked in Nancy Pelosi's office door and pushed down the hall towards her inner sanctum, the mob howling with rage – Crazy Nancy probably would have been torn into little pieces, but she was nowhere to be seen." Ex. 1 p. 4.   The court also found that the defendant had also clearly expressed his intentions regarding anticipated activity following the January 6 riot, writing "Now we're all going back armed for war and the Deep State is about to get run out of DC." Ex. 1 p. 5.

In ordering detention, the court also noted that the defendant had "evade[d] surveillance" and relocated to a family member's house before his arrest, and noted that at the time of his arrest the defendant was in possession of "at least two AR-15 rifles, four shotguns, a pistol, a set of brass knuckles, and hundreds of rounds of ammunition."  Ex. 1 p. 5 (and depicted below).   The magistrate appeared particularly troubled by the defendant's statement that he intended to "engage in a violent insurrection and 'slaughter' people he considered his political opponents."  Ex. 1 p. 6.

4



The detaining magistrate found, after considering all of the evidence presented, including the testimony of the case agent, that the evidence presented by the government was "sufficient to show by a clear and convincing" standard "that no condition or combination of conditions of release will reasonably assure the safety of any other person or the community" and "[t]he evidence further shows by a preponderance . . . that no condition or combination of conditions of release will reasonably assure the Defendant's appearance as required." Ex. 1 p. 5-6. The court found that the defendant "showed that his intentions were more than mere fantasies when he participated in the violent invasion of the United States Capitol during a joint session of Congress to certify the results of a national election, an invasion that resulted in the deaths of five people, including one law enforcement officer," and that at "the time of his arrest, Defendant was evading law enforcement and heavily armed." Id.

The basis for the 3142(g) findings has not changed since the Court in the Middle District of Georgia ordered the defendant's detention on January 25, 2021. The defendant remains both a danger to the community and a flight risk. *See* 18 U.S.C. § 3142(g)(4) (requiring the Court to first evaluate "the danger" that "would be posed by the person's release.")

Notwithstanding these factors, the defendant argues that the existing public-health crisis militates in favor of his release. The government now turns to this argument.

## II.   While the COVID-19 pandemic is dangerous and the defendant may have pre-existing health conditions, neither constitutes a changed circumstance that necessitates reconsideration of detention at this time.

While the defendant asserts that he has pre-existing health conditions, including a prior prostate cancer diagnosis, he provides no medical evidence or other information about its severity or impact on his susceptibility to the virus. Indeed, other than the fact that the defendant appears to have what may be a routine medical visit, there has been no information provided to the court about the nature of his medical diagnoses or his current health other than the precatory assertion that release is mandated. *Cf.* Def. Mot. Ex. A.

This is not the first time a court has considered bond based on real or asserted health emergencies. In *United States v. Johnston*, No. 17-46 (RMM), 2017 WL 4277140 (D.D.C. Sept. 27, 2017), the Court released a defendant for a limited purpose: to obtain surgical treatment. "This is a temporary release to home detention that is narrowly tailored to respond to the exigent and unusual circumstances presented by [the defendant's] cancer diagnosis and the status of his testing and treatment." *Id.* at *9. When the district court has previously reviewed a motion for release from pretrial detention for health conditions that can be treated at the jail, the court denied the motion, citing that a defendant's "history and characteristics" is only one of four factors that the

6

Court must consider in determining the appropriateness of pretrial detention. *United States v. Parker*, 517 F. Supp. 2d 375, 377 (D.D.C. 2007) (defendant's medical conditions, including diabetes, asthma and hypertension, for which he required ongoing medication and treatment, *cannot* be dispositive in considering motion for release).[1]

Section 3142(i) operates independently of the detention factors. Under 3142(i), the Court could release a defendant temporarily to the custody of another if it finds a "compelling reason" that necessitates temporary release. The existence of the pandemic in and of itself, however, is not a compelling reason to justify release. Moreover, as discussed in greater detail *infra*, the D.C. Department of Corrections (DOC) appears to be have undertaken several steps to try to prevent the spread of COVID-19 within its facilities. Lastly, Section 3142(i) establishes the parameters for *temporary* release; a factor overlooked in the defendant's motion, which considers it, aspirationally and erroneously as a mechanism for indeterminate release.

