```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF GEORGIA

3                      MACON DIVISION

4                 _____

5   THE UNITED STATES OF AMERICA      )
                                      ) Case No. 5:21-MJ-8
6       vs.                           )
                                      ) Macon, Georgia
7   WILLIAM MCCALL CALHOUN JR.,       )
    DEFENDANT                         )
8   _____)

9

10         PRELIMINARY EXAMINATION and DETENTION HEARING

11        BEFORE THE HONORABLE CHARLES H. WEIGLE
                UNITED STATES MAGISTRATE JUDGE
12

13                   January 21, 2021

14

15  APPEARANCES:

16  FOR THE GOVERNMENT:        Leah McEwen, AUSA
                               UNITED STATES ATTORNEY'S OFFICE
17                             Post Office Box 1702
                               Macon, GA  31202-1702
18
    FOR THE DEFENDANT:         Timothy R. Saviello
19                             FEDERAL DEFENDERS OF THE
                               MIDDLE DISTRICT OF GEORGIA
20                             440 MLK JR Blvd, Ste 400
                               Macon, GA  31202
21
    Proceedings reported stenographically
22  _____
23                      DARLENE D. FULLER, USCR
                          Registered Professional Reporter
24                          Registered Merit Reporter
                           Certified Realtime Reporter
25               Georgia Certified Reporter No. 5641-3440-5157-6832
```

<u>WITNESS INDEX</u>

<u>PAGE</u>

**FBI SA TIMOTHY ARMENTROUT**

Direct Examination By Ms. McEwen: ........................8

Cross Examination By Mr. Saviello: .....................25

Redirect Examination By Ms. McEwen: ....................34

Recross Examination By Mr. Saviello: ...................38

Redirect Examination By Ms. McEwen: ....................47

Recross Examination By Mr. Saviello: ...................65


**MARY CALHOUN**

Direct Examination By Mr. Saviello: ....................82

Cross Examination By Ms. McEwen: .......................88

<pre>
1              GOVERNMENT EXHIBITS ADMITTED DURING TESTIMONY

2      NUMBER            DESCRIPTION                          PAGE

3      GX 1         1-6-21 Screenshot of Calhoun Facebook ....16
                    post
4
       GX 2         12-29-20 Screenshot of Calhoun Parler ....16
5                   post

6      GX 3         1-4-21 Screenshot of Calhoun Parler ......16
                    post
7
       GX 4         undated Screenshot of Calhoun Facebook ...16
8                   post

9      GX 5         1-6-21 Screenshot of Calhoun Facebook ....16
                    post
10
       GX 6         1-6-21 Screenshot of Calhoun Facebook ....16
11                  post

12     GX 7         1-6-21 Screenshot of Calhoun Facebook ....16
                    post
13
       GX 8         Video from Business Insider .............18
14
       GX 9         10-17-20 Screenshot of Calhoun Twitter ...48
15                  post

16     GX 10        10-17-20 Screenshot of Calhoun Twitter ...48
                    post
17
       GX 11        10-19-20 Screenshot of Calhoun Twitter ...48
18                  post

19     GX 12        10-16-20 Screenshot of Calhoun Twitter ...48
                    post
20
       GX 13        10-16-20 Screenshot of Calhoun Twitter ...48
21                  post

22     GX 14        10-15-20 Screenshot of Calhoun Twitter ...48
                    post
23
       GX 15        10-15-20 Screenshot of Calhoun Twitter ...48
24                  post

25     GX 16        Undated Screenshot of Calhoun Twitter ....48
                    post
</pre>

1                    GOVERNMENT EXHIBITS ADMITTED DURING TESTIMONY

2         NUMBER          DESCRIPTION                                PAGE

3         GX 17           10-20-20 Screenshot of Calhoun Twitter ...48
                          post
4
          GX 18           10-20-20 Screenshot of Calhoun Twitter ...48
5                         post

6         GX 19           10-20-20 Screenshot of Calhoun Twitter ...48
                          post
7
          GX 20           Undated Screenshot of Calhoun Twitter ....48
8                         post

9         GX 21           Undated Screenshot of Calhoun Twitter ....48
                          post
10
          GX 22           Undated Screenshot of Calhoun Twitter ....48
11                        post

12        GX 23           Undated Screenshot of Calhoun Twitter ....48
                          post
13
          GX 24           Undated Screenshot of Calhoun Twitter ....48
14                        post

15        GX 25           Undated Screenshot of Calhoun Twitter ....48
                          post
16
          GX 26           Undated Screenshot of Calhoun Twitter ....48
17                        post

18        GX 27           Undated Screenshot of Calhoun Twitter ....48
                          post
19
          GX 28           1-6-21 Screenshot of Calhoun Facebook ....48
20                        post

21        GX 29           Undated Screenshot of Calhoun Twitter ....48
                          post
22
          GX 30           Screenshot from GX 34 ....................24
23
          GX 31           Photo of bedroom .........................63
24
          GX 32           Photo of bedroom .........................63
25

```
1              GOVERNMENT EXHIBITS ADMITTED DURING TESTIMONY

2     NUMBER              DESCRIPTION                         PAGE

3     GX 34          Video by third party/obtained online ....24

4     GX 35          Video provided by H. Scott ..............22

5     GX 35A         Transcript of GX 35 .....................22

6

7              DEFENSE EXHIBITS ADMITTED DURING TESTIMONY

8     NUMBER              DESCRIPTION                         PAGE

9     DX 1           Business emails evidencing threats ......76

10    DX 2           Affidavits offered for character ........77

11    DX 3           Calhoun secretary's affidavit ...........81

12    DX 4           Affidavit of attorney at courthouse .....82

13    DX 5           Affidavit of attorney at courthouse .....82

14    DX 6           Voicemail message .......................79

15    DX 7           Voicemail message .......................79

16    DX 8           Voicemail message .......................79

17    DX 9           Voicemail message .......................79

18    DX 10          Voicemail message .......................79

19

20

21

22

23

24

25
```

1    Macon, Georgia

2    Thursday, January 21, 2021

3    10:00 a.m.

4                  P R O C E E D I N G S

5         COURT OFFICER:  All rise.  United States District

6    Court for the Middle District of Georgia, Macon Division, is

7    now in session.  The Honorable Charles Weigle, United States

8    Magistrate Judge, presiding.  Please be seated.

9         THE COURT:  Today is January the 21st, 2021.  We are

10   here this morning with a preliminary and detention hearing on a

11   criminal complaint from the District of Columbia.  That's Case

12   5:21-MJ-8; in the District of Columbia it's Case 1:21-MJ-40, in

13   the matter of United States versus William McCall Calhoun

14   Junior.

15        Mr. Calhoun is here this morning represented by

16   Mr. Saviello from the Federal Defenders Office.  We have

17   Ms. McEwen here for the government.  Are the parties ready to

18   proceed at this time?

19        MS. McEWEN:  Yes, Your Honor.

20        MR. SAVIELLO:  Yes, Your Honor, with one quick

21   preliminary question.  Is it okay if the Marshals remove

22   Mr. Calhoun's restraint on his right hand so he can take notes

23   and assist me during the hearing?

24        THE COURT:  That's good with me if it's good with the

25   Marshals, yeah.

1              MR. SAVIELLO:  Thank you, Your Honor.

2         (Officer released Defendant's hand.)

3              THE COURT:  I believe Ms. Alston has already

4    mentioned this, but I would request everybody remain seated.  I

5    think that's going to work better with the sound system.  So no

6    need to stand when you're making arguments.

7              Are there any other preliminary matters that the

8    parties want to take up with the Court before we begin with the

9    evidence?

10             MR. SAVIELLO:  Not from the defense.  Thank you, Your

11   Honor.

12             MS. McEWEN:  No, Your Honor.

13             THE COURT:  All right.  Then I think the appropriate

14   way to proceed would be with the preliminary hearing matters

15   first.  There may be some overlap, depending how that turns

16   out, with the detention matter.  But the first issue is to deal

17   with whether there's probable cause to support the allegations,

18   so I'll let the government proceed with its case.

19             MS. McEWEN:  Yes, Your Honor.  I would call Special

20   Agent Armentrout to the stand.

21             THE COURT:  Come up and be sworn in please, sir.  And

22   can everybody hear me okay?  I'm never sure with the mask on

23   and this is a new courtroom for me.

24             MS. McEWEN:  Yes, Your Honor.

25             COURTROOM DEPUTY:  Raise your right hand.  Do you

1    solemnly swear that the testimony you are about to give is the

2    truth, the whole truth, and nothing but the truth, so help you,

3    God?

4              THE WITNESS:  I do.

5              COURTROOM DEPUTY:  Please be seated and please state

6    and spell your name.

7              THE WITNESS:  Yes, ma'am.  My name is Timothy

8    Armentrout, T-i-m-o-t-h-y A-r-m-e-n-t-r-o-u-t.

9                    FBI SA TIMOTHY ARMENTROUT

10   called by Government at 10:04 a.m., having first been duly

11   sworn, testified as follows:

12                    DIRECT EXAMINATION

13   BY MS. McEWEN:

14   Q.    Special Agent Armentrout, how are you employed, sir?

15   A.    I am a special agent with the FBI.

16   Q.    And in that regard, are you familiar with the joint

17   session of Congress that was ongoing on January the 6th, 2021?

18   A.    Yes, ma'am.

19   Q.    Have you become aware, as a part of this investigation,

20   that the United States Capitol is an area to which only

21   restricted access is granted?

22   A.    Yes, ma'am.

23   Q.    And have you also become aware that on January the 6th,

24   2021, there were temporary barricades that had been placed

25   outside the Capitol Building for purposes of crowd control?

1    A.    Yes, ma'am.

2    Q.    Now, approximately 2:00 p.m. that afternoon, are you aware

3    that the joint session of Congress was ongoing and then later

4    disrupted by protesters?

5    A.    Yes, ma'am.

6    Q.    And describe for the Court, if you can, what you

7    understood took place inside the Capitol as a result of the

8    protesters entering the building.

9    A.    The protesters entered the building, and the joint session

10   of Congress had to be evacuated, and the congressmen and all

11   the members had to be removed from the building, and the

12   proceeding had to stop.

13   Q.    And what was the nature of the proceeding that Congress

14   was taking up that day, if you know?

15   A.    They were confirming the election results from the

16   electoral college.

17   Q.    And about how long was the session suspended?

18   A.    Approximately six hours, I think.

19   Q.    Okay.  And ultimately, did Congress come back into session

20   later that evening?

21   A.    Yes, ma'am.

22   Q.    Now, at some point on the afternoon of January the 6th of

23   2021, did you receive a call that indicated that one or more

24   residents of the Middle District of Georgia were alleged to

25   have traveled and participated in the activities at the

1    Capitol?

2    A.    Yes, ma'am.  It was actually a text message, but the

3    Americus Police Chief texted me, alerting me to the fact that

4    Mr. McCall Calhoun possibly was attending the ongoing

5    disturbance at the Capitol.

6    Q.    And prior to that time, were you familiar with

7    Mr. Calhoun?

8    A.    I was.

9    Q.    Okay.  And was that as a result of the call that had come

10   in to an FBI tipline some months ago?

11   A.    Correct.  And I believe -- I can check my notes as to the

12   exact date -- on or about November 12th, a call was placed to

13   our national tipline concerning Mr. McCall Calhoun posting

14   threatening messages on social media platforms.

15   Q.    And, generally speaking, what was the alleged nature of

16   those threatening communications on social media platforms as

17   it was conveyed to the tipline in November?

18   A.    I believe it was threatening.  There's some quotes here in

19   the notes:

20            "Somebody will live long enough to be

21            exterminated with extreme prejudice."

22            "It is going to be hard to buy a beer when

23            the Democrats are being shot on site."

24            "We are going to kill every last Communist

25            who stands in Trump's way."

1    Q.    So as a result of that preexisting familiarity and the

2    text message you received from the Americus Police Chief, did

3    you take any action?

4    A.    I attempted to view the video that -- I had received a

5    screenshot of the video as it was on McCall Calhoun's Facebook

6    page.  I tried to watch that video.  I was able to watch that

7    video, and then I alerted my supervisor that we had an

8    individual from the Middle District of Georgia that may be a

9    participant in the riots at the Capitol.

10   Q.    Now, when you viewed the Facebook page that evening,

11   January the 6th, and saw the video that you've just referenced,

12   were there other posts in addition to the video?

13   A.    There was.  At that time I didn't go through them all, but

14   I did view the video.

15   Q.    And since that time, have you had the opportunity to

16   obtain screenshots of various posts from his Facebook page that

17   were made on January the 6th?

18   A.    Yes, ma'am.

19   Q.    And are those currently labeled as Government's Exhibits 1

20   through 7?

21   A.    Yes, ma'am.

22   Q.    Now, have you become familiar with the fact that

23   Mr. Calhoun used multiple social media platforms?

24   A.    Yes, ma'am.  We're aware of a Parler account, a Twitter

25   account, and his Facebook account.

```
1    Q.   And, generally speaking, in your review of the posts that
2    were made on the three social media platforms, did you find
3    them to be consistent with one another or inconsistent with one
4    another?
5    A.   They were generally consistent.
6    Q.   So if we could, do you have certain exhibits there before
7    you, Government's Exhibits 1 through 7?
8    A.   Yes, ma'am.
9    Q.   If you could, identify those for the record and describe
10   them for the Court, please.
11   A.   Yes, ma'am.  Exhibit 1 is the Facebook screenshot of the
12   video posted on Facebook, and that was the original video that
13   was sent to me by Chief Scott.  It was inside the Capitol
14   Building.  It was titled -- part of the title that you can read
15   -- "After we had forced our way in but before the cops
16   were...," and then there's a partial word, "...rout..."
17        Exhibit 2 is a Parler account posting, I believe it was
18   posted on or about December 29th, and said,
19             "Being physically present in Washington on
20             January 6 is of key importance.
21             "We the People have no other realistic option
22             to convey our unwavering intent to demand
23             fair elections now and forever -- or else.
24             "I'll see you there."
25        Government Exhibit 3, also a Parler post.  This would have
```

1     been on or about January 4th or 5th.

2                   "Headed to DC to give the GOP some back

3                   bone -- to let them know this is their last

4                   chance to Stop the Steal -- or they are going

5                   to have bigger problems than these coddled

6                   Antifa burning down their safe spaces.

7                   "DC announced it is 'banning guns' when we

8                   storm the Capitol tomorrow.  Laugh out

9                   loud -- guns are already banned in DC.  Very

10                  illegal.

11                  "Whether the police can enforce their gun

12                  laws depends on how many armed Patriots show

13                  up.

14                  "Ironically, in the long list of firearms and

15                  weapons banned by the DC ordinance, tomahawks

16                  are not mentioned, meaning there is no

17                  prohibition against carrying a tomahawk as

18                  long as it is not used offensively!

19                  "The tomahawk revolution -- Real 1776!"

20         Exhibit 4 is a Facebook posting from McCall Calhoun's

21    Facebook page.  It is a picture of a large crowd outside the

22    United States Capitol Building.  "We're going to get inside the

23    Capitol before this ends," is the caption.

24         Facebook page -- Exhibit 5, excuse me, is an additional

25    Facebook posting from McCall Calhoun on or about January 6th:

1              "Patriots have taken the Capitol building.

2         We overran multiple police barricades and

3         swarmed the building.  We busted through --

4         thousands of us swarmed in.

5              "There was a last police barricade inside,

6         and we had packed in right up to them.

7              "Somebody yelled, 'push through,' so we did

8         and the shock of our momentum brushed them

9         aside -- some people were bleeding pretty

10        badly by that point.

11             "After we had overrun that last police

12        barricade, the momentum caused a bad crush at

13        one point, but carried the Vanguard through

14        several smaller doors and down halls as we

15        swarmed Congress, yelling the names of

16        various members.

17             "Then we stormed upstairs through the rotunda

18        admiring the amazing art work but at the same

19        time looking for members of Congress, as by

20        this time we physically owned the Capitol --

21        All law enforcement had retreated to the

22        perimeter and even more thousands were trying

23        to push in!

24             "And get this -- the first of us who got

25        upstairs kicked in Nancy Pelosi's office door

```
 1              and pushed down the hall towards her inner

 2              sanctum, the mob howling with rage -- Crazy

 3              Nancy probably would have been torn into

 4              little pieces, but she was nowhere to be

 5              seen -- then a SWAT team showed, and we

 6              retreated back to the rotunda and continued

 7              our hostile take over of the Capitol

 8              Building.

 9              "There was such a push of even more Patriots

10              coming into the Capitol that we couldn't get

11              out for about 20 minutes."

12      Exhibit 6 another Facebook posting.  On January 6th.  By

13  McCall Calhoun.

14              "Today the American people proved that we

15              have the power.

16              "We physically took control of the Capitol

17              building in a hand-to-hand hostile takeover.

18              "We occupied the Capitol and shut down the

19              Government -- we shut down their stolen

20              election shenanigans.

21              "I was there and saw it.  My buddy Andy

22              Nalley and I were in the first two hundred to

23              rush up the steps and inside after the

24              Vanguard had clashed hard with the police and

25              made them retreat.
```

1                "The military isn't going to save the

2                Democrat Communists.  They are done.

3                "Today we brought our Government to its knees

4                with no weapons."