While the government shares the defendant's purported concerns over the potential risk of COVID-19 exposure while detained, it remains unclear to undersigned counsel what, if any, precautions this defendant would be able to put in place to protect himself and those around him from COVID-19 if he were to be released. *See United States v. Edwards*, 20-mj-50, at *6 (RMM) (March 30, 2020 D.D.C.) ("Although [the defendant's] alleged health problems may make him at heightened risk if he contracts the coronavirus, he would be at risk even if he were not incarcerated."); *United States v. Washington*, 18-cr-309 (DLF) (D.D.C. Telephonic Conference April 2, 2020) (noting that an asthmatic defendant who is addicted to narcotics and avoided taking

---

[1] *See also United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (medical conditions can warrant temporary release under § 3142(i)).

his mental health medication may be safer in custody). Moreover, any such circumstances must also protect the public from a dangerous defendant who appears committed to—and undeterred from—armed violence.

The defendant's argument in the instant motion that his release is required due to the health risks posed by the COVID-19 is ironic when considered in the context of statements made on January 13, 20113 and subsequently provided to the FBI on that topic (redacted to protect the identity of the interlocutor):



As the court can see, the defendant's attitudes towards the COVID-19 pandemic in communications dated January 13, 2021 (two days before his arrest) appear to have shifted dramatically since being detained in this case.  Indeed, it seems that the defendant, based on his own statements, previously believed that concerns regarding COVID-19 transmission are "hysteria," didn't consider the disease any worse than "the flu," and may have already contracted the illness, which to the defendant's mind was "no big deal for healthy people" like himself.

The only real basis for the defendant's request for release is the existence of the COVID-19 pandemic in the context of his pre-existing health conditions. While the COVID-19 pandemic is obviously startling, the government still has a duty to ensure the safety of the community and balance the security of others with the safety of the defendant. In other words, unless this or any court is willing to release all defendants, or defendants with verified vulnerabilities, regardless of their danger and/or risks, the Bail Reform Act still provides the pertinent framework to analyze the defendant's motion. As described earlier, the defendant's chief argument is that he has (or has been previously diagnosed) with prostate cancer and thus, he needs to be released.

As this Court is likely aware through prior filings, the government has endeavored – on a case-by-case basis and as a result of the public health crisis currently pending – to permit temporary release pursuant to 18 U.S.C. § 3142(i) or 18 U.S.C. § 3145(c) to those who actually need release.[2] Here, it is unclear as to how any of the circumstances cited in his motion, in this context, at this

---

[2] For example, in *United States v. Carl Courtney*, 19-cr-413 (TJK), the government consented to release where the defendant had open wounds and was scheduled for surgery. In *United States v. Larry Key*, 19-cr-292 (JDB), the government consented to release due to the defendant's advanced age, his lung, heart, and kidney disease, and current multiple hospitalizations. The government is sincerely trying to balance the danger of the offender and the pandemic, but cannot ignore a person's record, their conduct, or their alleged or unverified maladies.

time, and with this charge, necessitates release under these circumstances. Furthermore, the defendant has not offered any rationale for why release into a community that is already affected by a virus (to which he was previously nonplussed) will protect him any more than his current placement at the Department of Corrections.

**III. The D.C. Jail has responsibly addressed the COVID-19 crisis.**

In preparing to respond to these and other similar motions, the United States Attorney's Office has consulted with DOC to obtain relevant information as to its handling of the public health crisis, and passes this information along to the Court for its consideration. Indeed, this office continues consulting with the DOC in light of the rapidly-changing situation. Specifically, as of March 27, 2020, DOC has instituted the following protocol to ensure the safety of its incarcerated population:

- banned all non-attorney visits to limit unnecessary exposure;

- implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.;

- all new inmates are quarantined for 14 days before they assigned to a housing unit;

- if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days;

- DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus;

- DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.;

- DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control;

- DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations;

- DOC checks and rechecks its ventilation system to ensure the air quality in the facilities;

- DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses weekly and free of charge to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours;

- DOC would like to limit the number of inmates coming into its facility at any given time[3]; and

- upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change.