5                Now we will all -- "Now we're all going back

6                armed for war and the Deep State is about to

7                get run out of DC."

8        You want me to go to Exhibit 7; is that correct?

9    Q.   Yes, sir.

10   A.   Okay.  Exhibit 7.  Another Facebook posting on January 6th

11   by McCall Calhoun.

12               "The rotunda of the Capitol, occupied by the

13               People in a hostile takeover January 6."

14   And it shows a photo of appears to be rioters inside the Capitol

15   rotunda.

16   Q.   Now, with respect to the exhibits you have just

17   identified, 1 through 7, do you believe each of them to be a

18   true and accurate screenshot or photograph of the posting on a

19   social media site made by the defendant, William McCall Junior?

20   A.   Yes, ma'am.

21               MS. McEWEN:  Your Honor, I would tender Government's

22   Exhibits 1 through 7.

23               MR. SAVIELLO:  No objection, Your Honor.

24               THE COURT:  They are admitted.

25          (Government Exhibits 1 through 7 admitted into evidence at

1          10:14 a.m.)

2     BY MS. McEWEN:

3     Q.    Now after viewing posts such as Exhibits 1 through 7, did

4     you and other agents of the FBI endeavor to locate third-party

5     confirmation of the presence of Mr. Calhoun inside the building

6     there at the U.S. Capitol?

7     A.    Yes, ma'am.

8     Q.    And describe for the Court ways in which you did that.

9     A.    We spoke to other witnesses that had screenshots and were

10    aware of Mr. Calhoun possibly being there and, um, were

11    providing us videos that possibly could show him being in the

12    Capitol.

13    Q.    And did you take the opportunity to also review footage

14    obtained by media outlets?

15    A.    Yes, ma'am.

16    Q.    And do you have before you Government's Exhibit Number 8?

17    A.    Yes, ma'am.

18    Q.    And describe that for the Court, please.

19    A.    This is a video that was posted on -- I believe this is

20    from *Business Insider* website, and it is a video which shows an

21    individual, McCall Calhoun, within the Capitol Building.

22    Q.    And is it a true and accurate photograph or screenshot of

23    a portion of the video posted on *Business Insider*?

24    A.    Yes, ma'am.

25              MS. McEWEN:   Your Honor, I would tender Government's

1    Exhibit Number 8.

2            MR. SAVIELLO:  No objection, Your Honor.

3            THE COURT:  It is admitted.

4        (Government Exhibit 8 admitted into evidence at

5        10:15 a.m.)

6            MS. McEWEN:  Your Honor, I would ask if I could

7    publish that for the Court, please.

8            THE COURT:  You may.

9        (Video played at 10:15 a.m.)

10   BY MS. McEWEN:

11   Q.    Agent Armentrout, are you able to see Exhibit Number 8 on

12   your screen?

13   A.    Yes, ma'am.

14   Q.    And do you see Mr. Calhoun shown in that photo?

15   A.    Yes, ma'am.

16   Q.    Can you describe for the Court which individual he is.

17   A.    He is the individual on the far right, to the front of the

18   screen, gray beard, ball cap with what appears to be white

19   lettering, a brown and black style scarf around his neck, and a

20   green field jacket style jacket with four pockets.

21           MS. McEWEN:  Okay.  Now, we can take Government's

22   Exhibit 8 down, please.  Thank you, ma'am.

23   BY MS. McEWEN:

24   Q.    At some point did you apply for and obtain permission to

25   search Mr. Calhoun's residence in Americus, Georgia?

1    A.    Yes, ma'am.

2    Q.    The items of clothing that are depicted in Government's

3    Exhibit Number 8, were they some of the things that the Court

4    authorized you to search for and seize if located?

5    A.    Yes, ma'am.

6    Q.    Did you locate any of the items of clothing shown in

7    Government's Exhibit Number 8 at the residence in Americus?

8    A.    So, the search warrant was for 423 East Lee Street,

9    Mr. Calhoun's residence, and we located the green field jacket

10   with the four pockets at his residence.

11   Q.    Did you locate any of the other items of clothing depicted

12   in Government's Exhibit Number 8 elsewhere as a part of your

13   investigation?

14   A.    Yes, ma'am.  When we made contact with Mr. Calhoun in

15   Macon, Georgia, we found what we believed to be the ball cap

16   and the scarf that was in the photo in the bedroom he was

17   staying at at his sister's house.

18   Q.    Now you mentioned earlier that Government's

19   Exhibit Number 1 was a screenshot of the beginning of a video

20   that you viewed on Mr. Calhoun's Facebook page; is that

21   correct?

22   A.    That is correct, ma'am.

23   Q.    Were you able to download that video directly from his

24   page the next day?

25   A.    I was not.  The page had been taken down.

1    Q.   Did you later locate some or all of the same video through

2    another source?

3    A.   Yes, ma'am.

4    Q.   And can you describe that for the Court, please.

5    A.   The video?

6    Q.   How you located it.

7    A.   Oh, yes, ma'am.  So, there was also an individual that was

8    providing kind of Twitter updates on his Twitter page, an

9    individual by the name of Houston Scott, and he was following

10   Mr. Calhoun from early November up through January 6th, and we

11   interviewed him, and he had a copy of the video.

12   Q.   Okay.  And did you view the video provided to you by that

13   witness?

14   A.   Yes, ma'am.

15   Q.   Was it the same video that you had seen on January the

16   6th when you had first been alerted to this by Chief Scott?

17   A.   He had changed it a little bit to show postings within

18   Facebook, but the -- the beginning of the video and the end of

19   the video is the video.  He just added a little bit to the

20   middle to show the Facebook posting comments.

21   Q.   Okay.  And when you say "he added a little bit to the

22   middle," who are you referring to?

23   A.   I apologize.  Mr. Scott.

24   Q.   Okay.  And have you prepared a transcript of some portions

25   of the audio of that video?

1    A.    Yes, ma'am.

2    Q.    Now, were you able to identify the voice of the speaker in

3    that video?

4    A.    Yes, ma'am.

5    Q.    How were you able to identify that voice?

6    A.    I had previously heard recordings of Mr. Calhoun -- voice

7    recordings of Mr. Calhoun, and I had spoken to Mr. Calhoun.

8    And the voice on the video is consistent with my conversations

9    with Mr. Calhoun and the voice recordings that I had heard.

10    Q.    And are you familiar with the fact that the video of that

11    is currently labeled as Government's Exhibit 35 and the

12    transcript that you prepared is currently labeled as

13    Government's Exhibit 35A?

14    A.    I believe that's accurate.    I have not physically seen 35.

15    The exhibit.

16            MS. McEWEN:    May I approach the witness?

17            THE COURT:    You may.

18    BY MS. McEWEN:

19    Q.    (Displaying items to witness.)

20    A.    Yes, ma'am.    The video -- the CD I assume has the video on

21    it is 35, and 35A is the transcript which I typed.

22    Q.    And you provided the video to our office in electronic

23    format; is that correct?

24    A.    Yes, ma'am.

25    Q.    And the electronic format that you provided it was a true

1   and accurate copy of it as you had received it; is that

2   correct?

3   A.   Yes, ma'am.

4          MS. McEWEN:  Your Honor, I would tender Government's

5   Exhibits 35 and 35A and ask to publish them for the Court.

6          MR. SAVIELLO:  No objection.

7          THE COURT:  They are admitted.  You can publish them.

8       (Government Exhibits 35 and 35A admitted into evidence at

9       10:20 a.m.)

10         MS. McEWEN:  For explanatory purposes, Your Honor, we

11  are showing a side-by-side version of the transcript and the

12  video at the same time.

13      (Video playing at 10:20 a.m.)

14  BY MS. McEWEN:

15  Q.   Now, in further of your search with respect to third-party

16  confirmation videos, did you also locate another video online

17  which appeared to show the same time frame inside the Capitol

18  as Government's Exhibit 35, but from another angle?

19  A.   Yes, ma'am.

20  Q.   Okay.  And describe for the Court, if you can, what you

21  observed relevant to the probable cause issue in this case with

22  respect to viewing that video.

23  A.   In that video it shows the crowd pushing forward towards

24  the police barricades, the police line.  And at the end of that

25  video, you can see Mr. Calhoun in the bottom corner of the

1    video as part of that crowd.  And it's consistent with this

2    video as where they were at within the building.

3    Q.   And that particular video, the third-party video, does not

4    contain any narration that you believe to be relevant to the

5    Court's determination in this case; is that correct?

6    A.   Correct, ma'am.

7    Q.   So have you prepared a transcript in that regard?

8    A.   No, ma'am.

9    Q.   And you provided that to us in electronic format as well?

10   A.   Yes, ma'am.

11   Q.   Are you familiar with the fact that's currently labeled as

12   Government's Exhibit 34?

13   A.   Yes, ma'am.

14   Q.   And do you believe that to be a true and accurate copy of

15   the video you provided to our office?

16   A.   Yes, ma'am.

17   Q.   And are you familiar with a screenshot that is taken from

18   that video that's currently labeled as Government's Exhibit 30?

19   A.   Yes, ma'am.

20   Q.   And do you believe that Government's Exhibit 30 is a true

21   and accurate photograph of a portion of the video, Government's

22   Exhibit 34?

23   A.   Yes, ma'am.

24          MS. McEWEN:  Your Honor, at this time I would propose

25   to publish and tender Government's Exhibit 34 followed by 30.

```
 1              THE COURT:  Objection from the defense?
 2              MR. SAVIELLO:  I'm sorry, no objection, Your Honor.
 3              THE COURT:  All right, they are admitted.  You can
 4    publish those.
 5         (Government Exhibits 30 and 34 admitted into evidence at
 6         10:23 a.m.)
 7              MS. McEWEN:  Thank you, Your Honor.
 8         (Video played at 10:23 a.m.)
 9              MS. McEWEN:  If we could now switch to the still
10    shot, Government's Exhibit 30, please.
11    BY MS. McEWEN:
12    Q.   Now, Agent Armentrout, are you able to see this still
13    shot, Government's Exhibit 30?
14    A.   Yes, ma'am.
15    Q.   Can you point out for the Court what you believe is
16    relevant to its probable cause determination with respect to
17    the contents of Government's Exhibit 30.
18    A.   Yes, ma'am.
19              THE WITNESS:  Am I able to touch the screen and draw
20    on it?
21              COURTROOM DEPUTY:  Yes, you can circle it.
22    A.   This individual at the bottom of the right-hand corner of
23    the screen, which I'm circling, is Mr. McCall Calhoun.
24    BY MS. McEWEN:
25    Q.   Okay.  And, finally, are you familiar with an interview
```

1  that Mr. Calhoun gave to the *Atlanta Journal Constitution* with

2  respect to his participation in this activity?

3  A.    Yes, ma'am.

4  Q.    And without asking you to quote it directly, can you give

5  the Court a summary of what you understand his statement to the

6  *Atlanta Journal Constitution* was.

7  A.    Yes, ma'am.  He stated that he was there, that he

8  participated in it, that anybody -- that it was -- the crowd

9  was of one like mind, and that it was necessary to show the

10  government they weren't going to stand for the ongoing actions.

11          MS. McEWEN:  Just one moment, Your Honor.

12      (Aside with co-counsel at 10:25 a.m.)

13          MS. McEWEN:  Your Honor, I have no further questions

14  with respect to this witness as to probable cause.

15          THE COURT:  All right.  Mr. Saviello for the defense?

16          MR. SAVIELLO:  Thank you, Your Honor.

17                          CROSS EXAMINATION

18  BY MR. SAVIELLO:

19  Q.    Agent Armentrout -- is that right?

20  A.    Yes, sir.

21  Q.    I want to make sure I say that right.  -- are you familiar

22  with the affidavit that was submitted by the government in

23  support of the issuance of the Complaint in this case?

24  A.    Yes, sir.

25  Q.    You did not author that affidavit; did you?

1    A.    I'm sorry, sir?

2    Q.    You did not write that; did you?

3    A.    I participated in the authoring of that.

4    Q.    Do you have a copy of it?

5    A.    I do, sir.

6    Q.    In the first paragraph, is it fair to say that that is a

7    summary of the theory of the affidavit, that there is evidence

8    to support a finding of probable cause as to the three counts

9    listed in the Complaint?

10    A.    Yes, sir.

11    Q.    Okay.  And the last sentence, which appears at the top of

12    Page 2 of the affidavit, begins, "Specifically..."  Can you

13    read that for us, please.

14    A.        "Specifically, on or about January 6, 2021,

15            CALHOUN traveled to Washington D.C. and

16            knowingly and willfully joined and encouraged

17            a crowd of individuals who forcibly entered

18            the U.S. Capitol and impeded, disrupted, and

19            disturbed the orderly conduct of business by

20            the United States House of Representatives

21            and the United States Senate."

22    Q.    All right.  Can you tell me in the evidence that has been

23    submitted so far today and in your investigation of this case

24    where is the evidence or what evidence do you have that

25    Mr. Calhoun on January 6th "encouraged a crowd of individuals."

1    That is the encouragement part, not the participation.

2    A.   I believe the encouragement part is the entirety of the

3    circumstances.  He posted online that he was going there for

4    the specific purpose.  He posted online outside the building,

5    "We're going to take this building today."  And then he's -- at

6    the beginning he's at the front of the people entering the

7    building and pushing forward the police.

8            He is not trying to stop them.  He is not trying to

9    say, "This isn't the right thing to do."  He is participating

10   in it and moving forward with the crowd.

11   Q.   Okay.  So, his social media posts from the day is part of

12   your evidence; is that what you're saying?

13   A.   I'm sorry, sir?

14   Q.   His social media posts from that day, January 6, you are

15   saying that that is part of the theory of encouragement?

16   A.   Yes, sir, I believe so.

17   Q.   So your theory, then, is that people in the crowd were

18   following his social media feed and looking at his posts in the

19   moment and, thus, through the social media he was encouraging

20   that crowd?

21           MS. McEWEN:  Your Honor, I object to that question.

22   I think it's outside the bounds of what the Court is called

23   upon to consider here today.  He is not specifically charged

24   with any offense that requires encouragement.  He is charged

25   with obstruction of an official proceeding.  So I think this is

 1    outside what the Court is called upon to consider.

 2              MR. SAVIELLO:  Your Honor, I would disagree because

 3    the affidavit, in which they had the entirety of the English

 4    language to choose from, chose the words that he "encouraged

 5    the crowd" and now they have to answer to that.

 6              THE COURT:  I will overrule the objection.  We will

 7    sort all that out when we make a decision.  But you can ask the

 8    question.

 9              MR. SAVIELLO:  Thank you, Your Honor.

10    BY MR. SAVIELLO:

11    Q.   So, again, your theory, then, is that the social media

12    posts he posted while at the Capitol were followed by people

13    also at the Capitol, and those social media posts thus

14    encouraged the others at the Capitol to act?

15    A.   No, what I'm saying is his social media posts are

16    indicative of his mindset and his participation in that crowd

17    at the Capitol; that he was there and intended to, along with

18    the crowd, take the Capitol Building that day.  And he was

19    encouraging people on social media, and that was his mindset,

20    to encourage the crowd to take the building that day.

21    Q.   Okay.  So the social media posts were not direct

22    encouragement to individuals who were actually there, but,

23    rather, indicative of his mindset of participation in --

24    A.   I think if you were there, sir, and read his posts and you

25    were there, then it was also encouraging anyone there who read

1    his posts.

2    Q.   Do you have evidence of anybody who was there who was

3    following and reading his posts in the moment?

4    A.   I do not know that anyone specifically read his posts that

5    day.  I have no knowledge of that.

6    Q.   Moving on, then.  You've reviewed and we've heard about

7    videos that you viewed, both Mr. McCall posted and news media

8    posted.  Nowhere on any of those videos can Mr. McCall be heard

9    encouraging anybody to do anything; is that fair to say?

10   A.   I can go back and look at the quotes, but I believe he

11   said, "We're moving up past this crowd," as in he is part of

12   that crowd moving forward.

13   Q.   Okay.  Is it fair to say "we are moving forward" is a

14   narration as opposed to encouragement?

15   A.   I believe it's all part of his intent to take the

16   building.

17   Q.   But, again, we're speaking about encouragement.  There is

18   no evidence that he says, "Let's go, everybody!"  There's no

19   evidence that he says, "Let's get 'em!"  No evidence that says,

20   "Come on, everybody follow me."  None of that; right?

21   A.   There are no quotes of that, no.

22   Q.   Okay.  You've seen photographs and we've seen a couple at

23   least of Mr. McCall in the Capitol that day; is that right?