*See also* Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how DOC has suspended in-person visitations,

---

[3] Law enforcement partners have put in place procedures to reduce the number of individuals subject to custodial arrest, exercising their authority to issue citations for individuals to appear on a future dates. *See e.g.*, Metropolitan Police Department Order EO-20-011, *Coronavirus 2019 Modification to Citation Release Criteria* (effective March 17, 2020) ("[T]he USAO and OAG have exercised their authority under DC Code § 23-584(c) to categorically approve the citation release of arrestees consistent with the following updated criteria during the COVID-19 emergency. . ."). Additionally, on March 27, 2020, with the consent of the U.S. Attorney's Office and others, the Chief Judge issued an order regarding the suspension of the execution of bench warrants in certain misdemeanor cases and an order suspending all sentencing provisions requiring service of sentence on weekends. *See also* Superior Court of the District of Columbia Order, March 16, 2020, available at http://www.dccourts.gov/sites/default/files/Order_3-16-20.pdf; COVID-Emergency Act, D.C. Code § 24-221.0(c) (giving DOC discretion to award good time credit); DOC Change Notice #20-002, March 18, 2020 (doubling the maximum number of monthly sentencing credits which a misdemeanant may receive).

enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19).

As of March 3, 2021, the government learned that there are 1043 residents at the District of Columbia Department of Corrections' (DOC) Central Detention Facility, and 446 residents at DOC's Correctional Treatment Facility,  with no general population DOC residents testing positive for COVID-19 and only four positive residents in isolation.

The government and the Court are faced with the difficult challenge—how to balance the security and safety of the community with the safety of the defendant. But it is also critical that the defendant bring his concerns to the DOC's attention, as the DOC is the entity to whom the defendant should direct any specific request for needed accommodations based on the defendant's particular situation. Noticeably absent from the defendant's motion is any statement or claim that the defendant has contacted the DOC to determine what other accommodations, if any, may be appropriate for the defendant given his particular health concerns.

## IV.     Non-binding District Precedent Militates Against Release.

As defendants have litigated release based on COVID-19, courts in this district have entered a number of orders assessing the validity of the various claims related to COVID-19 or DOC. In *United States v. Smith*, 19-cr-324 (BAH) (D.D.C. March 23, 2020), Chief Judge Howell—who also issued Standing Order 20-9, suspending most courthouse operations as a result of the pandemic—remarked that "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent
> the spread of the virus within the facility where defendant is detained . . . including
> suspending all in-person visits, programming, and volunteer activities within its
> facilities, enhanced cleaning efforts, especially within common areas, and vigilant

medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14, 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although defendant is in an age group that may be more susceptible to the virus . . . this risk pertains whether the defendant were released or detained, and any heightened risk posed by pretrial detention does not outweigh the presumption in favor of detaining the defendant pretrial, nor does it alter the balance of the statutory factors Congress prescribed for determining the propriety of detention, which all continue to weigh heavily in favor of detention.

*Id.* (denying release in a child exploitation case).

Judges have previously noted that DOC appears – despite the obvious struggles of a worldwide health crisis – to be tackling this problem. *See, e.g.*, *Lee*, 19-cr-298, at * 11 (noting the "aggressive precautions that DOC appears to have undertaken to prevent the spread of COVID-19 within its facilities"); *United States v. Adams*, 19-cr-257-003, at *3-4 (DKC) (D. Md March 25, 2020) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (D. Md March 21, 2020) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus."). To the extent circumstances continue to change, the government is committed to informing the court of any known developments related to COVID-19.

The decisions issued by various courts have consistently and clearly illustrated that in assessing the risk (or any particularized risk to a defendant) related to the COVID-19 pandemic,