24   A.   That's correct.

25   Q.   You don't have any photographs or video evidence of

1    Mr. McCall holding a sign in which he's encouraging anybody

2    that says -- a sign, for instance, that says, "Let's go get

3    'em!"; right?

4    A.    No, there's no evidence of him holding a sign, no.

5    Q.    There is no evidence, video or still photo evidence of

6    Mr. McCall holding a megaphone or any other speaker or

7    amplification device to use to speak to a group; is that right?

8    A.    No.  That is correct, yes.

9    Q.    All right.  There's basically only the social media posts;

10   is that fair to say?

11   A.    And the videos of him in the Capitol, at the front of the

12   crowd, pushing forward towards the police.

13   Q.    Posted on social media?

14   A.    Correct.

15   Q.    Thank you.  How many followers did Mr. Calhoun -- social

16   media followers did Mr. Calhoun have on January 6?

17   A.    I can't be for certain because he took the post down

18   shortly thereafter, and I have not been able to view his

19   Facebook page to understand how many followers he had.

20   Q.    Okay.  All right.  Let's speak -- let's speak more

21   specifically, then, about what the social media posts do show.

22   There is nothing showing that Mr. Calhoun was causing any

23   damage while he was there that day; is that correct?

24   A.    I'm sorry, can you repeat the question.

25   Q.    Sure.  There is no evidence showing that Mr. Calhoun

1    caused any damage to property that day; is that right?

2    A.    There is no photos of him damaging anything.  Breaking

3    anything, is that what you mean?

4    Q.    Yeah, damaging property.

5    A.    No, sir.

6    Q.    There is no evidence showing that Mr. Calhoun assaulted

7    anyone that day; is that right?

8    A.    There were no photos -- there's the quotes of him saying

9    that he was part of the crowd that pushed up and kicked in

10   Nancy Pelosi's door in an attempt to locate members of

11   Congress.

12   Q.    Okay.  And which -- which post is that?  Government's 5, I

13   believe.

14   A.    I got a little bit out of order here as I was going

15   through them.  Correct, sir.

16   Q.    Okay.  And can you read for us that specific paragraph,

17   the last full paragraph in that post which talks about Speaker

18   Pelosi's office.

19   A.        "And get this -- the first of us who got

20             upstairs kicked in Nancy Pelosi's office door

21             and pushed down the hall towards her inner

22             sanctum, the mob howling with rage -- Crazy

23             Nancy probably would have been torn into

24             little pieces, but she was nowhere to be

25             seen -- then a SWAT team showed, and we

1              retreated back to the rotunda and continued

2              our hostile take over of the Capitol

3              Building."

4    Q.   So in that paragraph, he never uses the word "I" to

5    describe his individual action; is that right?

6    A.   No, he just refers to "we."

7    Q.   And throughout this particular post in Government's 5 he

8    uses the -- what we would call the "collective we" to describe

9    what's going on; correct?

10   A.   Correct.  From the very beginning, "We overran multiple

11   police barricades and swarmed the building.  We busted

12   through -- thousands of us swarmed in," and it continues that

13   way throughout the whole post.

14   Q.   In fact, in all of the social media posts from that day,

15   when he describes activities that went on, he uses the phrase

16   "we" or "us" to describe them; correct?

17   A.   (Witness reviewing document.) I believe that's correct,

18   yes, sir.

19   Q.   All right.  And you don't have any evidence to show that

20   Mr. Calhoun was armed with any firearms that day, January 6; do

21   you?

22   A.   No.  There's nothing that says he had a firearm that day.

23   I mean, there's the posting saying that he potentially would

24   take a tomahawk, but I don't know if he actually did.

25   Q.   Is there any evidence that he had a tomahawk?

1    A.    No, not other than his statement.

2    Q.    You spoke on direct examination about the interview that

3    he gave to the *Atlanta Journal Constitution*.

4    A.    Correct.

5    Q.    In that article he referred to the collective actions of

6    the group that day as civil disobedience; didn't he?

7    A.    One second, let me review it.    (Witness reviewing

8    document.)    He did.

9    Q.    Okay.    And in that article, he does make some admissions

10   about his individual actions; doesn't he?

11   A.    He does.

12   Q.    And he basically says that he will freely admit that he

13   trespassed but did it for love of his country; is that fair to

14   say?

15   A.    Yes, sir, he states, "I would freely admit that I

16   trespassed, but I did it for love of my country."

17   Q.    Okay.

18   A.    He also states that, "It's probably not a good idea."    He

19   also states,

20              "The crowd was of one mind, everybody there

21              had the same attitude.    They felt they had

22              been robbed of their fair election and

23              Congress wasn't listening to them."

24   Q.    All right.

25              MR. SAVIELLO:    Nothing further -- well, I take that

1    back.

2    BY MR. SAVIELLO:

3    Q.    Nothing in the video evidence or the still photo evidence

4    that you have introduced today or that you have seen shows

5    Mr. Calhoun in Speaker Pelosi's office; does it?

6    A.    We have no videos or photos of him in the office, no.

7    Q.    Okay.  And, in fact, the video or photo evidence that you

8    have of Mr. McCall on that day show him in the vestibule or

9    the -- the general areas that would, on a normal day, if given

10   a tour, be open to the public; is that fair to say?

11   A.    If it was open to the public, then I would say yes.

12   Q.    There are no videos of him or pictures of him in the

13   Senate Chamber; correct?

14   A.    Correct.

15   Q.    Or the House Chamber?

16   A.    Correct.

17            MR. SAVIELLO:  Nothing further of the agent, Your

18   Honor, as to probable cause.  Thank you.

19            THE COURT:  Does the government have any further

20   questions?

21            MS. McEWEN:  I do, Your Honor.

22                         REDIRECT EXAMINATION

23   BY MS. McEWEN:

24   Q.    If I could direct your attention to Exhibit 2.  I would

25   ask if we could pull that up for the Court.  Do you have that

1    in front of you?

2    A.    Yes, ma'am.

3    Q.    Tell us again about when you believe Exhibit Number 2 was

4    posted.  What date?

5    A.    December 29th.  On or about.

6    Q.    Okay.  And in Exhibit Number 2, do you believe that

7    Mr. Calhoun has encouraged anyone to do anything?

8    A.    Yes, ma'am.  He is basically saying that being in

9    Washington on January 6th is important and that

10                "...the People have no other realistic option

11                to communicate [their] unwavering intent to

12                demand fair elections now and forever."

13   So if you don't think elections were fair, then you need to be

14   there to participate in what occurred on the 6th.

15   Q.    Okay.  And how does he close out this post in

16   Exhibit Number 2?

17   A.    "I'll see you there."

18   Q.    If I could, then, direct your attention to Government's

19   Exhibit Number 4.

20                MS. McEWEN:  If we could display that for the Court,

21   please.

22   BY MS. McEWEN:

23   Q.    Now, you were asked a question earlier with respect to

24   what, if anything, you knew about whether anyone who was in

25   Washington during these events was following what Mr. Calhoun

1    was posting on his social media.  Do you recall that?

2    A.   Yes, ma'am.

3    Q.   Now, you see down at the bottom where the "like" function

4    shows on this particular photograph?

5    A.   Yes, ma'am.

6    Q.   Are you able to see any names associated with persons who

7    had liked this post about getting inside the Capitol before

8    this ends?

9    A.   Yes, ma'am.  An individual by the name of Dandon Hancock

10   had liked his post.

11   Q.   And is Mr. Hancock a resident of the Americus, Georgia,

12   area to your understanding?

13   A.   Yes, ma'am.

14   Q.   Do you have information that suggests to you that

15   Mr. Hancock traveled to Washington on that occasion for the

16   same purpose?

17   A.   Yes, ma'am.  He had posted on his Facebook page that he

18   was at the South of the Border rest stop, if you want to call

19   it that, at the North Carolina/South Carolina state lines on

20   I-95.  It's a well known place there.  And he had posted they

21   were passing through there and someone asked him, "Where are

22   you headed?  To Jacksonville?"  And he said, "No, to DC."  I

23   believe that was the date prior.

24   Q.   Okay.  And is it -- this screenshot, Government's

25   Exhibit Number 4, it indicates on the screenshot that the post

1  had been made 7 hours before the screenshot.  Is that right?

2  A.   I'm sorry, can you say that again.

3  Q.   Okay.  So immediately at the top of the screenshot, under

4  Mr. Calhoun's name, it shows "7 hours."

5  A.   Correct.

6  Q.   Is it your understanding that that means this post was

7  made 7 hours before the screenshot?

8  A.   Yes, ma'am.

9  Q.   So by the time this was screenshotted in Exhibit Number 4,

10 21 people had liked it; is that right?

11 A.   Correct.

12 Q.   And one of those is listed by name.

13 A.   Correct.

14 Q.   Is it your belief, based on what you know in this case,

15 that Mr. Hancock would have had to have liked Government's

16 Exhibit Number 4 before he returned to Americus, Georgia, from

17 Washington, based on travel time?

18 A.   Yes, ma'am, he would have had to do it from 7 hours of the

19 post to the time of this screenshot.

20 Q.   So Mr. Saviello asked you a question as to whether you had

21 any information as to -- or evidence as to anyone following

22 Mr. Calhoun's posts while this activity was going on.  Anyone

23 who was in Washington.  Do you have evidence of that?

24 A.   Yes, ma'am.  Dandon Hancock had liked his post.

25              MS. McEWEN:  Nothing further, Your Honor.

1           MR. SAVIELLO:  Just briefly, Your Honor, if I may.

2           THE COURT:  Yes, sir.

3                     RECROSS EXAMINATION

4    BY MR. SAVIELLO:

5    Q.    So, Agent, you don't know what time Dandon Hancock liked

6    that post in Government's 4; do you?

7    A.    No.  You can't tell from the posting at what point in time

8    he liked it, no.

9    Q.    So he could have liked it anytime from the moment it was

10   posted until 10:16 p.m. that night; correct?

11   A.    That's correct.

12   Q.    What time were the protesters cleared from the Capitol

13   that day?

14   A.    "Cleared from the Capitol"?

15   Q.    Yes, sir.

16   A.    I don't know the exact time.  It would have had to

17   probably be between 6:00 and 7:00, I believe.  I think Congress

18   went back into session at 8:00 p.m. that day.

19   Q.    So all protesters were cleared and Congress was back in

20   session by 8:00 p.m.; is that fair to say?

21   A.    Yes, sir.  I don't have the exact times but yes, sir.

22   Q.    Certainly by 10:16 p.m.?

23   A.    Yes.

24   Q.    So the evidence that Mr. Hancock liked this post can only

25   tell the Court that it happened between when the time was

1    posted and 10:16 p.m.; correct?

2    A.    Correct.

3    Q.    Thank you.

4              THE COURT:  All right.  May Agent Armentrout step

5    down?

6              MS. McEWEN:  He will also be our witness in the

7    detention phase, so if he might remain.

8              THE COURT:  All right.  You may step down and do what

9    you need to do.

10         (Witness stepped down at 10:43 a.m.)

11             THE COURT:  Any other witnesses for the government?

12             MS. McEWEN:  No, Your Honor.

13             MR. SAVIELLO:  No witnesses for the defense as to

14   probable cause, Your Honor.

15             THE COURT:  Do the parties want to make some

16   arguments?  Or submit it?

17             MS. McEWEN:  The government is prepared to submit it,

18   Your Honor.

19             THE COURT:  Mr. Saviello?

20             MR. SAVIELLO:  Thank you, Your Honor.  I would make

21   some brief argument as to probable cause.  In part, because --

22   and so -- and you can catch me on this later -- I don't want to

23   repeat this argument later, but, of course, in the detention

24   phase, the strength of the government's case should be one of

25   the considerations the government should make.  So I'm going to

```
 1    piggyback on this argument later, if that's all right.
 2               THE COURT:  Yes.
 3               MR. SAVIELLO:  So, Your Honor, as to probable cause
 4    as to Count Three, I think there is an issue as to the
 5    government's ability to prove up at least one of the critical
 6    and required elements of a successful prosecution of a
 7    violation of 1512(c)(2).  The elements of a violation of
 8    15C12(c)(2) -- 1512(c)(2), sorry, have been identified by our
 9    own Eleventh Circuit in the United States versus Friske,
10    F-r-i-s-k-e, found at 640 F.3d 1288, which is a 2011 case, and
11    they are listed as follows.
12               Number one, that there was an official proceeding
13    taking place.  In this case, that official proceeding, under
14    the government's theory, would be the certification of the
15    electoral vote by Congress.
16               Number two, that Mr. Calhoun engaged in conduct which
17    constituted a substantial step toward the commission of the
18    crime of obstruction of an official proceeding.  So that he
19    engaged in conduct which constituted that substantial step.
20               Number three, that he acted corruptly--that is, with
21    an improper purpose--and to engage in conduct knowingly and
22    dishonestly with the specific intent to subvert, impede, or
23    obstruct the electoral certification.
24               And, four, that the natural and probable effect of
25    Mr. Calhoun's conduct would be the interference with the due
```

1    administration of justice.

2          And so I think what's critical for a question of

3    probable cause finding, Your Honor, is that the government has

4    to prove that his actions were a substantial step toward

5    commission of the crime of obstruction.  And the only evidence

6    the government has offered so far is that Mr. Calhoun made some

7    social media posts relating to going to the Capitol and being

8    at the Capitol to voice objections to the election and

9    electoral process, although he didn't specifically mention

10   that.

11         There is no evidence that he was anyone who broke

12   down any barriers or engaged with any law enforcement, but,

13   rather, the evidence as presented is that he was inside the

14   Capitol, along with a lot of other people, in what would on a

15   normal day be the public areas available -- areas available for

16   the public to enter.

17         As Agent Armentrout brought out, he used the royal

18   "we" -- that is, he spoke about "we" as a group -- consistently

19   throughout his social media posts and never said, "I did this,"

20   "I did that," "I am going to do this."  He spoke about the

21   group.  And you can see that in Government's 5, 6 and 8

22   specifically.

23         And if you read it that way, Your Honor, you can read

24   it that it shows that he is narrating and observing what is

25   going on, and he is including himself as the narrator.  It

1    could be read the government's way as well, Your Honor.  But as

2    to probable cause, the Court has to find that it is more likely

3    than not in order to find probable cause.  And if it can be

4    read equally both ways, his use of the word royal "we" in the

5    absence of his presence as to specific intent, then I would

6    argue that is not sufficient to find probable cause as to that

7    element.

8         I would point the Court finally to one quote from

9    *United States* versus *Friske* found at 1293 -- that opinion, by

10   the way, authored by our very own Beverly Martin -- and she

11   said this:  The only way the jury could conclude that the

12   defendant knew his actions were likely to affect an official

13   proceeding, in the absence of any evidence that he was aware

14   that the specific official proceeding was pending or

15   foreseeable, would be through speculation.  But speculation is

16   not enough to sustain a conviction based on circumstantial

17   evidence.

18        And there has been no evidence, Your Honor, that

19   Mr. Calhoun knew specifically that Congress was in session that

20   day.  It is -- you know, the posts talk about going to the

21   Capitol, and we're going to get inside, and we've -- you know,

22   we're inside, and we're moving forward, and those sorts of

23   things.  And so I think there is a question of probable cause

24   as to those two elements that *Friske* requires for a conviction

25   of 1512(c), and for that reason we think the government has not

1    met its burden on those points.

2                THE COURT:  Anything the government wants to say in

3    reply?

4                MS. McEWEN:  Yes, Your Honor.  I believe there is

5    substantial evidence that Mr. Calhoun was aware of the nature

6    of the proceedings going on before Congress on the 6th.  That's

7    from the various posts, that have been entered into evidence,

8    by him, before he traveled to Washington.  His express purpose

9    was to travel to Washington to be, as he said, physically

10   present on the day that this decision was taken up and to cause

11   a change or in some way affect the proceeding that was going on

12   inside Congress.

13                We know that he was present inside the building, and

14   we have his own statements as to the activities that he

15   participated in, together with other people, that actually did

16   have the effect of obstructing the proceedings.

17                This is not a case in which there's a lack of

18   evidence.  There's certainly not circumstantial evidence as to

19   what his intent was or what his hope that the result of his

20   activities would be.  He has said it as plainly as it could be

21   said.  It's direct evidence of his own words, of his own state

22   of mind, both prior to and during the time of these events

23   inside the Capitol, and we believe we have carried the

24   necessary burden of probable cause in this case.

25                THE COURT:  All right.  Very good.  Well, I want to

1    take a recess for about 15 minutes to review my notes and

2    review the *Friske* case that Mr. Saviello cited.  So we will be

3    in recess, let's say 20 minutes, until 10 after 11:00.

4            COURT OFFICER:  All rise.  Court will stand in recess

5    for 20 minutes.

6        (Court in recess from 10:49 to 11:09 a.m.)

7            COURT OFFICER:  All rise.  This Honorable Court is

8    again in session.  Please be seated.