the §3142(g) factors provide the necessary framework to evaluate whether to release an individual who was previously deemed too dangerous or too much of a flight risk to reenter the community. *See, e.g.*, *United States v. Gonzalez*, 20-cr-40 (BAH) (D.D.C. March 24, 2020) (denying release, noting the steps taken by DOC to protect inmates); *United States v. Antonio Tabron and Lamont Johnson*, 18-cr-112 (TFH) (denying release after trial in a PCP conspiracy case); *Lee*, 19-cr-298 (KBJ) (denying release in a firearms case based on generalized COVID-19 concerns); *United States v. Parker*, 19-cr-349 (APM) (D.D.C. March 30, 2020) (denying release after a 924(c) plea despite Eighth Amendment claim); *United States v. Watkins*, 20-cr-19 (CRC) (D.D.C. March 31, 2020) (Minute Order) (highlighting the §3142 factors and noting that a "generalized risk to otherwise healthy detainees" is not alone sufficient, denying release in a gun case); *United States v. Foster*, 17-cr-160 (RC) (D.D.C. March 31, 2020) (Minute Order) (discussing *Lee* and other relevant authorities but denying release in a postal robbery); *United States v. Lin*, 19-cr-387, at *4-5 (TJK) (D.D.C. April 1, 2020) (denying release in an aggravated identity theft conspiracy and noting that "even a heightened risk of infection is but one factor that the Court must balance" and finding the difference between COVID-19 pandemic at Rikers Island and D.C. jail to be "substantial"); *United States v. Marchi*, 19-cr-406 (DLF) (D.D.C. April 2, 2020 Minute Order) ("[B]ased on the current record, neither the present pandemic nor the defendant's mild asthma is a new circumstance that warrants reconsideration" in a firearm case); *United States v. Mathis*, 19-cr-330 (CJN) (D.D.C. April 2, 2020) (denying release post-plea in a an obscene materials to a minor case despite possible existence of hypertension); *United States v. Whitaker*, 19-cr-351 (DLF) (D.D.C. April 2, 2020) (denying release pending sentencing in a firearms case even though the defendant claimed bronchitis, allergies, and asthma); *United States v. Bailey*, 19-cr-391 (JDB)

14

(denying pretrial release, despite defendant's claim of "complicated medical conditions," noting the applicable §3142 factors); *United States v. Amos*, 19-cr-398 (CRC) (D.D.C. April 3, 2020) (denying release in a firearms case after a plea); *United States v. Park*, 16-cr-9 (TSC) (D.D.C. April 4, 2020) (denying pretrial release in a sex offense case where the defendant failed to rebut the presumption and failed to offer a plan in place if released); *United States v. Rees*, 19-cr-378 (EGS) (D.D.C. April 4, 2020) (denying post-plea release in child exploitation case where the defendant failed to meet his burden and DOC appeared to be reacting reasonably under the circumstances); *United States v. Brooks*, 19-cr-67 (RCL) (D.D.C. April 4, 2020) (denying release after a plea to a firearms charge when the defendant failed to specify the nature of his asthma); *United States v. Green*, 19-cr-250 (DLF) (D.D.C. April 6, 2020) (denying post-plea release in a gun case where the defendant failed to meet 3143(a)(1) factors, and his health risk was limited); *United States v. Carter*, 19-cr-39 (RBW) (D.D.C. April 7, 2020) (denying pretrial release in a Hobbs Act robbery case where DOC is trying to take steps to protect inmates and weighing the 3142(g) factors, including the defendant's criminal history and the "very weighty" evidence). *But see United States v. Harris*, 19-cr-356 (RDM) (D.D.C. March 26, 2020) (releasing defendant in a child exploitation case in part because of COVID-19 pandemic, along with the expert opinion signifying the defendant's limited danger); *United States v. Jaffee*, 19-cr-88 (RDM) (D.D.C. March 26, 2020) (releasing defendant because of COVID-19 pandemic but noting his prior perfect compliance with his conditions of release as well as weakened state evidence in a gun and drugs case); *United States v. Mclean*, 19-cr-380 (RDM) (D.D.C. March 28, 2020) (releasing the defendant in a gun and drugs case due to COVID-19, the defendant's prior HISP release orders, and the underlying condition for diabetes); *United States v. Kofi Appiah and James Hutchings Jr.*,