9            THE COURT:  All right.  With regard to probable

10   cause, there are three charges set out in the Complaint.  The

11   first is 18 U.S.C. Section 1752(a) which makes it a crime to

12   knowingly and with intent to impede or disrupt the orderly

13   conduct of government business or official functions engage in

14   disorderly or disruptive conduct in or within such proximity to

15   any restricted building or grounds when or so that such conduct

16   in fact impedes or disrupts the orderly conduct of government

17   business or official functions.  I do find probable cause to

18   establish that charge as set forth in the evidence presented

19   here today.

20           The second charge is 40 U.S.C. Section 5104(c)(2).

21   That makes it a crime for any individual or group of

22   individuals to willfully and knowingly, with the intent to

23   disrupt the orderly conduct of official business, enter or

24   remain in a room in any of the Capitol buildings set aside or

25   designated for the use of either House of Congress or a member,

1    committee, officer, or employee of Congress or either House of

2    Congress.  And I do find probable cause to establish that

3    violation as well.

4            And then finally the felony charge is 18 U.S.C.

5    Section 1512(c)(2).  And as Mr. Saviello pointed out, the

6    *Friske* case gives an outline of the elements of that.  That

7    crime provides that anyone who corruptly obstructs, influences,

8    or impedes any official proceeding or attempts to do so shall

9    be liable to imprisonment of not more than 20 years.

10           And that requires the government to prove, one, that

11   there was an official proceeding taking place.  There was.  Of

12   course, it's beyond dispute there was an official proceeding

13   taking place -- the joint session of Congress to certify the

14   results of the election on January the 6th, 2021.

15           Number two, that the defendant engaged in conduct

16   which constituted a substantial step toward the commission of

17   the crime of obstruction of an official proceeding.  It is

18   quite clear that the defendant joined a large mob of people who

19   stormed the Capitol Building and did, in fact, disrupt the

20   official proceedings.  That was simply going into the building

21   with that mob, whether it's the first person plural or the

22   first person singular involved, it's clear that the defendant

23   was involved in that, and that was a substantial step towards

24   the commission of obstruction.

25           Number three, that the defendant acted

1    corruptly--that is, with an improper purpose--to engage in

2    conduct knowingly and dishonestly with the specific intent to

3    subvert, impede, or obstruct the proceeding.  In this case, the

4    defendant's intent has been shown by the various social media

5    posts he made, both before and during the events of January the

6    6th, indicating that the intent was, in fact, to "stop the

7    steal," as the defendant said, or to take back the House of

8    Congress to obstruct the certification of the election.

9            And then finally, that the natural and probable

10    effect of the defendant's conduct would be the interference

11    with the due administration of justice, and that certainly was

12    the natural and probable and foreseeable effect of storming --

13    to use his own terms, "storming the Capitol" with a mob while

14    Congress was in session.  So I find that there is probable

15    cause to establish each of the three crimes that are alleged in

16    the Complaint.  So the case can be bound over.

17            Now, what that means, Mr. Calhoun -- of course, you

18    are an attorney, so you know this -- but the next step in the

19    case would be for the government to present these allegations

20    to a grand jury for indictment.  Because there is a felony

21    charged in those charges, they would, under the Fifth

22    Amendment, have to be presented to a grand jury.  So the

23    government will have to make a presentation at some point to a

24    grand jury.

25            If the grand jury refuses to return an indictment,

1    then the case would be dismissed.  If the grand jury does

2    return an indictment, then you would move forward in the more

3    formal criminal proceedings in the District of Columbia.

4         And, of course, I will enter an Order of Removal to

5    the District of Columbia to remove these proceedings for

6    further proceedings in that District as required.

7         And that brings us to the question of the

8    Government's Motion for Detention in this case.  So let's move

9    on to that.  And let me hear from the government first,

10   Ms. McEwen.

11        MS. McEWEN:  Yes, Your Honor.  First I would like to

12   ask the Court to consider the exhibits that were previously

13   admitted as a part of the preliminary examination in its

14   consideration of the issue of detention before I call the

15   witness to continue to explain those facts.

16        THE COURT:  Any objection to that, Mr. Saviello?

17        MR. SAVIELLO:  No objection, Your Honor.

18        THE COURT:  All right.  We will take those into

19   consideration.

20        MS. McEWEN:  Yes, Your Honor.

21                     REDIRECT EXAMINATION

22   BY MS. McEWEN:

23   Q.   Now, Agent Armentrout, in addition to the exhibits that

24   you discussed earlier during the preliminary examination, have

25   you reviewed many more social media posts of the defendant?

1    A.   Yes, ma'am.

2    Q.   And can you give the Court an estimate of the number of

3    total posts you've reviewed.

4    A.   Somewhere between 150 and 200.

5    Q.   And as a result of that review, have you identified what

6    are now marked as Government's Exhibits 9 through 29 as

7    exhibits that you believe speak to issues before the Court in

8    this detention hearing?

9    A.   Yes, ma'am.

10   Q.   And can you tell us, as a group, Exhibits 9 through 29,

11   what social media platform were they pulled from.

12   A.   These are Twitter posts.

13   Q.   And do you believe that each of those is a true and

14   accurate screenshot of a post from Mr. Calhoun's Twitter

15   account?

16   A.   Yes, ma'am.

17          MS. McEWEN:  Your Honor, at this time I would tender

18   as a group Government's Exhibits 9 through 29, and then ask to

19   publish them individually.

20          MR. SAVIELLO:  No objection, Your Honor.

21          THE COURT:  All right.  They are admitted.

22       (Government Exhibits 9 through 29 admitted into evidence

23       at 11:15 a.m.)

24          MS. McEWEN:  If we could begin with Exhibit Number 9,

25   please, ma'am.

1    BY MS. McEWEN:

2    Q.    All right.  Agent Armentrout, first, can you tell us the

3    date that this indicates it was posted by Mr. Calhoun.

4    A.    Yes, ma'am.  It would be October 17th, 2020.

5    Q.    And can you read into the record the contents of the

6    Twitter post.

7    A.          "Yeah, standing by, and when Trump makes the

8                call, millions of heavily armed, pissed off

9                Patriots are coming to Washington to deal

10               with the traitorous Chicom Democrats.

11               "Oh yeah, the cops and the military are on

12               our side."

13               MS. McEWEN:  Moving forward then to Government's

14   Exhibit Number 10, please, ma'am.

15   BY MS. McEWEN:

16   Q.    Can you describe what is shown here and then read it into

17   the record, please.

18   A.    That's a posting from 10-17-2020.  The caption is "Hang

19   the bastard."  It appears to be, like, a reposting of someone

20   else's, and it's a picture of Now-President Biden with what

21   appears to be a China flag behind him, and it says (hashtag)

22   "ChinaStoogeBiden."  And the original post was from 10-16, the

23   day prior.

24   Q.    Moving forward then to Government's Exhibit Number 11.

25   Now, does this one display a date near the bottom?

1    A.    Yes, the date on the bottom is 10-19-2020, 11:37 a.m.

2    Q.    Can you read this into the record, please.

3    A.        "You get help you commie hag.

4            "Bring your rioting BLM-Antifa crime wave to

5            my city and the body bags with you morons are

6            going to get stacked up high.

7            "In GA we have the right to self-defense you

8            idiot."

9    Q.    Do you know what "BLM" stands for in this post?

10   A.    I believe it refers to Black Lives Matter.

11   Q.    Moving forward then to Government's Exhibit Number 12,

12   please.  What's the date on this post?

13   A.    This is 10-16.

14   Q.    And can you read it into the record, please.

15   A.        "I am living my life.  I have tons of ammo.

16           Gonna use it, too -- at the range and on

17           racist democrat communists.

18           "So make my day.  We will end this BS."

19   Q.    Moving forward to Government's Exhibit 13, please.  What's

20   the date on this post?

21   A.    Also 10-16.

22   Q.    And can you read it into the record.

23   A.        "While y'all pick on Tiffany and concern yourselves

24           with other trivialities and irrelevancies,

25           we're loading AR-15 magazines and getting

```
 1                    range time in.  My AR-15 set up will do head
 2                    shots at 200 meters no problem.  You have no
 3                    clue what's coming."
 4    Q.   Prior to reading this post, were you familiar with the
 5    term "head shot"?
 6    A.   Generally, yes, ma'am.
 7    Q.   And what do you believe it refers to?
 8    A.   Head shots usually refer to shooting someone in the head.
 9    Q.   Okay.  Moving forward to Government's Exhibit 14.  What's
10    the date on this?
11    A.   This is 10-15-2020.
12    Q.   Please read it into the record.
13    A.        "Oh if you're white and what you're pushing
14                    happens you may not die on my sword, but
15                    you'll get an Antifa brick bashed against
16                    your head.
17                    "For my part, I'll be slinging enough hot
18                    lead to stack you commies up like cordwood."
19    Q.   Had you previously heard the phrase, "hot lead"?
20    A.   "Hot lead" would be bullets, fired bullets, bullets that
21    had been fired.
22    Q.   Moving forward to Government's Exhibit 15, what's the
23    date?
24    A.   Also 10-15-2020.
25    Q.   Please read it into the record.
```

```
1   A.          "War is coming.  It's the only way to deal with
2               our domestic Communist problem.  Ruthlessness
3               is in order.  Harsh examples have to be made.
4               This can be over soon enough if conservative
5               Americans still have what it takes to kick
6               some *ss.  We shall see."
7   Q.   Moving forward to Government's Exhibit 16, please.  Now,
8   here, does it show a date?
9   A.   No, it does not.  It just says, "4 days ago."
10  Q.   Okay.  And can you read it into the record, please.
11  A.          "We are waiting on the Supreme Court to do
12              the right thing -- and if it doesn't then the
13              civil war is on.  We won't stand for this
14              democrat fraud and ejection stealing in the
15              middle of the night!"
16  Q.   And here do you believe that there's a typographical error
17  in the word "ejection"?
18  A.   Yes.  I believe it was probably meant to be "election
19  stealing."
20  Q.   Thank you.  Moving forward to Government's Exhibit 17.
21  What's the date on this post?
22  A.   It's 10-20-2020.
23  Q.   And please read it into the record.
24  A.          "As part of the anti-Communist counter
25              revolution we've got to get serious about
```

```
 1                    stopping them by force of arms.  We've been
 2                    asleep at the wheel for so long there is no
 3                    other way.
 4                    "No one on the right has any balls.  All
 5                    talk, no action.
 6                    "While conservatives do nothing and 'talk'
 7                    their way into slavery?
 8                    "File under 'the United States is too weak,
 9                    effete and corrupted to be allowed to exist
10                    any longer.
11                    "I am a lawyer saying these things.  We are
12                    so fucked unless regular Americans are
13                    prepared to do what has to be done."
14    Q.   Moving on to Government's Exhibit 18, please.  What's the
15    date here?
16    A.   It's 10-20-2020.
17    Q.   Please read it into the record.
18    A.          "I'm banned, I'm an outlaw and I'm pissed.
19                 "The only remedy for BLM-Antifa communism is
20                 violent retribution against the media and the
21                 democrats.
22                 "And I hate them even more for bringing us to
23                 this point."
24    Q.   Government's Exhibit 19, please.  What's the date here?
25    A.   Also 10-20-2020.
```

1    Q.    Please read it in.

2    A.         "Patriots be ready to storm Washington!

3              "If you're willing to go to Washington in

4              November to 'peacefully protest' with AR-15

5              in hand, upvote this."

6    Q.    Government's Exhibit 20?  And are you able to see a date

7    on this post?

8    A.    It says, "6 days ago."  There is no actual date.

9    Q.    Can you read it into the record.

10   A.         "Why are Republicans so effete?  And ignorant

11             of history?

12             "This is a racist communist insurgency.

13             "One cannot negotiate with communists -- they

14             keep coming until they are either destroyed

15             or victorious."

16             You are not -- "You will not end this threat

17             from n courts or R polls, but only by force

18             of arms.  Think 'ethnic cleansing,' but it's

19             anti-Communist cleansing.

20             "They would do it to us at the earliest

21             opportunity.

22             "Attempted Peace is no longer even remotely

23             an option, but is a recipe for our downfall!"

24   Q.    Moving forward to Government's 21.  Are you able to

25   determine the date that this was posted?

1    A.    No, ma'am.

2    Q.    Please read it into the record.

3    A.         "Enough.

4              "58K at the latest Trump rally.  Biden?

5              LOL.  Fake negro Kamala?  Not enough people

6              to even have a card game.

7              "Meanwhile, all these businesses aren't

8              boarding up to protect against Trump voters

9              dumb shit.  They aren't voting for you pigs.

10             "Matt Taibi nailed it -- this democrat party

11             is like a 'vomit milkshake.'

12             "Even now you are pushing a form of Nadler's

13             'Antifa violence is a myth' bullshit.  Such a

14             liar.  So done.

15             "So do you want a re-education camp or a

16             bullet to the head?  We're NOT going to

17             co-exist with you racist communist assholes."

18             You won't be let -- "You wouldn't let us if

19             we wanted to because believe me we've tried."

20   Q.    Moving forward to Number 22.  Is there a date posted on

21   Government's Exhibit Number 22?

22   A.    No, ma'am.  It simply says "4 days ago."

23   Q.    Please read it in.

24   A.         "That's why we have AR-15s, and it's just

25             about time to open up a can of whoop ass!"

1    Q.    Government's Exhibit 23, please.  Does this one show a

2    date?

3    A.    No.  It states, "11 days ago."

4    Q.    Please read it in.

5    A.    It has,

6              "@letsgoducks756.  I won't struggle pulling a

7              head shot at 200 meters day or night.  Smoke

8              that over commie bitch."

9    Q.    Government's Exhibit 24.  Does this one display a date?

10   A.    No, ma'am.  It states, "5 days ago."

11   Q.    Please read it in.

12   A.            "@Lokahi7701.  I write in complete sentences.

13             You must be a proud graduate of STEM?  You're

14             probably one of these poor fools whose middle

15             school history book mentioned George

16             Washington once and Harriet Tubman 11

17             times -- this is why your an ignorant dumbass

18             who hates your own race and country.

19             "You're just another brainwashed idiot who

20             doesn't know squat.

21             "I also shoot in a straight line, right on

22             target -- a head shot 150 meters is like...no

23             problem, dude."

24   Q.    Government's Exhibit 25.  Does this display a date?

25   A.    No, ma'am.

1  Q.   And in this particular post, are there items that were

2  posted apparently by someone other than Mr. Calhoun?

3  A.   Yes, ma'am.   There's a post by someone using the screen

4  name of Jack Gaynor at Serious Chance.

5  Q.   So, first, if you could read in the initial post under the

6  name, Jack Gaynor.

7  A.        "Terrible thing that is happening but The Lord

8             is in control.   Dad would say Daniel 4, Try

9             not to be anxious...try not to be angry...

10            humility is one of God's traits."

11 Q.   And what was Mr. Calhoun's response to that?

12 A.        "God helps those who help themselves.

13            "God is on Trump's side -- God is not on the

14            Communists' side and the party of 60 million

15            abortions, and if Patriots have to kill

16            ten million of these fucking communists to

17            prove it, then it's God's Will."

18 Q.   Government's Exhibit 26.   Does this display a date?

19 A.   No, ma'am.

20 Q.   Can you read in the original post by someone whose name is

21 partially shown as "The W."

22 A.   It states, "Let's watch PA find 700,001 votes for Biden."

23 Q.   What do you believe "PA" stands for?

24 A.   Pennsylvania.

25 Q.   And what was Mr. Calhoun's response?

```
 1    A.          "Let's just slaughter the motherfuckers
 2                because they are coming for us!"
 3    Q.   And do you know who it is that he's referring to needing
 4    to be slaughtered in Government's Exhibit 26?
 5    A.   Based on his other posts, I would say democrat-communists-
 6    Antifa-BLM's, something to that effect.
 7    Q.   Moving forward to Government's Exhibit 27.  Does this
 8    display a date?
 9    A.   No, ma'am.
10    Q.   And here is Mr. Calhoun responding to the same poster that
11    you mentioned earlier, "letsgoducks756"?
12    A.   Yes, ma'am.
13    Q.   And what does he say in Government's Exhibit 27?
14    A.          "I'm 58 and fully capable of pounding your
15                snowflake ass into the ground.
16                "You won't be laughing when Patriots go door
17                to door executing you commies."
18    Q.   Based on your view of the several hundred posts that you
19    mentioned earlier, does Mr. Calhoun connect himself with a
20    group he refers to as Patriots?
21    A.   Yes, ma'am.
22              MS. McEWEN:  Government's Exhibit 28, please, ma'am.
23    BY MS. McEWEN:
24    Q.   Now, where did this particular post come from?  What
25    platform?
```

1    A.    I believe this is Facebook.

2    Q.    Okay.  And when, approximately, do you believe that

3    Mr. Calhoun posted this particular item?

4    A.    On or about January 6th, the day of the riots.

5    Q.    And read it into the record and describe what's shown.

6    A.          "These were first 200 or so of us to

7                actually get inside the Capitol.  There was a

8                group outside who made the initial

9                breakthrough (not shown) and a few of them

10               got hurt pretty good, but it didn't matter.