19-cr-361 (BAH) (D.D.C. March 26, 2020) (releasing defendants in a firearms conspiracy case because of underlying health conditions, including severe assault at jail and verified asthma); *United States v. Stephon Davis*, 19-cr-292 (JDB) (D.D.C. April 6, 2020) (granting home confinement in pretrial narcotics conspiracy where defendant had proven acute bronchitis and had limited record with no record of violence); *United States v. Johnson*, 19-cr-52 (TSC) (D.D.C. April 8, 2020) (granting pretrial release in a felon in possession case where defendant had documented medical issues, including obesity, mobility issues, digestive disorders, and the fact his two prior trials were postponed due to such documented issues); *United States v. Johnson*, 18-cr-293 (RJL) (D.D.C. April 8, 2020) (denying release pending sentencing in wire fraud case where defendant failed to establish exceptional reasons or meet his burden because of his alleged dental issues). A close reading of each case suggests that the particulars of the defendant's circumstances guide the analysis. The pandemic, alone, is not a talismanic but-for cause of the defendant's release, even under 18 U.S.C. § 3142(i).[4] *See United States v. Phillips*, 20-cr-36, at *2 (ABJ) (D.D.C. April 10, 2020) ("[T]he defendant has focused almost exclusively on the virus, without addressing the facts that relate to him specifically, and following his argument to its logical conclusion would mean that the courts are now obliged to open the doors and release every person at the jail who is awaiting trial. That cannot be the right answer, and judges all over the country have emphasized that these decisions must be made on a case by case basis.").

---

[4] *See also United States v. Cox*, No. 19-cr-271, 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Green*, No. 19-cr-304, 2020 WL 1477679 (M.D. Fla. Mar. 26, 2020); *United States v. Steward*, No. 20-cr-52, 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *United States v. Hamilton*, No. 19-cr-54, 2020 WL 1323036 (E.D.N.Y. Mar. 20, 2020).

Opinions filed in neighboring districts are in accord.[5] Early in this crisis, on March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on COVID-19. *See United States v. Martin*, 2020 WL 1274857, *2 (D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court nevertheless recognized that "resolving . . . an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's proposed use of GPS location monitoring even if the defendant was released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (E.D. La. March 19, 2020) ("If anything, the COVID-19 pandemic

---

[5] *But see United States v. Stephens*, 15-cr-95-AJN (S.D.N.Y. March 19, 2020) (COVID-19 outbreak and as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.*

Notably, the Court recognized that its decision cannot be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).")

has reduced the availability of conditions to mitigate the risk to the community"). The Court's concerns in *Martin* continue to remain relevant, even as the crisis worsens. Like the U.S. District Court for the District of Columbia, judges in the District of Maryland (Greenbelt Division) – whose defendants are also detained by DOC – has also denied release on generalized grounds, noting the importance in evaluating the defendant's risk through the Bail Reform Act. *See, e.g.*, *United States v. Bilbrough, IV*, 20-cr-33, at *4-5, 7 (TDC) (D. Md March 20, 2020) ("D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities. Although [the defendant] may still be at an increased health risk [from diabetes] . . . this factor alone does not outweigh the other factors."); *United States v. Brown*, 16-cr-553 (RDB) (D. Md March 26, 2020) (denial of release from BOP custody); *United States v. Jefferson*, 19-cr-487 (CCB) (D. Md March 23, 2020) ("Precautionary measures have been implemented at CTF in light of the COVID-19 pandemic" denying release to an asthmatic defendant); *United States v. Johnson*, 17-po-9262 (TMD) (D. Md March 20, 2020) (discussing general risk of exposure to COVID-19, but denial of release on other grounds); *United States v. Jones*, 17-cr-582, at *2 (CCB) (D. Md March 20, 2020) ("CDF medical personnel are adequately addressing Defendant's medical needs" and the COVID-19 "risks are not the sole determinant of whether detention is appropriate."); *United States v. Legard*, 19-cr-137, at *2-3 (PWG) (D. Md March 24, 2020) (Asthma was not a basis alone to release a defendant in light of COVID-19 pandemic and that the measures at the D.C. jail are "in compliance with state and federal guidelines regarding protective measures"); *United States v. Perry*, 14-cr-181, at *1-2 (GLR) (D. Md March 26, 2020) (denial of release from halfway house due to COVID-19, but on statutory reasons, but also noting that the affidavit of Dr. Marc Stern "lack[ed] the case or institution specificity to determine, with sufficient

18

certainty, the health risks posed at the institution."). In fact, in *United States v. Williams*, 13-cr-544 (PWG) (D. Md March 23, 2020), the Court even acknowledged that DOC has taken significant measures to stem the tide of the pandemic, but that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly." *Id.* at *5. Perhaps most explicitly, "[t]he existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained." *Id.* The Court thus denied a 67-year-old defendant emergency release.