11               Those of us coming up filled the ranks and we

12               pushed on through and headed to the next

13               barricade without stopping.  That's what

14               you're seeing here."

15   And there's a partial picture of a building, a window.  It's

16   hard to see exactly what it is.

17   Q.    And then finally Government's Exhibit 29.  What platform

18   was this taken from?

19   A.    I believe this is Twitter.

20   Q.    Okay.  And does it display a date?

21   A.    I'm sorry, ma'am?

22   Q.    Does it display a date?

23   A.    No, ma'am.

24   Q.    Okay.  Can you read it into the record.

25   A.          "We do not stop at words!  We get set for the

```
 1                   green light which will be the day the Supreme
 2                   Court ratifies this bullshit stolen election,
 3                   then AND ONLY then do we go to war, and when
 4                   we go to war we are going to kill every last
 5                   fucking communist that stands in Trump's
 6                   way!"
 7              MS. McEWEN:  Okay.  Now, if we could take that down
 8    from the screen for a moment.
 9    BY MS. McEWEN:
10    Q.   You mentioned earlier in your testimony during the
11    preliminary examination that you had taken a search warrant for
12    Mr. Calhoun's residence in Americus; is that correct?
13    A.   That's correct.
14    Q.   So I want to talk with you a bit about the timing of
15    certain events last week, leading up to Mr. Calhoun's arrest,
16    if we could.
17    A.   Okay.
18    Q.   Did you receive notice from the District of Columbia that
19    a warrant had been issued early in the week?
20    A.   For his arrest or for the search?
21    Q.   For his arrest.
22    A.   Yes, ma'am.
23    Q.   And were you aware at that point that Mr. Calhoun had made
24    it back from Washington to the Americus area prior to your
25    learning that the warrant had been issued for his arrest?
```

1    A.    Yes, ma'am.

2    Q.    Were you aware that he had been going about his usual

3    business with respect to making court appearances on behalf of

4    his clients in that area?

5    A.    Yes, ma'am.

6    Q.    Now, at some point during the week, perhaps Wednesday or

7    Thursday, were you conducting surveillance in preparation of a

8    joint execution of the arrest warrant and the search warrant at

9    his residence in Americus?

10   A.    We were.

11   Q.    And were you able to keep track of him in the Americus

12   area or was he not present?

13   A.    On Wednesday of last week, he was present.  He attended a

14   court hearing at the Superior -- at the courthouse in Sumter

15   County.  After the court hearing, he proceeded home to 423

16   South Lee Street.  He stayed there for a period of time.  And

17   we did not observe him leave that residence, but we later

18   determined that he had left.

19   Q.    And, ultimately, were you able to locate him for purposes

20   of executing the arrest warrant in Americus, Georgia?

21   A.    We were not able to locate him in Americus, no.

22   Q.    Where did you locate him?

23   A.    In Macon, Georgia.

24   Q.    And after locating him in Macon, Georgia, did you take him

25   into custody?

1    A.    We did.

2    Q.    Describe the room in which you found the defendant,

3    Mr. Calhoun, at the time you took him into custody.

4    A.    He appeared to be staying in what I would say is a spare

5    bedroom, and he had been staying there.  Upon entering the

6    room, there was a camouflage, like, backpack and other items.

7    There were some guns -- or gun bags that appeared to have

8    something in them laying on the floor.

9         There was a pistol in a -- or a handgun inside of a

10   holster next to a -- on the night stand, next to the bed, along

11   with a pair of brass knuckles.

12        There were approximately -- I believe it's eight rifles

13   and shotguns, I think it was four and four, in the closet,

14   along with a large quantity of ammunition in the closet.

15   Q.    Okay.  And also did you find any items of evidence that

16   were responsive to your original warrant to search his

17   residence in Americus?

18   A.    Yes, ma'am.  We found the ball cap we believe he was

19   wearing the day he entered the Capitol, along with the scarf

20   that he had around his neck.

21   Q.    Now, are you familiar with two photographs currently

22   labeled Government's Exhibits 31 and 32 depicting the interior

23   of the bedroom you just described for the Court?

24   A.    Yes.  32 is inside the closet inside that bedroom.  31 is

25   a picture of the bed, just inside the bedroom, with the brass

1    knuckles and the handgun laying on top of the computer next to

2    the bed.

3    Q.    And do you believe each of those Exhibits 31 and 32 are

4    fair and accurate depictions of the portions of the spare

5    bedroom that you just described Mr. Calhoun was taken into

6    custody inside of?

7    A.    Yes, ma'am.

8            MS. McEWEN:  Your Honor, I would tender those two

9    exhibits, 31 and 32, at this time and ask that they be

10   published to the Court.

11           MR. SAVIELLO:  No objection.

12           THE COURT:  All right, they are admitted.

13       (Government Exhibits 31 and 32 admitted into evidence at

14       11:32 a.m.)

15   BY MS. McEWEN:

16   Q.    If we could begin with Number 31, please.  Now, if you

17   could, just going across the photograph from left to right,

18   describe for the Court what items you see depicted here in this

19   photograph.

20   A.    From left to right, on the far left, over here in the

21   closet, you see a shotgun, two AR-15 style rifles, and I

22   believe another shotgun is sticking out just below the door

23   here.  These are ammo cans filled with various types of

24   ammunition.  I believe this -- this camouflage stuff here is,

25   like, a backpack or something, if I remember correctly.

1    And then, as you move across, there's the brass knuckles

2    on the night stand, the Glock 19 handgun that was recovered,

3    and then on the bed is the ball cap that he was pictured with

4    at the Capitol.

5    Q.    And is it your understanding that these are items of

6    firearms and ammunition that were brought by Mr. Calhoun into

7    this residence when he came there last week?

8    A.    Yes, ma'am.

9    Q.    Moving forward then to Government's Exhibit Number 32, if

10   we might display that.  Tell the Court what is shown here.

11   A.    So, there's two additional shotguns here.  And then this

12   is -- this was also pictured in the last picture.  These were

13   all pictured in the last picture.  They are ammo cans full of

14   ammunition as well as this one here, and then these other --

15   the weapons that you saw in the last picture, as well.

16   Q.    And at this time, are you able to give the Court any

17   estimate of the number of rounds of ammunition that are shown

18   in the various cans in Government's Exhibit Number 32.

19   A.    Hundreds if not over a thousand.

20            MS. McEWEN:  Your Honor, I have no further questions

21   of this witness with respect to the issue of detention.

22            THE COURT:  Mr. Saviello?

23            MR. SAVIELLO:  Thank you.

24   ///

25   ///

```
1                    RECROSS EXAMINATION
2    BY MR. SAVIELLO:
3    Q.   Agent Armentrout, I would like to ask you a few questions
4    about the social media posts found in Government's I believe 9
5    through 29.  Okay.
6    A.   Yes, sir.
7    Q.   All right.  So, did you capture these social media posts?
8    Are you the one that made the screenshots?
9    A.   No, sir.
10   Q.   Okay.  Are you familiar with how Twitter works?
11   A.   I don't have a Twitter account, but I generally understand
12   it, yes.
13   Q.   Okay.  Is it fair to say that many of these posts,
14   Government 9 through 29, are in fact part of a conversation
15   that takes place on Twitter?
16   A.   Possibly.
17   Q.   Okay.  Well, let's look at a few of them and see if that
18   helps clarify for you.  If we can see on the screen, please,
19   Government's 11.  Just under the name, "McCall Calhoun," and
20   his Twitter handle at the time there, you see a sentence that
21   begins with, "Replying..."?
22   A.   Yes, sir.
23   Q.   Can you tell me what that reads.
24   A.   "Replying to @TheJaneway, @Iamthesandman13, and 3 others."
25   Q.   Okay.  And underneath that is Mr. Calhoun's post; correct?
```

```
1   A.    That's correct.

2   Q.    And what is the first sentence of that post?

3   A.    "You get help you commie hag."

4   Q.    Why don't you just go ahead and read the whole thing for

5   us.

6   A.    I'm sorry, sir?

7   Q.    Please read the whole thing for us.

8   A.         "You get help you commie hag.

9              "Bring your rioting BLM-Antifa crime wave to

10             my city and the body bags with you morons are

11             going to get stacked up high.

12             "In GA we have the right to self-defense you

13             idiot."

14  Q.    So is it fair to say that the post Mr. Calhoun made here

15  is, in fact, a response to something that was said by either

16  this person "@TheJaneway" or one of the three others?

17  A.    Yes, yeah, it's possible he's responding to a post there,

18  I guess.

19  Q.    But we don't know what those previous posts were that he

20  was responding to; correct?

21  A.    Correct.

22  Q.    Because it is not captured by the government in this

23  exhibit?

24  A.    That's correct.

25  Q.    But we know that it's possible to do that; don't we?  That
```

1    is, to capture the previous post to which there is a response?

2    A.    It could be possible, yes.

3    Q.    Why don't we look at Government's 26 to see how that

4    looks.  26, please.  Thank you.  Okay.  So here, as you

5    testified, we have a post by The W; correct?

6    A.    Correct.

7    Q.    To which Mr. Calhoun responded; correct?

8    A.    That's correct.

9    Q.    And at least in this instance, the government was able to

10   capture the original post and then Mr. Calhoun's response;

11   right?

12   A.    Correct.

13   Q.    And that provides some context to Mr. Calhoun's response;

14   doesn't it?

15   A.    It does.

16   Q.    Because if Mr. Calhoun's response was left alone, it would

17   read just, "Let's just slaughter the motherfuckers because

18   they're coming for us!"; correct?

19   A.    Correct.

20   Q.    And Ms. McEwen asked you who that post was referring to;

21   right?

22   A.    Correct.

23   Q.    And you believed it was Antifa, Democrats, BLM, any of

24   those sorts of folks; right?

25   A.    Correct.

1    Q.   We wouldn't know what that was a response to without the

2    original post; right?

3    A.   I'm sorry, I didn't understand your question.

4    Q.   We wouldn't know what Mr. Calhoun's response was unless we

5    knew what the original post was; correct?

6    A.   Correct.

7    Q.   So we do know it's possible because here in Government's

8    26 we see it; correct?

9    A.   That's correct.

10   Q.   And so we have the appropriate context in which to

11   evaluate Mr. Calhoun's response; right?

12   A.   Yes.

13   Q.   Okay.  Let's look at the next one, Government's 27.  Okay.

14   And this one is only Mr. Calhoun's post; correct?

15   A.   Yes.

16   Q.   Okay.  But he's clearly responding to @letsgoducks756;

17   correct?

18   A.   Yes, sir.

19   Q.   Again, we see Mr. Calhoun's response, but there's no

20   context because we don't see Letsgoducks756's response; right?

21   A.   Correct.

22   Q.   Okay.  Now, regarding these social media posts, primarily

23   the Twitter ones that appear in Government's 9 through 27,

24   although there is not -- on some of them the actual date is not

25   available, is it fair to say that many of them come from the

1    fall of 2020?  That is, October?

2    A.    That is correct.

3    Q.    Okay.  And do you have any evidence that Mr. Calhoun acted

4    violently towards anyone during the fall of 2020?

5    A.    I don't have any -- in the fall of 2020, no, there was no

6    reports of him conducting any violent actions.

7    Q.    Okay.  So despite the fact that during the fall of 2020 he

8    was engaging with people on Twitter and speaking about body

9    bags and ARs and shooting and things of that sort, there's no

10   evidence that he actually did anything; right?

11   A.    That's correct.

12   Q.    Okay.  And then on January 6th, you testified and we've

13   seen the exhibits about what Mr. Calhoun was doing on

14   January 6th in terms of being at the Capitol; correct?

15   A.    Correct.

16   Q.    And there's no evidence that Mr. Calhoun engaged in any

17   individual violence on that day -- when I say "individual

18   violence," what I mean is Mr. Calhoun specifically engaging

19   with another person in a violent way -- is that fair to say?

20   A.    We don't visibly see him in any videos, but his statements

21   are "we pushed past police barricades and past the police,"

22   which I would argue, if you're crossing a barrier line made

23   with police --

24   Q.    Okay.

25   A.    -- that that may constitute -- it may not be a violent

1   action, but certainly one that is not -- that you shouldn't be

2   taking part in.

3   Q.   Okay.  So, again, then, there's no evidence that you have

4   of him engaging individually with another person in a violent

5   way.  He is not assaulting anyone that you can prove; correct?

6   A.   That's correct.

7   Q.   And as we discussed earlier, his posts used the terms "we"

8   and "us"; correct?

9   A.   That's correct.

10  Q.   They don't use the word "I"; correct?

11  A.   Correct.

12  Q.   And let's move forward, then, to -- well, even beyond

13  that.  After January 6th, it is my understanding, then, that

14  you were aware of Mr. Calhoun's posts and his presence in DC,

15  and you engaged in some investigation relating to him; correct?

16  A.   Correct.

17  Q.   And there's no evidence that you have that Mr. Calhoun,

18  after January 6, before his arrest on the 15th, that he engaged

19  in any violent acts; correct?

20  A.   I am not aware of any violent acts.  He did have an

21  interaction with the assistant district attorney in Sumter

22  County.  The assistant district attorney asked him to wear a

23  mask in court.  He refused, and later texted the assistant

24  district attorney saying the judge didn't wear a mask, he

25  wasn't wearing a mask.  The mask was all basically proven to

1    not work and that -- kind of in keeping with his other posts --

2    that this was all BS.

3    Q.    Is that a violent act?

4    A.    A violent act as far as towards someone else, no.  But I

5    would say it's in keeping with his posts.

6    Q.    So I'll ask again.  After January 6th, before his arrest

7    on January 15th, do you have any evidence that Mr. Calhoun

8    engaged in any violence toward any individual person?

9    A.    No.

10   Q.    Okay.  Now, let's move forward to that week.  So it's my

11   understanding from your testimony, then, that on the 13th you

12   were surveilling Mr. Calhoun in the Americus area; is that fair

13   to say?

14   A.    Yeah, I believe -- is Wednesday the 13th?

15   Q.    Wednesday is the 13th.

16   A.    Yes.

17   Q.    So it's your testimony that you saw him go to Sumter

18   County Superior Court; is that correct?

19   A.    We did not see him go there.  We located his vehicle

20   outside of the courthouse.  He had already arrived.

21   Q.    Did you confirm that he, in fact, was representing clients

22   in court that day?

23   A.    Yes.

24   Q.    Okay.  And then you followed him, you said, back to the

25   house at -- 423 was the street address; is that correct?

1  A.   Correct.

2  Q.   And that -- the residence at that location, that is both

3  his personal residence and his law office; is that correct?

4  A.   That's correct.

5  Q.   Okay.  And so it's my understanding that you were

6  watching, but you did not see him leave; is that right?

7  A.   That's correct.

8  Q.   Okay.  Consequently, you were not able to effect the

9  arrest warrant that day; right?

10 A.   At that point in time, we did not have an arrest warrant

11 in hand.

12 Q.   On the 13th you did not?

13 A.   On the morning of the 13th we did not.

14 Q.   When did you get the arrest warrant?

15 A.   I believe the evening of -- the 13th?  The evening of the

16 13th.

17 Q.   Okay.  And that arrest warrant was issued pursuant to the

18 signed Complaint that was filed in the District of Columbia; is

19 that correct?

20 A.   Correct.

21 Q.   Okay.  And so then you located Mr. Calhoun on Friday, the

22 15th, in Macon; is that right?

23 A.   Correct.

24 Q.   And you located him at his sister's home; isn't that

25 right?

```
 1   A.   That is correct.
 2   Q.   And I am going to ask a few questions about when you went
 3   to the house.  Who was at home when you got there?
 4        Well, first of all, sorry, what time was it?
 5   A.   Approximately 1:00 p.m.
 6   Q.   "1:00 p.m."?
 7   A.   Correct.
 8   Q.   And who was home?
 9   A.   Mr. Calhoun and his sister.
10   Q.   Okay.  And you learned that that is his sister's permanent
11   residence?
12   A.   Correct.
13   Q.   Okay.  Who answered the door?
14   A.   The sister.  Her name is Mary.
15   Q.   And Mr. Calhoun was inside the house; correct?
16   A.   Correct.
17   Q.   And he cooperated with the arrest?
18   A.   He did.
19   Q.   He cooperated with the search --
20   A.   He did.
21   Q.   -- incident to the arrest?
22   A.   Correct.
23   Q.   He identified the guns as his; correct?
24   A.   He did.
25   Q.   Identified the ammunition as his?
```

```
 1    A.    Correct.

 2    Q.    The other items that were in the bedroom he was staying

 3    in?

 4    A.    Correct.

 5    Q.    And he didn't try to run in any way?

 6    A.    I'm sorry?

 7    Q.    He didn't try to run?

 8    A.    No, sir.

 9    Q.    He didn't resist in any way?

10    A.    No, sir.

11    Q.    Okay.

12              MR. SAVIELLO:  Just one moment, Agent, Your Honor.

13              THE WITNESS:  Yes, sir.

14         (Aside with Defendant at 11:45 a.m.)

15              MR. SAVIELLO:  No more questions, Agent.

16              Thank you, Your Honor.

17              THE COURT:  Redirect from the government?

18              MS. McEWEN:  No, Your Honor.

19              THE COURT:  All right.  Agent Armentrout, you may

20    step down.

21         (Witness stepped down at 11:45 a.m.)

22              MS. McEWEN:  The government has no other witnesses or

23    evidence with respect to detention.

24              THE COURT:  All right.  Mr. Saviello, anything from

25    the defense?
```

1          MR. SAVIELLO:  Yes, Your Honor.  I previously

2    provided the items that I am going to offer to the government,

3    with the exception of one that I just got today, if I can

4    approach Ms. McEwen briefly.