Finally, while the COVID-19 virus is a valid and serious concern, arguments based primarily on even serious health concerns are not. Courts have generally recognized that "it is a rare case in which health conditions present an exceptional reason" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (quotations omitted).

The government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant, but regardless of whether the Court applies the standard articulated under the "compelling reason" language of 18 U.S.C. § 3142(i) or the "exceptional reason" standard of 18 U.S.C. § 3145(c), the defendant cannot meet either burden mandating his release. Moreover, the existence of the COVID-19 pandemic and his prior health diagnoses can certainly factor into this analysis, but it cannot be dispositive, without additional evidence.  The inquiry before this Court, today, is whether the Court can find that the defendant

has met his burden under either standard, which the government respectfully submits he has failed to do.

**V.     The defendant's additional claims are not meritorious.**

The defendant also argues, in passing, that his continued pretrial detention would constitute a Due Process violation and would subject him to Cruel and Unusual Punishment. Def. Mot. P. 4. This argument is similarly without merit.

Judge Grimm considered this issue, briefly, in *Martin*, before holding that "as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." ___ F.3d at ___, 2020 WL 1274857 at **2-3 (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001); *Loe v. Armistead*, 582 F.2d 1291, 1293–94 (4th Cir. 1978)). As the Supreme Court has long held, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537.

The Courts of Appeal have been even more explicit:

> [I]solated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. Nor can the incidence of diseases or infections, standing alone, imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks. . . *a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights.*

*Shepherd v. Dallas County*, 591 F.3d 445, 454 (5th Cir. 2009) (emphasis added); *see also Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (noting that a pretrial detainee could not make out a Due Process claim without showing that the detention facility demonstrated "deliberate indifference"

or "recklessness" with regard to inmate safety) (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)).

The defendant cannot satisfy this burden. Far from being deliberately indifferent to the threat of COVID-19, DOC has enacted its own protocol – a protocol that is complaint with CDC and D.C. Department of Health requirements and recommendations. DOC has implemented its protocol to quarantine inmates who might have been exposed to COVID-19, and also to isolate the inmates who have tested positive. *See also Lee*, 19-cr-298, at *10-11 (finding that prison authorities have not been deliberately indifferent to this threat); *Parker*, 19-cr-349, at *2 (noting that the defendant offers "no proof specific to [DOC] efforts to manage the present crisis to support his constitutional claim."); *United States v. Thorne*, 18-cr-389, at *5 (BAH) (D.D.C. March 31, 2020) ("[D]efendant has not shown that the DOC is deliberately indifferent" to risks and that DOC protocols "undercut any claim of" deliberate indifference). In the absence of a Due Process violation, the Court must rest its decision on the Bail Reform Act factors which, as noted above, continue to weigh heavily in favor of pretrial detention in this case. Notwithstanding the potential that Defendant might contract COVID-19 in DOC, there is no combination of conditions which would ensure the safety of the community if he is released.

Finally, defendant also argues, again in passing, for release based on a purported violation of the Sixth Amendment right to counsel. Def. Mtn. p. 10-11. He claims that he should be released because his "ability to prepare a defense will be hampered by his pretrial incarceration." Id.. Even assuming such a denial, this Court lacks authority to release the defendant on that ground, which is unrelated to the reasons for his pretrial detention, *viz.*, risk of flight and danger to the community. In any event, given the unprecedented institutional challenges faced by the District of Columbia

Department of Corrections ("DOC"), the defendant has come nowhere close to demonstrating an "unjustifiable obstruction" with his legal representation. *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001); *see also United States v. Johnson*, 225 F. Supp. 2d 982, 1005 (N.D. Iowa 2002).