5          (Aside between counsel at 11:46 a.m.)

6          MR. SAVIELLO:  Your Honor, first -- and I have

7    digital copies for the Court after the hearing, as well, per

8    the local rules, but I also have paper copies.

9          First, I would like to offer Defense Exhibit 1, which

10   is a series of affidavits attesting to -- I'm sorry, Exhibit 1

11   is a series of emails that were sent to Mr. Calhoun's business

12   email address.  That is, his law practice email address.  And

13   these emails are harassing and threatening.

14         I do have one addition to that exhibit, Your Honor,

15   which includes an email from yesterday, which is why it was not

16   prepared before today.  These have been provided to the

17   government previously.

18         And then Exhibit Number 2, Your Honor, is a series of

19   affidavits from people who know and care about Mr. Calhoun.

20   And I offer these affidavits as their own observations of his

21   character and their belief that, should the Court grant bond,

22   that he will both not flee or be a danger to society.

23         So, I anticipate no objection to the character

24   affidavits.

25         MS. McEWEN:  (Eyebrows raised.)

1              MR. SAVIELLO:  I could be wrong.  So, I guess I will

2       get into that before I pass them to the Court.

3              MS. McEWEN:  With respect to Defendant's

4       Exhibit Number 1, it is the government's position that those

5       emails are irrelevant to the decision before the Court today,

6       which is whether to detain Mr. Calhoun or impose conditions.

7              THE COURT:  All right.  I will overrule that

8       objection.  We will admit those into evidence.

9           (Defense Exhibit 1 admitted into evidence at 11:48 p.m.)

10             MS. McEWEN:  With respect to the global, as he calls

11      it, exhibit of affidavits, there's a number of those which the

12      government contends contain wholly irrelevant affidavits,

13      things that don't go to the questions before the Court at all,

14      and I'm prepared to list those by name as it relates to the

15      persons who gave the statement.

16             And then there are some which partially contain

17      things that might go to the issues before the Court but which I

18      believe should be redacted because there are quite a number of

19      assertions within those affidavits which do not go to the

20      issues before the Court.

21             So if the Court would like me to state which

22      affidavits within Government's (sic) Exhibit Number 2 I think

23      should be stricken entirely?  That's the affidavits of last

24      name Gilfoil, Turner, Breedlove, Israel first initial C,

25      Lesueur, Joan Waller, Johnnie Waller, Daniel, M. Hawkins,

1    Labeda, Shumake, R. Hawkins, Reddish, LaBella, and Stapleton.

2            THE COURT:  Well, you know, there's really no way I

3    can determine what's relevant or irrelevant without reading

4    those affidavits.  So, I would admit them into evidence and

5    we'll figure out what's relevant and what's not.

6            What are you talking about wanting to redact?

7            MS. McEWEN:  So, the remainder of the affidavits, for

8    example, might have five paragraphs; three of the paragraphs

9    may be responsive to the issues before the Court (i.e., how

10   does the witness know Mr. Calhoun and what does the witness

11   think about Mr. Calhoun's peaceableness versus danger or

12   likelihood to flee or not), but there are other things that are

13   set forth in the affidavits which are just not germane to the

14   issues before the Court.

15           And so I think that there are portions of those

16   affidavits of Ms. Vickers; Ms. Ansley; last name Sanders; last

17   name Wall, first initial N; Larkin; Wall first initial S; and

18   Evans, which should be redacted.

19           THE COURT:  Well, again, we don't have a jury here,

20   and I've got to read them to decide what's relevant or not, so

21   I'll admit them into evidence and we'll sort that out.

22           MS. McEWEN:  Yes, Your Honor.

23       (Defense Exhibit 2 admitted into evidence at 11:50 a.m.)

24           MR. SAVIELLO:  Your Honor, I will offer in -- Defense

25   Exhibit 1 is the emails and Defense Exhibit 2 is the character

1    affidavits.  And, again, because there is an additional page to

2    Exhibit 1, which I just got today, so I've got the original,

3    and before I submit it I would like to make the appropriate

4    redactions.

5            THE COURT:  Give those to the clerk.  I will take

6    those, thank you.

7            MR. SAVIELLO:  Your Honor, next the defense would

8    offer Defense Exhibits 7, 8, 9 and 10.  And 7 and 8, 9 and 10,

9    Your Honor, are audio recordings of voicemails that were left

10   on Mr. Calhoun's office voicemail system.  These have

11   previously been provided to the government as well.

12           And I offer these -- Your Honor, again, these are

13   harassing and threatening voicemails.  And they are specific in

14   that they both reference knowing about Mr. Calhoun's

15   business -- that is, having seen it personally -- as well as

16   threatening both him personally and his family.

17           And they are relevant, Your Honor, as I'll discuss

18   when we get to argument, as to why Mr. Calhoun was in Macon and

19   not in Americus.  That is the reason he wasn't home when he was

20   arrested and why if the Court were to grant him bond we would

21   ask that he be allowed to stay with his sister in Macon;

22   specifically, to avoid these confrontations.  I understand the

23   government might have some objection.

24           MS. McEWEN:  The same objection that I don't believe

25   they're relevant, Your Honor.

1          THE COURT:  All right.  Well, it sounds like there's

2    some relevance to them, and I'll -- again, we'll sort that out

3    when we sort out all the issues, so I'll admit those as well.

4          (Defense Exhibits 6, 7, 8, 9 and 10 admitted into evidence

5          at 11:52 a.m.)

6          MR. SAVIELLO:  So, I'm prepared to play 6 through 10,

7    Your Honor.  And just for the record, I am not an audio

8    engineer; however, I was able to redact personal information

9    because some of these callers left their name and phone number,

10   suggesting that he call them back and confront them directly.

11   So you will hear a portion where it's muted.  I wasn't able to

12   get a beep in there, but I got it muted so that part is

13   redacted.  All right.  So we'll start with 6.

14         (Audio played at 11:52 a.m.)

15         MR. SAVIELLO:  All right, That was 6.

16         This is Defense 7.

17         (Audio played at 11:53 a.m.)

18         MR. SAVIELLO:  Your Honor, I will stop that one

19   there.  It goes on for another minute and a half in that same

20   vein, but you get the gist.

21         Defense Exhibit 8, Your Honor.

22         (Audio played at 11:54 a.m.)

23         MR. SAVIELLO:  In that call, of course, you can hear,

24   Your Honor, the caller referencing that she's seen --

25         MS. McEWEN:  Your Honor, I object to his commentary

1    on the evidence at this point.

2            THE COURT:  I'll overrule that.  I don't think we're

3    going to get into argument.

4            MR. SAVIELLO:  I just offer that one to show that

5    people are looking at the house physically, Your Honor, which

6    is a bit different from people calling from out of state.

7            This is Defense Exhibit Number 9.

8        (Audio played at 11:55 a.m.)

9            MR. SAVIELLO:  Whether true or not, Your Honor, the

10   suggestion that that person is calling from the New York State

11   Penitentiary is unusual at best, concerning at worst.

12           This is Defense 10, Your Honor.

13       (Audio played at 11:55 a.m.)

14           MR. SAVIELLO:  And one brief comment before I play

15   that one again, because it's a little softer.  But what the

16   caller says is I'm going to have your family because McCall is

17   locked up.

18       (Audio replayed at 11:56 a.m.)

19           MR. SAVIELLO:  So, again, there we have threats

20   towards Mr. McCall's family as well, Your Honor.

21           Next, Your Honor, we would offer an affidavit from

22   Mr. Calhoun's former office secretary.  And the affidavit

23   describes what her job was like between January 6th and

24   January 12th of 2021, before she quit the office.  Including an

25   interaction on January 7th where a person physically came to

1    the office, looking for Mr. Calhoun.  And so we would offer

2    that Defense Exhibit 3.

3            MS. McEWEN:  Again, I object on the grounds of

4    relevance.  I understand the Court's prior ruling.

5            THE COURT:  All right.  Very good.  I will admit that

6    and overrule the objection.

7        (Defense Exhibit 3 admitted into evidence at 11:57 a.m.)

8            MR. SAVIELLO:  Then, Your Honor, Defense Exhibits 4

9    and 5 -- and this is housekeeping of a sort -- I was not aware

10   that Agent Armentrout and others were surveilling Mr. Calhoun

11   on the 13th and saw him at the Sumter County Courthouse

12   practicing law.  I obtained affidavits from two lawyers who

13   were present in Sumter County court that day, and their

14   affidavits simply state that they were there in court and saw

15   Mr. Calhoun there, in court, representing his clients.  That's

16   Defense 4 and Defense 5.

17           Your Honor, and that would be all the documentary

18   evidence the defense would offer at this point.

19           We would, however, have testimony from one witness --

20   that is Mary Calhoun, Mr. Calhoun's sister -- on the point of

21   should the Court release Mr. Calhoun under conditions, he would

22   ask to remain here in Macon and reside at her house.  So we

23   offer her to tell you about her house and herself and the

24   conditions under which he would be there.

25           THE COURT:  All right, very good.

```
1              Exhibits 4 and 5 are admitted, by the way.
2          (Defense Exhibits 4 and 5 admitted into evidence at
3          11:58 a.m.)
4              COURTROOM DEPUTY:  If you will, raise your right
5      hand.  Do you solemnly swear that the testimony you are about
6      to give is the truth, the whole truth, and nothing but the
7      truth, so help you, God?
8              THE WITNESS:  I do.
9              COURTROOM DEPUTY:  Please state and spell your name
10     for the record, please.
11             THE WITNESS:  Mary Calhoun, M-a-r-y C-a-l-h-o-u-n.
12                            MARY CALHOUN
13     called by Defendant at 11:59 a.m., having first been duly sworn,
14     testified as follows:
15                          DIRECT EXAMINATION
16     BY MR. SAVIELLO:
17     Q.  Good afternoon, barely, Ms. Calhoun.  How are you related
18     to William McCall Calhoun?
19     A.  I am one of his sisters.
20     Q.  And where do you live?
21     A.  I live here in Macon.
22     Q.  Do you live in a house or an apartment?
23     A.  A house.
24     Q.  Who else lives there with you?
25     A.  My daughter.
```

1    Q.    And how old is she?

2    A.    She's twenty-one.

3    Q.    How long have you lived at this house in Macon?

4    A.    We're -- this is my third year living there.

5    Q.    Is there room for one more occupant of that house?

6    A.    Yes, there is.

7    Q.    Okay.  How many -- I am going to ask a few questions just

8    generally about your immediate family.  How many siblings do

9    you have?

10   A.    I have one brother, two sisters, and also I do have a

11   stepsister and two stepbrothers.

12   Q.    Okay.  Are your parents alive?

13   A.    My mother is alive; my father is deceased.

14   Q.    Where does your mother live?

15   A.    My mother lives in Americus, Georgia.

16   Q.    Okay.  Do all your other family members live in Georgia?

17   A.    Yes, sir, they do.

18   Q.    During the pandemic, like so many of us, have you been

19   working from home?

20   A.    Yes, sir.  I have, I have been working remotely.

21   Q.    Okay.  And do you use a computer when you work from home?

22   A.    Yes, sir, I do.

23   Q.    Is that your personal computer or is that a work-issued

24   computer?

25   A.    It's work-issued.

1    Q.    Is it password-protected?

2    A.    Yes, sir, it is.

3    Q.    All right.  So do you have a smart phone?

4    A.    Yes, sir, I do.

5    Q.    And is that smart phone your personal phone or your

6    work-issued?

7    A.    Really both.  It's personal, but I use it for work

8    purposes as well.

9    Q.    Okay.  Is that phone password-protected?

10    A.    Yes, sir, it is.

11    Q.    All right.  Does your daughter work or does she go to

12    school?

13    A.    Actually, both.

14    Q.    Okay.  Does she -- is she at college or university?

15    A.    Yes, she is.

16    Q.    Is she going to school physically or is she taking classes

17    online?

18    A.    Now, physically.

19    Q.    Does she have a computer at home?

20    A.    Yes, she does.

21    Q.    Does she use that for school and work?

22    A.    She uses it for her schoolwork.  Yes, she does.

23    Q.    Do you know, is that computer password-protected?

24    A.    Yes, sir, it is.

25    Q.    Does she have a smart phone?

1    A.   Yes, sir, she does.

2    Q.   And do you know if that smart phone is password-protected?

3    A.   Yes, sir, it is.

4    Q.   Okay.  Um, do you understand that we're here today for the

5    judge to consider whether or not to let your brother out of

6    jail while this case is pending?

7    A.   Yes, sir.

8    Q.   And if the judge were to let him out, would he be able to

9    come live at your house?

10    A.   Yes, he would.

11    Q.   Okay.  And prior to his arrest last Friday, had he been

12    staying at your house for the previous week or so?

13    A.   Yes, sir.  He had, at my invitation.  Because -- may I

14    elaborate on that?

15    Q.   Yes, you may.

16    A.   Because of the harassing phone calls and the death threats

17    to our family and my brother, you know, I chose to ask him if

18    he would, you know, please come stay with us.

19    Q.   Okay.  And does your brother -- do you know, does your

20    brother practice law?

21    A.   Yes, sir.

22    Q.   How long has he been in the practice of law?

23    A.   Oh, goodness, thirty years.  I mean, it's been a really --

24    all of his life, you know, after college.

25    Q.   Okay.  And during this past -- the last week when he was

1    staying with you, do you know, did he continue to represent his

2    clients and make court appearances?

3    A.    Yes.  Yes, he did.  Yes.

4    Q.    Now, if the judge were to allow your brother out on bond

5    and direct him to live at your house, speaking -- I am going to

6    ask some specifics, but just speaking generally, would you be

7    willing to do your best to make sure that he met the

8    responsibilities that he had under those conditions?

9    A.    Yes, sir.  I definitely would.  First of all, I give good

10   advice, and I have to say that I would make sure that he met

11   all of his required appointments, you know, whether it was --

12   anything: going to court or, you know, if he had to meet with

13   you or any -- even a probation officer, anything like that.  I

14   would make sure that -- that he did what was expected.

15   Q.    Okay.  One of the conditions the judge would have to

16   consider using would be something called home confinement,

17   which would be an order that your brother stay at your house

18   except for certain conditions.  And that might be to go to

19   work--that is, to court if he had to, to come visit me, to come

20   to court for his own case, or to the hospital if necessary.  Is

21   that something that you would be comfortable with?

22   A.    Yes, sir, it is.

23   Q.    That means that he would be home all the time, and you

24   would be all right with that?

25   A.    Oh, yes, absolutely.

1    Q.   Okay.  Another condition that the judge could have to

2    consider is that he could limit your brother's access to the

3    internet; and that is, order him not to have access to a

4    computer or smart phone that would be able to connect with the

5    internet.  Is that something that you feel that you could

6    handle at your house?

7    A.   Yes.  I definitely could.  There is no problem there.  I

8    definitely would follow that rule.

9    Q.   All right.  Another condition, if he was on supervised

10   release -- or on pretrial release and at your home, would be

11   that Probation would be authorized to come to your home and

12   search it without having to get a search warrant.  Is that

13   something that you would be okay with?

14   A.   Yes, I would.  That would be fine.

15   Q.   All right.  Another condition would be that your brother

16   not have access to any firearms or weapons.  Would you be okay

17   with that as well?

18   A.   Yes.  Definitely.

19   Q.   Okay.  Is there anything else, Ms. Calhoun, that you would

20   want the judge to know about what it would be like if he were

21   to allow your brother to come live with you during the pendency

22   of this case?

23   A.   I can say that I love my brother and so does my daughter.

24   And I know personally -- just because I've known him all my

25   life and I know his true nature, I know that, you know, he's --

1    I know he's -- he wouldn't hurt anyone.  I know that we would

2    be glad to have him in our home.  I welcome him there.  And we

3    love him very much.

4        I know that I will provide a safe and secure environment

5    for him and, like I've said before, giving him good advice

6    and -- and just supporting him through this.  And I welcome him

7    into my home, and I hope that you will allow him to come.