 "[W]hen an institutional restriction on pretrial detainees infringes a specific constitutional guarantee [*i.e.*, the Sixth Amendment], 'the practice must be evaluated in light of the central objective of prison administration, safeguarding institutional security.'" *Benjamin*, 264 F.3d at 187 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)) (bracketed material in original); *see also Johnson*, 225 F. Supp. 2d at 1006 ("pretrial detainee must show . . . 'unjustifiable obstruction' with legal representation").

The "core" of the Sixth Amendment right to assistance of counsel is "'the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare for trial.'" *Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (citation omitted). As explained, the defendant is not (and has not alleged that he is) being deprived of his right to "consult" with his counsel. The defendant can consult with his counsel daily on unrecorded and unmonitored phone calls. Nor is the defendant being deprived of his right to have his counsel investigate his case and prepare for trial based on those daily consultations. Even if the defendant's current contact is limited to telephone conversations, "not every restriction on counsel's time or opportunity to investigate or consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983).

Presumably, when the District and the Nation emerge from this extraordinary health crisis, there will be ample opportunities for counsel to consult with the defendant in person. In the meantime, the defendant should not be released because of the minimal DOC intrusion on his Sixth

Amendment right. *See*, *e.g.*, *United States v. Green*, 19-cr-250 (DLF) (D.D.C. April 6, 2020 Minute Order) ("Although the COVID-19 pandemic has limited counsel's access to Mr. Green, counsel can still communicate with Mr. Green."). *United States v Lucas*, 873 F.2d 1279, 1280 (9th Cir. 1989) (per curiam) (defendant failed to show his detention in facility 120 miles from counsel's office prevented him from adequately communicating with counsel such as to give rise to Sixth Amendment violation); *see generally United States v. Mukhtar*, 2013 WL 12204792, *7 (D. Nev. Feb. 13, 2013) ("The Court recognizes that detention limits Defendant's ability to communicate with his counsel or review electronic discovery or other documentary or physical evidence as frequently or for as long as he might do if he were out of custody. Defendant is, however, represented by competent counsel and has access to support staff and assistance to prepare his defense in this case. Defendant has not demonstrated that his pretrial detention so substantially impairs his ability to communicate with his counsel and examine discovery, that he and his lawyers cannot adequately prepare his defense.").

## **CONCLUSION**

Given the plans in place at the DOC and the danger that the defendant represents to the community – the same community also affected by this illness, the government respectfully requests that this Court deny the motion.

Respectfully submitted,

Channing D. Phillips
Acting U.S. Attorney
D.C. Bar No. 415793

By: /s/ Adam Alexander
Alaska Bar No. 1011057
Assistant United States Attorney
Capitol Riot Detailee
222 W. 7th Avenue Suite 253
Anchorage, Alaska 99513
(907) 271-2309
Adam.Alexander@usdoj.gov

Dated: March 4, 2021

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-00016 (DLF)** |
| | : | |
| **WILLIAM McCALL CALHOUN,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR RELEASE – EXHIBIT LIST**

1. Exhibit 1, Order of Detention Case 5:21-mj-00008 ECF 10 (MJ C.H. Weigle).

2. Exhibit 2, a 33 page document containing the government's exhibits 1-35a.

3. Exhibit 3, Exhibit List from 1/21/21 detention hearing 5:21-mj-00008 ECF 9.

4. Exhibit 4, Transcript of January 21, 2021 Preliminary Examination and Detention Hearing
   in  Case 5:21-mj-00008.

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 4th day of March 2021, a true copy of the foregoing Opposition to the Defendant's Motion for Reconsideration of Detention, and Exhibits, was emailed to:

Mr. Jonathan Hopkins, Courtroom Deputy
Email: Jonathan_Hopkins@dcd.uscourts.gov
Honorable Judge Dabney L. Friedrich

Ms. Jessica N. Sherman-Stoltz, Esq.
Attorney for Mr. Calhoun
Email: jessica@sslawgroupva.com

With leave of court and until such time that this motion and accompanying exhibits can be filed via CM/ECF in due course.

/s/ Adam Alexander
Alaska Bar No. 1011057
Assistant United States Attorney
Capitol Riot Detailee
222 W. 7th Avenue Suite 253
Anchorage, Alaska 99513
(907) 271-2309
Adam.Alexander@usdoj.gov