8              MR. SAVIELLO:  I have no further questions, Your

9    Honor.

10             Thank you, Ms. Calhoun.

11             THE COURT:  All right.  Any questions from the

12   government?

13             MS. McEWEN:  Yes, Your Honor.

14                       CROSS EXAMINATION

15   BY MS. McEWEN:

16   Q.   Can you tell us what day he arrived at your home?

17   A.   I think it was maybe two days after the 6th.  So maybe it

18   was the 8th.  It could have been the 7th.  Maybe the night of

19   the 7th.  I remember when he came, he came because he was going

20   to pick up his dog.  We were babysitting his dog.  And -- but I

21   believe it was -- I believe it's the night of the 7th.

22   Q.   How long had you had his dog?

23   A.   Well, let's see.  I guess maybe -- I don't know, maybe the

24   5th?  Maybe -- I guess it was the 5th he brought him, possibly.

25   I didn't really keep up with it, but that's a possibility.

1    Q.    When he brought the dog, did you know he was on his way to

2    Washington?

3    A.    Yes, I did.

4    Q.    And you said a couple of times on direct examination that

5    you believe you give him good advice?

6    A.    Yes, ma'am.

7    Q.    Did he ask your advice about whether he should take this

8    trip for this purpose?

9    A.    Well, actually, we did discuss it.  We did discuss it.

10    Q.    And did you try to discourage him?

11    A.    Well, what I did was I asked him some questions, and -- I

12    knew that he was going.  But I also knew that so many people

13    from around the country were going.  And -- but I did ask him

14    if he was taking any weapons.  I did ask him that.  And he said

15    to me, "No," he said, "Because it's against the law."  He

16    said -- and he told me exactly what the restrictions are.  And

17    he said that, you know, he was not allowed to, so he wasn't.

18    So that is one thing that we discussed.

19        And I felt like it was going to be okay, you know, simply

20    because of that.  You know, he wasn't going to, you know, shoot

21    anyone.  You know, he wasn't going to harm anyone.  And because

22    that was not his intention.

23    Q.    And so I guess, then, my original question of did you try

24    to discourage him, the answer was no?

25    A.    No, because I didn't think there was anything to

1    discourage him from.

2    Q.    And when he arrived I believe you said the night of the

3    7th, did he arrive with any of his personal property?

4    A.    "Personal property"?  Well, he would have had -- he would

5    have had his bag that -- but, like, a backpack-type bag.

6    Q.    Okay.  Did you see the photographs of the bedroom?

7    A.    Yes, ma'am.

8    Q.    And did you see those guns and ammo cans?

9    A.    Yes, ma'am.

10   Q.    Were those things that you had in that room before he got

11   there?

12   A.    No, ma'am.

13   Q.    So did he bring those to your home?

14   A.    He did.  He did.  And he actually had asked me about that.

15   We did discuss it, and it was at some point when -- between him

16   going back down to his office and going to court and the

17   different times he had gone to the courthouse, he asked

18   permission to bring them.  And we discussed it.

19        And so we thought that it would be best -- I mean, I

20   agreed that he can bring them because I knew that he legally

21   owned them, and I thought that it would be better if he did

22   bring them because of the threats and the harassing phone calls

23   and even, I was told, people on his front porch.  That's

24   another thing his secretary had said.  And so I thought, well,

25   yes, you should bring them up here, you know, so that nobody

1  did steal them, you know, if they kicked the door in or
2  something.  So I thought that that would be best if he did
3  bring them.
4  Q.   Did you, yourself, know the nature of these emails and
5  phone calls prior to asking him to come stay with you?  Had you
6  read them?  Listened to them?
7  A.   I don't think that first night I had.  I'm really not for
8  sure.  I don't really know when my sister first told me that it
9  happened, but shortly after that I did.  I think I just asked
10  him to spend the night, you know, because he had been driving.
11       But then after that, very quickly, you know, we became
12  aware of what was going on with the phone calls and the people
13  on the front porch and all of that.  And so that -- and that
14  was very disturbing.  So I did want him to stay with me when I
15  heard the threats against my brother and my family.
16  Q.   So do you consider emails saying things like, "I will be
17  seeking your immediate disbarment," to be a threat?
18  A.   Well, I didn't say that.  I didn't say that.
19  Q.   But you know that's the type of thing that the emails
20  conveyed; don't you?
21  A.   Well, when I hear things like phone conversations saying,
22  "I'm coming after you and your family," that really sticks in
23  my mind.  Not so much, you know, something that's referring to
24  his position as an attorney.  Although, you know, I don't like
25  hearing that, but that what really just sticks in my mind is

1    threatening to hurt my child, to be honest.  Or my mother,

2    who's eighty-six.

3    Q.   When was it that you first heard that call that you just

4    referred to?  Was it in court today or sometime prior to that?

5    A.   I've heard prior to.  I've heard prior to.

6    Q.   Okay.  Can you tell us when in relation to when you asked

7    him to come stay at your house?

8    A.   Just really off and on, throughout the time period.  My

9    sister, who also has worked in my brother's office, she's

10   shared some of the information with me about it.  I can't

11   really tell you the exact day.  If I could think of it I'd tell

12   you.

13   Q.   Okay.  Do you consider emails that say, "You are the scum

14   of the earth, you'll rot in hell," to be a threat?

15   A.   Um, I guess I consider that as just someone's description

16   of him.  If they -- you know, or maybe what they want to happen

17   to him, which is extremely drastic.  I mean, rotting in hell,

18   that's kind of a scary thing to think about.  But I certainly

19   don't consider them friendly.

20   Q.   Right.  What about a person who emails hoping that he's

21   going to get ten years in prison?  Do you consider that a

22   threat?

23   A.   Well, I would say that there definitely -- their

24   intentions are not good if that's what they're focusing on.

25   So.  It's a bit disturbing.

1    Q.    Um-hum.  But you know that none of the emails that were

2    tendered into evidence as Government's Exhibit 1 threaten to do

3    any harm to your brother or anyone else; don't you?

4    A.    No.  I don't really know that, because, to be honest -- I

5    mean, this is overwhelming.  And I am not really -- I can't

6    really say that I'm -- I'm not an attorney myself.  And so I

7    guess maybe what I think might be disturbing to me might not be

8    to you, for instance.  And so I really -- it's kind of hard for

9    me to answer that the way that you're asking it.

10   Q.    None of the emails or even the phone messages that we've

11   heard here in court use any of the phrases like "execute,"

12   "slaughter," "sling hot lead," or, "stack up body bags," like

13   your brother used in his posts; isn't that right?

14   A.    Not to my knowledge.

15              MS. McEWEN:  Nothing further, Your Honor.

16              MR. SAVIELLO:  Nothing further.

17              Thank you, Ms. Calhoun.

18              THE COURT:  You may step down.  Thank you.

19              THE WITNESS:  Thank you.

20        (Witness was excused at 12:14 p.m.)

21              MR. SAVIELLO:  Your Honor, the defense would have no

22   more evidence but we would be prepared to argue.

23              THE COURT:  All right.  Well, let's -- does anybody

24   need a break?

25        (No affirmative responses.)

1          THE COURT:  Very good.  Let me hear from the

2    government first by way of argument.  Ms. McEwen?

3          MS. McEWEN:  Your Honor, I think when the Court

4    considers the factors at 3142(g) in this case, it's

5    particularly apparent that the defendant poses a danger to the

6    community.  We've seen approximately 20 of the hundreds of

7    posts that he has made that do use words like "execute,"

8    "slaughter," "sling hot lead," "make head shots," "go to war,"

9    and "stack up body bags."

10          Now, Mr. Saviello would point out to the Court, well,

11   this might be in response to something someone else said and

12   that we must consider the context in which these statements

13   were made.  And that's certainly true.

14          And, in fact, in one of those that was put before the

15   Court, the statement that was made by someone was concerning

16   whether or not a certain number of votes would be found by

17   persons counting votes in Pennsylvania.  And Mr. Calhoun's

18   response was, "Let's slaughter the motherfuckers."  So I think

19   taking it in context points out just how dangerous the type of

20   conduct that Mr. Calhoun has been promoting and suggesting that

21   he would participate in is to this community.

22          And it's not just that he said it, but that all of

23   the things that he talked about, he's followed through on to

24   this point.  He said:  That's why we have ARs, so that we can

25   open up cans of whoop ass, so that we can make head shots, so

1    that we can stack up body bags.  He had ARs.  He said he had

2    plenty of ammo that he intended to use at the range and on

3    people.  And he had plenty of ammo.  And not only did he have

4    it, but when he felt like he needed to relocate for whatever

5    reason -- which the Court may believe was because the FBI was

6    after him or because he was getting what might be considered

7    harassing phone calls or emails at his office in Americus -- he

8    took that amount of ammo and that number of firearms with him

9    when he relocated.

10            He said he was going to go to Washington.  He said he

11    was going to storm the Capitol.  He said he was going to try to

12    obstruct the electoral college vote being certified.  And he

13    did that.  Everything that he has said that he would do in

14    those posts, short of executing, slaughtering, and stacking up

15    body bags, he has done.

16            So the question is, what if anything can this Court

17    do to keep him from doing that?  The suggestion is that he

18    would stay with his sister.  I suggest that's simply not enough

19    for the Court to feel assured that Mr. Calhoun's not a danger

20    to this community.

21            There's a significant concern as well of him being a

22    flight risk in this case in that he intentionally relocated

23    himself for the purpose, we contend, of evading his own arrest

24    in this case.  And the Court certainly has to take into

25    consideration what, if anything, it could do to ensure that he

1    would appear for future court appearances.

2              So it's our suggestion that there are no conditions

3    that this Court can put in place that would satisfy the

4    necessary standards that the Court has before it to ensure his

5    return to court and the safety of this community.  And for that

6    reason we ask that he be detained, Your Honor.

7              THE COURT:  Mr. Saviello?

8              MR. SAVIELLO:  Thank you, Your Honor.  Speaking about

9    standards, why don't we start there.  As the Court is aware,

10   there is a statutory presumption in favor of release in this

11   case, and that the government must overcome that presumption,

12   and I think that they have failed to do so.

13             Now, the standard by which you must judge that is,

14   first of all, they must prove that there is either a serious

15   risk of flight or a serious risk of danger to the community.

16   The government believes that both are in place, and I would

17   disagree.

18             More importantly, the standard that they must reach

19   is that they must prove to a preponderance as to flight; that

20   is, that there is no conditions that will reasonably assure he

21   will come to court.  As to danger, they must prove by clear and

22   convincing evidence that there are no conditions you can impose

23   which would reasonably assure the safety of the community.

24             And so, I'd like to be a little more specific than

25   the government in addressing those.  3142(g), Your Honor,

```
1    outlines the factors which you must consider when thinking
2    about this issue:
3              Number 1, the nature and circumstances of the
4    offenses as charged.
5              Two, the weight of the evidence against the person,
6    and that brings us back to my argument as to probable cause,
7    Your Honor.  I understand you found there was probable cause.
8    But I do believe that considering their ability to prove a
9    couple of the elements of the 1512(c)(2) violation are not
10   quite as clear as the government might think they are.
11             But Number 3, Your Honor, I think is important.  That
12   is part of 3142(g)(3), and that is the history and
13   characteristics of the person.  And that's why we submitted all
14   the affidavits.  We have his sister here to testify to let you
15   know about him.  And they include the person's character.  And
16   the affidavits will attest that many, many people think that
17   Mr. Calhoun is a person of character in relation to whether he
18   will follow the court's orders and whether he is a danger to
19   anyone.  His physical and mental condition.
20             Your Honor, as the Court is aware from the pretrial
21   services report, Mr. Calhoun has prostate cancer for which he
22   is undergoing treatment.  And so we would argue that that, in
23   fact, motivates him to follow any conditions of the Court that
24   would allow him to be released so that he can continue to get
25   the medical care on the outside as opposed to rely on county
```

1    jail to provide medical care.  So that's incentive for him to

2    follow the rules should you let him out.

3          His family ties:  Your Honor, the testimony in his

4    own statements in the pretrial report are clear that his family

5    is generationally tied to Georgia.  He doesn't live anywhere

6    else and he hasn't for his adult life.  He is a UGA graduate,

7    multiple times over.  He's a Georgia person through and

8    through.

9          His employment:  Your Honor, he's a lawyer.  He's

10   been practicing for thirty years and was practicing up until

11   his arrest.  And the fact that he was going to court, meeting

12   his obligations, and representing his clients I think is

13   another thing that the Court can consider when considering

14   whether he is going to do as the Court would order.

15         His financial resources:  As the Court is aware, he

16   has his combination residence and law office in Americus.

17   There is a rental property in Columbus.  Again, those tie him

18   to the community as well.  In terms of financial resources,

19   without belaboring the point, Your Honor, he is not cash rich

20   such that he would have the funds to flee and finance a

21   lifestyle on the run.  And that is clear also from the pretrial

22   report.

23         Another one is past conduct.  And I don't have -- I

24   have been told there is an updated bail report that suggests he

25   might have had a DUI arrest while he was in college.  But other

1    than that, Your Honor, the man has no arrests, much less any

2    convictions.  He is a licensed lawyer, stayed in good standing

3    with the Bar of Georgia.  And if we look at past conduct as a

4    predictor of the future, then I think you will find him to be a

5    law abiding person.

6            History related to drug and alcohol abuse:  He is at

7    best a social drinker.  No indication of any of those problems

8    that need to be addressed or cause the Court any concern.

9            Again, no criminal history.

10           And then last factor in 3142(g)(3) is a record

11   concerning appearance at court proceedings.  We are in an

12   unusual situation, Your Honor, where not only are there no

13   indications of failure to appear as a defendant, because he's

14   never been a defendant, but, instead, there's no record

15   indicating that he doesn't appear in court for his clients when

16   he is supposed to.  So, Mr. Calhoun is the rare defendant who

17   understands what it means to go to court when you are required

18   to go to court, and I think the Court can find that he would do

19   that.

20           As to danger, Your Honor, 3142(g)(4) directs the

21   Court to consider the nature and seriousness of the danger to

22   any person or the community that would be posed by the person's

23   release.  And when considering the conditions of release, the

24   Court can consider all of those and create any other ones that

25   you might think are appropriate to satisfy any concerns.

1          So, I'd like to briefly talk about flight, Your

2    Honor, and the risk of flight, remembering that the standard is

3    that there must be a serious risk of flight proved to a

4    preponderance.  And I would disagree with the government.

5          First of all, I think the question would be for Your

6    Honor, what would be Mr. Calhoun's motivation in regards to

7    appearing in court if he got out.  And I think his motivation,

8    if there is a debit/credit analysis, would all be debits.  That

9    is -- I'm sorry, would all be credits.  That he is motivated to

10   come to court and will do so, one, to avoid prosecution for

11   bail jumping, right.  He understands what it means to jump bail

12   in federal court, and that is a separate federal offense, and

13   that is a felony offense, and that is essentially a status

14   offense.  And if he wants to continue to practice law, he will

15   be motivated to avoid a felony conviction.

16         Secondly, Your Honor, he had every reason to expect

17   that charges were coming in this case.  Right.  He gave an

18   interview to the *AJC* in which he admitted to trespass,

19   understanding what it meant and understanding the consequences

20   of that when he did so.

21         And the government's suggestion that by coming to

22   live at his sister's house was him fleeing arrest or fleeing

23   investigation I think is just simply not borne out by the

24   evidence or by common sense.  If he were fleeing investigation

25   and fleeing arrest, Your Honor, he would not continue to appear

1    in court on schedule.  Because even the most rudimentary

2    investigation would say why don't we find out when he's

3    supposed to appear in court for his clients, and we'll wait for

4    him in the parking lot.

5            And so, he wasn't fleeing arrest or fleeing

6    investigation.  Instead, he was doing exactly what the Court

7    would expect and hope someone would do in that situation; that

8    is, facing harassing and -- if the government disagrees that

9    some of those voicemails are threatening, that's their

10   prerogative.  Nevertheless, the voicemails and the emails and

11   the people showing up at his office, Your Honor, were doing one

12   thing, and that is trying to promote a confrontation with

13   Mr. Calhoun.

14           And so Mr. Calhoun would have been well within his

15   rights to continue to be at home, to sit on his front porch and

16   invite anyone who wanted to talk about those issues to come

17   talk to him face to face.  That would cause a confrontation

18   that could turn violent and turn dangerous for himself or

19   anyone else.  Did he do that?  No, he did not do that.  Instead

20   he removed himself from Americus and he began staying with his

21   sister, at her home in Macon, which is a safe place where

22   people wouldn't know where he was, so they couldn't come see

23   him there, and then the voicemails and the emails could be

24   managed from the safety of the computer or the voice -- or the

25   voicemail system.

1          And so that's the kind of responsible behavior that I

2     think the Court should look to to see how he would behave if

3     you, in fact, granted him bond.  He was trying to avoid

4     confrontation under those circumstances, Your Honor; not

5     fleeing from investigation or arrest.

6          His whole family is in Georgia.  His whole life is in

7     Georgia.  His business is in Georgia.  And he has clients

8     depending on him, Your Honor.  We have chosen not to introduce

9     records from his office up to the twenty or so cases that will

10    have matters pending in court over the next five to six weeks,

11    including final adoption approval where the parent he is trying

12    to --

13          MS. McEWEN:  Your Honor, I object to any discussion

14    of anything that's not before the Court in evidence.

15          MR. SAVIELLO:  All right.  That's fine, Your Honor.

16    The evidence is that he has a thriving law practice and is

17    expected in court and has been going to court.  So, Your Honor,

18    I don't think the government has met its burden to show that

19    there is any risk that he will flee, much less a serious risk

20    that he will flee.

21          And if the Court does find that there is a serious

22    risk, I think there are ample conditions you can impose that

23    would mitigate that risk:  That would be, order him to stay at

24    his sister's, which we believe is a safe environment, and the

25    evidence is that there is space for him there, he is welcome

1    there; home confinement or electronic monitoring like GPS

2    monitoring with the normal limits.  I think all of those things

3    can satisfy any concern there might be about flight.

4              Moving on, then, to discuss the risk of danger.  And

5    reminding the Court that, of course, the Court must prove that

6    there is a serious risk of danger to the community by clear and

7    convincing evidence.  And in this case, Your Honor, I think

8    reading between the lines, the question is what is the problem?

9    What is the real danger?

10             I don't think the government is suggesting -- if they

11   are, I don't think there's any evidence to support it -- that

12   he will commit violent acts.  To quote Ms. McEwen in her

13   argument, all of these things he said he followed up on, well,

14   that's just not true nor accurate.  Because through the fall he

15   was posting on Twitter in response to people that he was

16   engaged in conversations and in response to their posts talking

17   about head shots at 200 yards and stacking bodies like

18   cordwood.  And the evidence is amply clear that he never

19   engaged with anyone in a violent fashion, much less using a

20   firearm, taking shots at anybody, or even showing up with a

21   weapon anywhere.

22             And so the idea that he -- all of these things he

23   said he followed up on is just not accurate.  Instead, what the

24   evidence is, is that he was engaged, like many people, in

25   partisan and loud rhetorical comments on social media.  But the

1    idea that there is danger to any individual person I think is

2    not there.

3           Words do not equal action.  What he was doing was

4    posting on social media.  And any individual threats that were

5    made prior to January 6th, such as those in court -- or in

6    evidence in court, we don't have the context for them.  You

7    know, the Twitter posts about, you know, "you're a snowflake

8    and I can beat your ass," we don't know where that person was.

9    They could be in California, they could be in Canada, they

10   could be in Italy for all we know.  There's just no context to

11   that and no indication that he ever followed up on any of that

12   sort of stuff.

13          But what we do know is that the social media is what

14   the government is relying on to suggest that he's a threat.

15   Yes, he had a number of weapons.  Again, the testimony before

16   the Court is he behaved responsibly regarding those weapons and

17   the ammunition; that is, he asked his sister, "Can I bring

18   those things to your house here in Macon so that they don't get

19   stolen from the house in Americus because people might be

20   coming to break in?"  She said, "Yes."

21          When law enforcement showed up, he said, "Here they

22   are."  He helped them catalogue them, helped them take seizure

23   of them, was cooperative in every way.  All of them were legal.

24          So the issue really boils down to posting on social

25   media as a way to threaten people, not his actions, because he

1    has not acted on any of those posts.

2            Well, there's many ways to solve that problem.  First

3    of all, Facebook solved part of that problem because they

4    banned him from Facebook, so he can no longer post on Facebook.

5    Same thing with Twitter.  Parler, which already -- there are a

6    couple posts from Parler in the government's evidence -- they

7    have been shut down.  I understand that they may be trying to

8    get up again through Russian web hosting services, but I

9    checked this morning, Your Honor, and as far as I know they are

10   still not active.

11           But beyond that, you can make it a condition that he

12   not access the internet and post on social media through the

13   internet, cell phone, or on a computer or any other way.  So

14   that's a condition that you can impose.  And if he is not able

15   to do that, then it is essentially him talking to his sister,

16   maybe talking on the phone with some of his friends, those

17   sorts of things.

18           You can limit his ability to travel.  He does not

19   have a passport.  You could order home confinement with

20   electronic monitoring and allow him to do the work he needs to

21   do for his clients, to see his oncologist, to come see his

22   lawyer, to make court appearances, as necessary.

23           You can limit his ability to have weapons, which is

24   standard.  In this case all the weapons are gone.  And you

25   could make sure -- and his sister testified that she understood

1  that that could be a condition, and that was not a problem as

2  well.  And that the Probation could come search the house any

3  time they wanted.

4           And so, Your Honor, again, these things can be

5  mitigated, particularly the social media.  And I think there's

6  a point to be made.  The government's relying on those social

7  media posts to say that he is actually dangerous as opposed to

8  just having a big mouth.  And here's what we know.  I will

9  offer to the Court, although Agent Armentrout didn't know

10 specifically how many followers Mr. Calhoun had, but we can

11 make a comparison between Mr. Calhoun and Former President

12 Trump in terms of social media posting and actions to follow.

13          If they are arguing that Mr. Calhoun is influencing

14 people and that he could encourage others to commit acts of

15 violence, we know that on January 6th, President Trump at the

16 time had almost 89 million Twitter followers.  And part of the

17 result of his actions on Twitter was that tens of thousands of

18 people showed up to protest at the Capitol and ended up

19 entering the Capitol Building.  We don't know how many

20 followers Mr. Calhoun had on that day, but I dare say it was

21 some miniscule fraction of 89 million.

22          But we look at January 20th, and what we know on

23 January 20th, which was the Inauguration yesterday, was that

24 Former President Trump had zero Twitter followers.  And what we

25 also know then is that there were zero meaningful protests at

1    the Capitol in Washington, D.C.  So you take away the ability

2    to post on social media, if there was an audience, then you

3    take away the reason for those people to follow.  So, there are

4    things that the Court can do to mitigate any concerns they

5    might have about it.

6         And I think more importantly, Your Honor, is to think

7    about changing Mr. Calhoun's environment.  And I would argue

8    that the evidence suggests that when Mr. Calhoun was by

9    himself, living in Americus, he found himself engaging in lots

10   of social media posting and, you know -- howling at the moon of

11   sorts -- engaging with other people who are equally as angry as

12   he was.  But if we change his environment, I don't think we'll

13   see that.  If he were living with his sister, not having access

14   to social media or the internet, he would not have those same

15   incentives.  He would be in a different environment, and I

16   believe his behavior would be different.

17        Your Honor, he has a large support network, as

18   indicated by the fact that he has a large family, all in the

19   area, and the friends and professional colleagues who submitted

20   affidavits to the Court.  And I believe the evidence before the

21   Court is all of them are motivated to assist Your Honor in

22   making sure that Mr. Calhoun follows the rules -- that is, he

23   appears where he needs to be relating to this court case and

24   that he not get into any trouble; that is, not act in any way

25   that would cause a danger to anyone either individually or by

1    encouraging others.

2          He's got a safe and supportive place to live.  He's

3    got a way to make a living and a thing to keep him busy; that

4    is, to continue to represent his clients.  Those clients are

5    relying on him.  He has every motivation to show up, deal

6    responsibly with his position, and not cause further trouble.

7    Because a felony conviction for him means the loss of his law

8    license and the loss of his ability to make a living.  So I

9    think the Court can find that he is motivated to handle this

10   case in a professional way.

11         I am reminding the Court that the government has to

12   overcome the presumption of release in this case and show by

13   clear and convincing evidence that there are no conditions

14   which you could impose which would mitigate the danger.  And,

15   first, there is a risk of flight, which I disagree that there

16   is, but even if there is, they have to show that there are no

17   conditions which will sufficiently mitigate that as well.  And

18   I think it's clear that there are conditions that will do that,

19   and the law thus requires you to set conditions of release that

20   would allow him to do that.  Thank you.

21         THE COURT:  Anything further from the government?

22         MS. McEWEN:  Just briefly.  Your Honor, there's been

23   an argument brought forward that Mr. Calhoun's actions in

24   removing himself to his sister's home were responsible.

25   Mr. Saviello also said that Mr. Calhoun had every reason to

1    expect that charges were coming.  And a person in his position,

2    especially after having given this interview to the Atlanta

3    newspaper, when acting responsible would have gone to people he

4    interacts with every day, people like Chief of Police Scott in

5    Americus, and said, "I need to let you know, I feel like I've

6    been threatened by emails and phone calls that have come into

7    my office.  As a result of that, I'm relocating.  But if you

8    hear from the FBI that they are looking for me, let me tell you

9    where I am.  You always know how to get in touch with me,

10   Chief.  You have my phone number."

11          That is not what he did.  That is how a responsible

12   person, expecting and having every reason to expect charges

13   were coming, would have behaved.

14          I point the Court to the testimony of his sister with

15   respect to this one particular issue.  When I asked her if she

16   was aware he intended to travel to Washington for the purpose

17   of attending these protests outside the Capitol, she, herself,

18   asked him was he taking a gun.  And when he assured her he was

19   not, she was no longer concerned that he might shoot someone.

20   What that says is she's concerned he might shoot someone.  Just

21   like he said he would do.

22          We have seen his history and his characteristics in

23   these repeated posts that he has put up where he has said he

24   would execute, slaughter, go to war, stack up body bags, put

25   out head shots, and sling hot lead.  That is in addition to the

1   violent act that he participated in in breaching the United

2   States Capitol for the purpose of attempting to overturn the

3   results of the election in this country.

4           And I think that the Court can clearly see that we

5   have met our burden to demonstrate that there are no conditions

6   that can be imposed to keep him from being a danger to the

7   community.  And, again, we're asking that he be detained.

8           THE COURT:  I would like to take a moment to review

9   all these.  I didn't get a chance to look over the exhibits

10  that have been submitted, so we were talking about their

11  relevance.

12          MR. SAVIELLO:  Yes, sir.

13      (Court in recess from 12:38 to 12:49 p.m.)

14          THE COURT:  Based on the evidence that's been

15  presented here today and taking into consideration the factors

16  at 18 U.S.C. Section 3142(g), as the parties have fairly

17  thoroughly outlined, I do find by clear and convincing evidence

18  that there is no combination of conditions of release or

19  conditions of release that can secure the safety of the

20  community, so I am going to order that the defendant be

21  detained pending indictment and/or trial in this case.

22          I will just outline to some extent -- of course, the

23  parties have argued this fairly clearly, but just let me

24  outline what the basis of my ruling is.  That we do have -- and

25  I read every word of every one of these, and I -- quite a

1    number of affidavits from people in the community attesting to

2    the defendant's history in the community and history of

3    practicing law in that community.  And as the defense has

4    pointed out, there is no criminal history -- significant

5    criminal history in the case.

6            What is of concern in this case is the events of the

7    last six months in this defendant's life, and I don't -- from

8    the previous 23 years or 35 years or whatever these different

9    affidavits refer to, clearly something has changed.

10           And what we have, first of all, is we have the

11   defendant's own statements, made publicly on social media,

12   extensively, which reveal, first of all, that he has been

13   corrupted by or seduced by dangerous and violent ideology that

14   considers the United States to be in a state of civil war,

15   considers everyone who voted for a Democrat to be worthy of

16   execution, considers government officials and agents to be

17   members of a Deep State that has to be opposed by so-called

18   Patriots.

19           The language used in those posts is extremely

20   violent.  I won't repeat the terms, but we've been through them

21   multiple times, about "slaughtering" and "head shots" and the

22   threats against -- to hang President Biden, to tear Nancy

23   Pelosi to shreds.

24           Now, as Mr. Saviello pointed out, we know that

25   everybody on the internet is full of -- you know what.

1    Everybody is a liar on the internet.  And the internet does

2    encourage this kind of language.  So I have to take into

3    account that the possibility that this might just be a -- some

4    kind of rhetorical act or showmanship.

5          But we also have the defendant's actions.  First of

6    all, we have the fact when he was arrested he was found to be

7    heavily armed with multiple weapons and hundreds, if not

8    thousands, of rounds of ammunition.  But the biggest issue is,

9    you were in the Capitol on January the 6th, 2021.  We've seen

10   the video.  You have admitted it multiple times.  You bragged

11   about it.  You've said it was your patriotic duty to do.

12         You crossed a sacred, sacred line.  That was an act

13   of extreme violence by every single person who went in there.

14   I look in this courtroom -- this is not my courtroom, my

15   courtroom is much more humble than this.  We build buildings

16   like this to reflect the majesty of the law and the

17   Constitution of the United States.  We don't rely entirely on

18   the force of arms, but on the -- the symbolism, the sacredness

19   of the law and of the government of the United States.

20         And the Capitol Building is the pinnacle of that.

21   And when you and your friends went in there and tore the place

22   to shreds, killed five people, including a police officer, you

23   showed that you were willing to -- that there was nothing that

24   would hold you back except force.  That's why we had 25,000

25   National Guard members at our Inauguration yesterday.  It's a

1    shame and a scandal for our entire country.

2         And if you don't respect the Capitol Police and you

3    don't respect the Capitol Building of the United States, I

4    don't have any reason to believe that you'll respect anything

5    that I tell you to do.  And certainly, if you think that every

6    agent and officer of the government is part of some Deep State,

7    involved in some gigantic conspiracy, then I have no comfort in

8    sending a probation officer to your house to meet with you.  I

9    would be afraid for their life -- I would be afraid for my

10   life -- from what you've said and what you've done.

11        So based on that evidence, I find that no condition

12   or combination of conditions of release will be sufficient to

13   secure the safety of the community pending the outcome of this

14   case.  I am going to enter an order directing that you be

15   detained by the United States Marshal Service.  I will also

16   enter an order directing the Marshal Service to arrange for

17   your transportation to the District of Columbia for custody in

18   that District while you are pending proceedings in this case.

19        I will enter an Order of Removal directing the Clerk

20   of the Court transfer all the papers in this case to the Clerk

21   of Court for the District of Columbia.  I will also note that

22   you will be requesting appointed counsel when you arrive in

23   that District, and the Court can make further arrangements as

24   necessary in the case.

25        Is there anything else we need to discuss here today,

1    Mr. Saviello, from the defense?

2              MR. SAVIELLO:  Your Honor, two things.  Please note

3    my objection, first.  Secondly, could Your Honor favor us with

4    a ruling on flight risk.

5              THE COURT:  I do also find by a preponderance of the

6    evidence -- although flight is less of a concern for me than

7    danger to the community, but I think there is a preponderance

8    of the evidence that there's no condition or combination of

9    conditions of release that would be sufficient to secure the

10   defendant's appearance at trial.

11             I note that he, as you mentioned, is a resident of

12   the state of Georgia and has a life-long history here, but I

13   also note that he was found at his sister's house, he missed a

14   court date.  You mentioned he showed up at court every time.

15   Except for one day when he knew the FBI was looking for him.

16   He slipped their watch.  Showed up at his sister's house.

17   Armed to the teeth.

18             I also am concerned that he's got a network of

19   friends and social media followers that could assist him if he

20   were going to try to evade proceedings in this case, and I

21   don't think I can trust him to make arrangements to appear in

22   the District of Columbia for proceedings in that court.  So as

23   an alternate ruling, I do find that there's no condition of

24   release that would secure his appearance at trial.

25             I should also note it also comes back to my finding

1    that because of the corrupting and dangerous ideology that has

2    poisoned this man's mind, that he has no respect for the laws

3    of the United States, for the people who enforce those laws,

4    and I don't -- I wouldn't trust him to show up or do anything

5    that I told him to do.  Because he probably thinks that I'm

6    human scum or that I should be the victim of a head shot

7    because I work for the federal government.  So, no.  I am not

8    going to release him.

9              MR. SAVIELLO:  Please note my objection on the flight

10   ruling as well, Your Honor.  Thank you.

11             THE COURT:  Yes, sir.  Anything else from the

12   government?

13             MS. McEWEN:  No, Your Honor.

14             THE COURT:  All right.  Very good.  That concludes

15   our business for this morning.  Court will be in recess until

16   2:30 this afternoon.

17             COURT OFFICER:  All rise.

18       (Proceedings concluded at 12:57 p.m.)

19                           END OF RECORD

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, Darlene D. Fuller, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Middle District of Georgia, do hereby certify that pursuant to

8     Section 753, Title 28, United States Code, that the foregoing is

9     a true and correct transcript of the stenographically reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the regulations of

12    the Judicial Conference of the United States.

13

14                    Dated this 26th day of January, 2021

15                         *Darlene D. Fuller*

16                    _____
                      Darlene D. Fuller, RPR, CRR, RMR
17                    NCRA No. 5803
                      Federal Official Court Reporter
18                    Georgia CCR 5641-3440-5157-6832
                      Michigan Certification CSR-0929
19

20

21

22

23

24

25