```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,        .
                                        .  Case Number 21-cr-116-1
 4               Plaintiff,             .
                                        .
 5          vs.                         .
                                        .
 6     WILLIAM MCCALL CALHOUN, JR.,     .  March 5, 2021
                                        .  1:12 p.m.
 7               Defendant.             .
       - - - - - - - - - - - - - - - - -

 8

 9                   TRANSCRIPT OF MOTION HEARING, VOLUME I
                     BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                      UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the United States:       ADAM ALEXANDER, AUSA
                                    United States Attorney's Office
14                                  222 West Seventh Avenue
                                    Anchorage, Alaska 99501
15

16     For the Defendant:          JESSICA SHERMAN-STOLTZ, ESQ.
                                    Sherman-Stoltz Law Group, PLLC
17                                  P.O. Box 69
                                    Gum Spring, Virginia 23065
18

19

20

21     Official Court Reporter:    SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
22                                  U.S. Courthouse, Room 4704-B
                                    Washington, D.C. 20001
23                                  202-354-3284

24

25     Proceedings recorded by stenotype shorthand.
       Transcript produced by computer-aided transcription.
```

# C O N T E N T S

## TESTIMONY

WILLIAM M. CALHOUN, JR.   Direct Examination............   14
                          Cross-Examination............   33
                          Redirect Examination..........   54

```
 1                    P R O C E E D I N G S

 2         (All participants present via video conference.)

 3              THE COURTROOM DEPUTY:  Your Honor, we are in Criminal

 4    Action 21-116-1, United States of America versus William

 5    Calhoun, Jr.

 6         If I can have the parties identify themselves for the

 7    record, beginning with the United States.

 8              MR. ALEXANDER:  Adam Alexander for the United States,

 9    Your Honor.

10              THE COURT:  Good afternoon.

11              MS. SHERMAN-STOLTZ:  Jessica Sherman-Stoltz for the

12    defendant, Your Honor.

13              THE COURT:  Good afternoon.  And good afternoon,

14    Mr. Calhoun.

15              THE DEFENDANT:  Good afternoon.

16              THE COURT:  For the record, this is a video conference

17    hearing that is being conducted pursuant to the Chief Judge's

18    standing order relating to the pandemic.

19         Ms. Sherman-Stoltz, am I correct that Mr. Calhoun has

20    agreed to proceed by video conference today?

21              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

22              THE COURT:  All right.  Is that correct, Mr. Calhoun?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE COURT:  All right.  I do find it is in the

25    interest of justice to proceed in this way, given the public
```

1    health risks associated with the pandemic.

2         One housekeeping matter before we get started, and that is,

3    I know there had been some issues with the attorney admissions

4    paperwork being processed through the court, given the large

5    number of out-of-district attorneys who are seeking admission.

6         My understanding is that both attorneys do now have access

7    to ECF and are admitted.  Is that correct?

8              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

9              MR. ALEXANDER:  Yes, Your Honor.

10             THE COURT:  All right.  And I understand that -- I

11   know the government filed a motion to unseal the case, and that

12   should have been granted by now, and all the filings should be

13   on the public docket.  If not -- Mr. Hopkins, can you confirm

14   that?  Have the filings been posted on the public docket?

15             THE COURTROOM DEPUTY:  I can look and see, Your Honor.

16   Let's see.

17             THE COURT:  All right.  Well, regardless, I will ask

18   both of you to check that and make sure they are posted promptly

19   if they are not already on the docket.

20        So this is the defendant's motion.  So I will start with

21   you, Ms. Sherman-Stoltz.  I know a lot of your briefing and both

22   parties' briefing focuses on Mr. Calhoun's health situation.

23   And while I am not at all insensitive to his condition, I do

24   want to focus the argument on the bail reform factors.  I want

25   to focus on the 3142(g) factors here primarily.  I have read

1   your arguments with respect to the health issues you raise,

2   Ms. Sherman-Stoltz, and you can certainly add anything that you

3   would like to to your briefing, but I want to focus more on the

4   four factors that I have to consider.

5       Is there anything more, Ms. Sherman-Stoltz, with regard to

6   Mr. Calhoun's health situation that you would like to provide

7   beyond what's attached in the exhibits?

8       MS. SHERMAN-STOLTZ:  No, Your Honor.  There's nothing

9   new that has transpired since the time that I filed the motion

10  and the exhibits that has anything to do with his health.  It

11  remains in the same condition it was.

12      THE COURT:  All right.  I will just say, the exhibits

13  are kind of difficult to interpret other than there's been a

14  series of appointments, and I don't question that he has

15  prostate cancer and has been treated for it.  But in terms of

16  the nature of his treatment or the timing or anything like that,

17  it's not reflected in that paperwork.

18      MS. SHERMAN-STOLTZ:  Under Exhibit A, Your Honor, it

19  does show that his next upcoming appointment for cancer

20  treatment -- for his cancer treatment is on April 12, and it

21  indicates where it is.

22      And I apologize if I'm not looking directly at the video

23  monitor but also looking at the exhibits.

24      THE COURT:  Don't worry about that.

25      I appreciate his appointment in April, but I mean in the

1    sense of what his treatment entails, how long it's been going,

2    what the nature of it is, whether that can be handled someplace

3    else.  All of those kinds of questions I would have if I were

4    considering releasing him on that basis.

5        But I think that the government makes a very strong

6    argument that the appropriate mechanism to consider that is

7    pursuant to 18 U.S.C. 3142(i) and whether this is an exception

8    reason.  And based on the record before me now, I don't think

9    that you've established that now, not that you couldn't renew

10   the motion.

11       But for purposes of today's motion to reconsider the

12   magistrate's decision, I'm focused more -- because I don't think

13   you've met that threshold, I'm focused more on the fact that --

14   I do appreciate that you make the argument that Mr. Calhoun

15   would be more likely to abide by conditions of release so that

16   he can be treated out of custody.  So I am considering the

17   argument for that purpose.  But again, I am more focused now on

18   the factors as a whole.  So if you could direct your argument at

19   that, that would be helpful.

20       MS. SHERMAN-STOLTZ:  Yes, Your Honor.

21       If I could comment on one thing that you mentioned

22   regarding the length of his treatment is the first couple of

23   pages of Exhibit A have all those visits, and they date all the

24   way back to the beginning of his treatment.  So that would be

25   the starting point of his treatment that he began receiving for

1    his prostate cancer upon his diagnosis, and that goes back to

2    October 2nd, it looks like, of 2019.  So that would be the

3    starting point and then through current and then the upcoming

4    appointment of April 12th, 2021.

5                    THE COURT:  All right.

6                    MS. SHERMAN-STOLTZ:  Sorry.  I'm going to my motion

7    here so that we can address the rest of the argument towards

8    what Your Honor has requested.

9        Your Honor, our position -- and I don't know procedurally

10   if you want me to go specifically through my motion or having

11   already seen the government's opposition if you want me to

12   direct the majority of my argument also incorporating the

13   government's opposition.

14                   THE COURT:  That would be most helpful.  The parties

15   should assume I've read all of the filings and exhibits.  So it

16   would be most helpful if you respond to some of the points the

17   government raises.

18                   MS. SHERMAN-STOLTZ:  Absolutely.

19       One of the factors that Your Honor has to consider is, you

20   know, obviously violence of the defendant, danger, threat to the

21   community.  Mr. Calhoun's history, lack of criminal history, his

22   Georgia Bar membership responsibility that he's in good standing

23   show a clear respect and followance of the law.

24       The government addresses firearms and the amount of

25   firearms that he had.  But we would again direct Your Honor to

the fact that those firearms, had they been a concern at the

time of his first bond hearing and the pictures that were taken

that were presented, this is no longer a concern that the Court

should have because they have all been confiscated.  They have

been taken from his home.  His business and his sister's home

was subject to search warrants.  And all of those items were

removed.  So he doesn't have any access to firearms.

As we provided information in our motion, there's two

places where he could reside where he would feel safe, and he

doesn't have access to firearms there as well.

All of the affidavits that we supplied, Your Honor, show --

and there's a voluminous amount of them where people are talking

about his character, his kindness towards others, again his lack

of any type of harm or violence towards anybody.  He has

committed his life to helping others, particularly as a criminal

defense attorney, to helping those that are in less fortunate

positions than he is.

There's been nothing in his life and nothing that the

government has pointed out that shows any type of a pattern or

history or violence or danger to the community, anything that

has been acted upon, anyone that has come forward and indicated

that they have been harmed or hurt by him.

The government is relying upon for the bulk of their

argument a exhibit of screen shots of alleged social media

posts, various social media posts.  And Your Honor --

1          THE COURT:  Sorry to interrupt, Ms. Sherman-Stoltz.

2     But do you dispute that those are Mr. Calhoun's social media

3     posts?

4          MS. SHERMAN-STOLTZ:  Yes, Your Honor, we do, and we

5     dispute that they have not been altered in any way.  Those are

6     not authenticated.

7          THE COURT:  What evidence do you have to support that

8     that's the case?

9          MS. SHERMAN-STOLTZ:  So Mr. Calhoun's social media

10    platforms have all been shut down at this point.  But he has

11    seen the exhibits, and he has indicated in numerous ones of them

12    that that's not what he posted, that's not what he said.  The

13    context has been changed or words have been changed.

14        But without search warrants coming forward with the actual

15    authenticated and with the appropriate chain of custody

16    evidence, without having those documents at this point, all we

17    can say to the Court is that those that have been presented to

18    you are not authenticated.  Those are screen shots that were

19    taken by one individual, and he posted them on his Twitter feed,

20    and that's where the government obtained them from.  No chain of

21    custody.

22         THE COURT:  Let me drill down on this a bit.  I get

23    your point that they have not been authenticated to date.  But

24    are you also affirmatively stating that these are not his posts,

25    he did not state these words?  Is that your proffer here?

1        MS. SHERMAN-STOLTZ:  I can't say that for all of the

2   screen shots.  I can say that for some of the screen shots

3   Mr. Calhoun is indicating they are not correct.

4        THE COURT:  Let me ask you about one of those.  What

5   about the statement he made after he returned to Georgia where

6   he said something along the lines of "we brought the government

7   to its knees with no weapons.  Now we're all going back armed

8   for war, and the deep state is about to get run out of D.C."?

9   Is that one he contests as not being one of his statements?

10       MS. SHERMAN-STOLTZ:  Yes, Your Honor, he is contesting

11   that the -- I guess you could say the dramatization of the

12   events that occurred are not accurate as he had posted them.

13       THE COURT:  So he did not post those words?

14       MS. SHERMAN-STOLTZ:  Correct, Your Honor, no, not

15   those exact words, he did not.  And that's what he's indicating,

16   that they have been altered.  But we can't do side-by-side

17   comparisons at this point in time because his social media

18   platforms have all been, you know, shut down and restricted,

19   closed.

20       THE COURT:  And do you think they've been altered by

21   the government or --

22       MS. SHERMAN-STOLTZ:  No, Your Honor, we're not

23   suggesting that they've been altered by the government.  These

24   were retrieved by another individual, another individual who has

25   spent a good amount of time targeting and harassing Mr. Calhoun,

1    making it a point to, you know, reach out to him or poke at him

2    and then collect these screen shots, compile them over a period

3    of time, and then repost them in a manner to continue to harass

4    him and defame him.

5            THE COURT:  Do you have any evidence to support that

6    proffer?

7            MS. SHERMAN-STOLTZ:  Just the evidence that my client

8    has indicated that they are not --

9            THE COURT:  He's not testifying.  Do you have any

10   evidence that you can present here?

11           MS. SHERMAN-STOLTZ:  I don't have any of those

12   original posts, no, Your Honor.

13           THE COURT:  Or any other evidence that would support

14   your representation here?

15           MS. SHERMAN-STOLTZ:  No, other than having my client

16   testify to that.  If Your Honor would -- if that's what Your

17   Honor would like, he is prepared to do that.

18           THE COURT:  All right.  Is that true for the

19   statement "crazy Nancy probably would have been torn into little

20   pieces but she was nowhere to be seen"?  Did he write that?

21           MS. SHERMAN-STOLTZ:  I'm scrolling to it.  I'm sorry,

22   Your Honor.

23       I don't have a specific indication that that is not

24   accurate, but that's something again I can address with my

25   client under oath.

1          THE COURT:  Well, would you like to call your client

2     to the stand?

3          MR. ALEXANDER:  Your Honor, I apologize for

4     interrupting.  May I be heard just very briefly?

5          THE COURT:  Sure.

6          MR. ALEXANDER:  I just want to note for the record

7     before Mr. Calhoun is potentially sworn under oath and offers

8     testimony under oath that there's an *Atlanta Journal-*

9     *Constitution* article that I should have included, I suppose, as

10    an exhibit dated January 8th, 2021, that describes an interview

11    with Mr. Calhoun and specific references to his social media

12    posts that are -- that were used as exhibits at Mr. Calhoun's

13    initial detention hearing and including admissions regarding

14    Mr. Calhoun's conduct on the day of January 6th in the interview

15    to the *Atlanta Journal-Constitution*, as well as being asked

16    about certain tweets, including the one referencing hanging the

17    current president where Mr. Calhoun is quoted as saying "Trump

18    voters say that all the time.  We're just ornery," and "defended

19    statements" -- I'm quoting now, "defended statements he made

20    about civil war as heated political rhetoric, not actual

21    warnings."

22         There's no indication in this article where Mr. Calhoun is

23    quoted extensively that any of the social media posts that are

24    referenced were doctored or altered or anything other than his

25    words, just a question of, I suppose, the intent behind them.

1    So I just wanted to bring this to the parties' attention,

2    obviously, before Mr. Calhoun was sworn.

3        THE COURT:  Ms. Sherman-Stoltz, would you like a

4    moment to discuss with Mr. Calhoun whether he does, in fact,

5    want to testify here today in a break-out room?  I want to make

6    sure he's thought this through and that he is prepared to

7    testify, because as he well knows the statements he makes here

8    could be used against him.

9        MS. SHERMAN-STOLTZ:  Yes, Your Honor.  That would be

10   helpful.  Thank you.

11       THE COURT:  So Mr. Hopkins, I'm going to ask that you

12   place Ms. Sherman-Stoltz and Mr. Calhoun in a break-out room,

13   and I am going to sign off briefly.  Let me know when you're

14   available.

15       THE COURTROOM DEPUTY:  Absolutely, Your Honor.

16       THE COURT:  Thank you.

17      (Defendant and defense counsel conferred.)

18       THE COURT:  All right.  Ms. Sherman-Stoltz, are you

19   ready to proceed?

20       MS. SHERMAN-STOLTZ:  Yes, Your Honor.

21       THE COURT:  All right.  And does Mr. Calhoun still

22   seek to testify?

23       MS. SHERMAN-STOLTZ:  Yes, he does, Your Honor.

24       THE COURT:  All right.  If the courtroom deputy could

25   please place the defendant under oath.

1    WILLIAM MCCALL CALHOUN, JR., WITNESS FOR THE DEFENSE, SWORN

2                        DIRECT EXAMINATION

3              BY MS. SHERMAN-STOLTZ:

4    Q.   Mr. Calhoun, the Court was previously discussing and asking

5    questions regarding specific posts that it's my understanding

6    that you have seen.  I know you don't have a copy of them right

7    in front of you, but you have seen the posts that the judge has

8    indicated; is that correct?

9    A.   That's correct.  It's been a few weeks since I've seen

10   them, but I did see them when I was at court in Macon.

11   Q.   And Her Honor asked a question regarding the posts that

12   were specific to the events surrounding January 6th.  Do you

13   recall those posts?

14   A.   Yes.

15   Q.   And what you posted about, the events of January 6th, what

16   forum did you post those on?

17   A.   I think that was on Parler.  It would have either been on

18   Parler or Facebook.  Actually, I think I was restricted on

19   Facebook.  So it was probably on Parler actually.

20   Q.   And can you describe for the Court the nature in which you

21   wrote those posts, how you were writing about the events?

22   A.   Yes.  I was writing like a -- kind of like a narrative.

23   Often I used "we," you know, "we did this," "we saw this."  I

24   wasn't literally meaning that I did these things or was, you

25   know -- like for example, the post about coming back, what was

1    it, a week later armed or something of that nature, the one that

2    the Court asked about, all right, I was not saying we are, in

3    fact, coming back a week later armed for war or something like

4    that.  I was recording what I was hearing on the street from the

5    crowd.  So when I said, it was like the word on the street is

6    we're coming back.  Meaning, what I meant was the crowd is --

7    different people in the crowd at different times, different

8    places were talking about coming back armed.  I was not talking

9    about me personally coming back armed, but just that that is

10   what I was hearing being discussed.  So that's one example.

11       I mean, I would not -- I did not go to D.C. armed.  I would

12   not go to D.C. armed.  And I mean, I'm a law-abiding citizen.  I

13   did -- I admitted that, you know, I walked in an open door at

14   the Capitol while the police watched, but I didn't touch

15   anything or anybody, you know.

16   Q.   Mr. Calhoun, if I could kind of direct just a little bit

17   better this line of questioning.

18   A.   All right.

19   Q.   Now, the reference that the judge made towards the comments

20   about Nancy Pelosi, and I will read it to you as has been

21   provided in the exhibit from the government.  The specific

22   question was, "Crazy Nancy probably would have been torn into

23   little pieces but she was nowhere to be seen."

24       So is that something that you wrote and, if so, in what

25   context?

A.   Yes, I did write that, but you've got to understand, I had a fairly significant following on social media, and that was a satirical reference to earlier comments I had made in the weeks or months prior to January 6th where I had commented on more than one occasion that crazy -- or Nancy -- I don't know if I called her crazy Nancy, but that Ms. Pelosi would probably be ripped -- torn into pieces, torn into little pieces by an enraged Antifa mob when they realized that she had betrayed them.  So I had made satirical comments earlier about an Antifa mob tearing Nancy into little pieces or whatever when they figured out what she had done to them.  So my comment that day at the Capitol was a reference to that.

     If you had followed my posts, you probably would have known or maybe might have picked up that that was just a satirical reference, and although at this time it was made from the standpoint of the Capitol mob may have done it.  But in truth, the Capitol mob was not going to tear anybody to pieces.  The mob, if you can even call it a mob, everybody around me at the time I was in the Capitol was very respectful.  They were not doing property damage.  It was -- people were actually, you know, yelling out "don't touch anything," you know, "don't mess with anything."  That's what was happening around me when I was in there.

Q.   And is it correct that that would relate to a comment that you made on how the Capitol rioters were admiring the amazing

1    artwork?  Did you make that comment?

2    A.   Yes.  That photograph, I took that photograph.  That was on

3    the front page of the *Atlanta Journal-Constitution*.  You can

4    tell by the statement people -- you can tell from the photograph

5    that people are not running around frantically like it's a field

6    day or something.  They're standing there quietly looking at the

7    artworks.  Their legs aren't moving.  They're standing still.

8    And that's what was happening.  It wasn't -- it was very -- it

9    was very -- it was nonviolent.  It was a very intensely, you

10   know, patriotic moment.  I mean, I certainly, you know -- it may

11   not have been the best idea to go into the Capitol.  We

12   didn't -- we could have -- if we were trying to do damage and

13   hurt, we could have done millions of dollars' worth of damage to

14   artwork if that was what our intention was, but that was not our

15   intention.  We didn't do anything like that.

16   Q.   And Mr. Calhoun, by "we," who are you referring to?

17   A.   Well, all of -- that crowd of protestors who were -- I

18   could observe who were there around in my immediate, you know,

19   presence inside the Capitol.  It's -- I mean, that's what I saw.

20   Okay?  I mean, when I -- I was only in there for a brief period

21   of time, and when I was trying to leave, it basically took 15 or

22   20 minutes to get out because there were so many people crushing

23   to get in.  It took a while just to get out, there were so many

24   people trying to come in.

25        But I did eventually get out, and I didn't see anybody get

1    shot.  I didn't see anybody get, you know, assaulted in any, you

2    know, aggressive manner.  I think I saw somebody having a heart

3    attack early on outside, but I didn't -- I really can't -- they

4    were yelling for EMTs.  I really couldn't even see that.  I

5    mean, I, you know --

6    Q.   Mr. Calhoun, I want to go back real quickly.  You made a

7    comment regarding your followers, that you were writing to your

8    followers.  Now, how many followers would you say that you had

9    that were following you for, you know, these type of purposes,

10   you know, to hear your comments on political purposes or things

11   of that nature?

12   A.   I think on Facebook I had slightly less than 5,000.  I'm

13   not sure.  My Parler account was relatively new.

14        I will give you an idea of how bad it was, just to give you

15   an idea.  On Facebook, after the Capitol event on the 6th --

16   this is probably on about January 8th -- a friend of mine

17   posted -- I go by my middle name, McCall.  So a friend of mine

18   posted "McCall Calhoun for president" on Facebook, and he got

19   banned for 30 days for doing that.

20        So obviously, I had some people -- you know, my name was, I

21   guess, known on Facebook.  See, what happened was, I was --

22   Q.   Mr. Calhoun, I want to try to focus your testimony right

23   now on the questions that the judge had asked and the exhibits

24   that were provided by the government.

25        Now, you're aware of the screen shots that were, I guess,

1    taken from various social media platforms of yours and then

2    posted on another individual's Twitter feed; is that correct?

3    A.   Apparently so.  I had -- I didn't know -- well, I knew I

4    was being -- I knew I had people that hated me on social media.

5    I didn't know I was being cyber stalked for months on end and

6    they had been putting together this information that they had

7    ready.  It was -- part of it is edited.

8         Now, this is very specific.  There is an exhibit.  I don't

9    know the number.  But it's the one that refers to the D.C. gun

10   ban.  I think this is on Parler.  And it had -- the original

11   post had three sentences in it.  The government exhibit only has

12   two sentences, and the middle sentence is removed, and it

13   drastically changes the message.  Okay?  The message that is in

14   the exhibit goes something like this.  It says that "the D.C.

15   mayor has banned guns for January 6th," period.  Next

16   sentence, "Very illegal," period.  And that's conveying the

17   message that I am calling the D.C. gun ban is illegal.  That is

18   completely fabricated.  So my post as originally posted read

19   like this:  "The D.C. mayor has banned guns for January 6th.

20   However, guns are already highly illegal or already banned in

21   D.C.  Very illegal."

22        Meaning, I was just saying that the gun ban was redundant

23   because guns were already banned.  Why ban them again because

24   they're already banned.  That was my message.  It wasn't I was

25   calling the ban very illegal.  But that's one example of a post

1    that was edited.

2        Now, the other post that we were talking about where I

3    said "the word on the street is we're coming back armed for war"

4    or whatever it was, I think some of that was removed.  I'm not

5    100 percent certain.  But I know that the context, I've already

6    explained that that is just what I was reporting I had heard.  I

7    was not advocating for that in any form or fashion.

8        The additional context on this, though, on why the person

9    would have been doing this --

10   Q.   Real quickly, Mr. Calhoun, as far as context is concerned,

11   when you were speaking about -- well, writing about people

12   indicating that they were going to be coming back, had you

13   prefaced your statements by saying anything along those lines of

14   "this is what I'm hearing," "this is what people are saying"?

15   Had you conveyed it in a manner in which people knew that you

16   weren't saying it but that you were writing what you were

17   hearing?

18   A.   Right.  I think I said, "The word on the street is," but

19   anyway, that's what I was intending to convey, because that's

20   literally what the word on the street was.  I heard several

21   people in about four or five different conversations that I was

22   just -- was eavesdropping on where people were saying we're

23   coming back, you know, next week with guns or whatever, we're

24   coming back next time, we're coming armed.  That's what people

25   were saying.  I wasn't planning it.  I was just reporting what I

1    was hearing people saying on that.

2         But I think, you know, it is important to put some context

3    into why would somebody -- who would go to the trouble to cyber

4    stalk me for weeks and months on end in order to put together

5    this thing.

6         And I think it is important to know that I was a

7    Democrat -- I ran for office as a Democrat.  I ran for district

8    attorney in Southwestern Judicial Circuit as a Democrat back in,

9    I think it was, 2000.  All my career I have been a Democrat.  I

10   voted for Hillary Clinton in 2016.  I voted for Barack Obama

11   twice.  And then I -- and I was vocal against Trump early on.

12   You can go back to Facebook and see that for the first two years

13   he was in office.

14        But then at the end of 2019, I started reading these

15   Democratic gun bills that were coming out of Virginia, and I

16   thought if that becomes law, me and all of these farmers I know

17   are going to go to prison.  And then Hank Johnson of Georgia

18   filed H.R. 5717 in March of 2020, and I'm reading that going,

19   you know, if that becomes law, all these farmers I know and

20   their children and their grandchildren are going to be at risk

21   of going to federal prison.

22        And so I started defending the Second Amendment on

23   Facebook.  And I immediately got savaged and was called a white

24   supremacist.  I was called this.  I was attacked.  And of

25   course, my natural reaction is to push it further.  So I was

going full bore pushing First Amendment rights.  People were
being locked down.  They were being told in certain parts of the
country and Canada that they couldn't go to church but they
could go to strip bars.

I had no tolerance for that.  I had no tolerance for these
Democrat gun laws because they don't address the gun violence
problem.  They address guns that aren't doing any crimes.  We
can argue the policy, but the thing is, I was a Democrat lawyer
who flipped very vocally to the conservative side, and they
hated me for that.  So that's part of what's going on here.

Q.   In any of your posts, Mr. Calhoun, did you make any direct
threats towards anyone or threaten harm to anyone?

A.   No.  I have threatened no one.  I mean, I have not
threatened anyone.  I have not advocated the overthrow of the
government.  I have not -- I have not -- I've made no threats.
I've been very meticulous over the past 30 years as a lawyer not
to commit felonies, including terroristic threats.  I am not
threatening anyone, and I have not threatened anyone.

Q.   So if the government had any posts showing that you
threatened someone or some individuals, would your
representation be that that is not accurate and that may have
been altered by this individual that you said was stalking you?

A.   Well, there was more than one, I want to be clear about
that, that was stalking me.  But I did not threaten anyone.
Now, I have made -- if you recall, last summer and into the

1    fall, there was a national debate going on in this country

2    whether Antifa or Black Lives Matter had the right to engage in

3    what I think they called therapeutic retribution, meaning we're

4    oppressed, so therefore we should be able to burn down sections

5    of cities or burn down a federal courthouse or whatever or burn

6    down the house with you in it because that will make us feel

7    better.  Of course, there is no legal doctrine that justifies

8    burning down anything like that.

9        And all of my comments, I made comments in the realm of

10   self-defense.  In other words, if a bunch of Communists showed

11   up at my house trying to burn it down, I will take care of the

12   problem, you know.  If the police can't stop them and the

13   National Guard can't stop them, then me and the farmers, we'll

14   stop them, basically trying to deter these people from bringing

15   their looting and burning down to my part of Georgia, which it

16   has not come there yet.  It's kind of a powder keg where

17   Americus, Georgia, is, which is why I'm not living there.

18       But the idea was to deter these people.  There is no right

19   to burn down somebody's house because you feel oppressed.  I'm

20   sorry.  You cannot lay siege to a federal courthouse.  I know --

21   Q.   Mr. Calhoun, I would like to ask you a question about that.

22   At the time that you wrote those statements, were you yourself

23   receiving any type of threats of harm or -- for your opinion,

24   for what you were saying?

25   A.   I was not receiving -- well, a threat of physical harm, no.

There was a movement to -- they were going to try and have me disbarred.  The sheriff is a good friend of mine, the sheriff of Sumter County, Eric Bryant, and he was like, "Boy, they want you searched.  They want you detained.  They want you arrested. They want you in jail."  And it was all because I was defending the First Amendment and the Second Amendment.

And I know that they reported me to the FBI, to the GBI, to the chief of police, to the state bar, although I never heard anything from the state bar.  There was definitely, I will call it, a plan to get me.  Of course, I thought, and I still think, even though I'm sitting here for what I said, I still am a firm believer that you cannot be imprisoned or disenfranchised in this country because of political speech.  And I'm certainly -- right now, I'm a little -- it shook me to my core to be held here for my political positions, which is why I'm here.

The person that I went to the Capitol -- that I rode to Washington with on January 6th, he's not in jail.  He got arrested.  He was released within 24 hours.  He doesn't even have a job.  I have a law practice that is going down the tubes. I've got responsibilities.  I need to deal with these people that do not deserve to be languishing.  For example, I have one client who -- one of my sisters was trying to get lawyers to substitute in or maybe get a public defender or whatever if they needed it.  I've got one client who he refused a public defender.  He is going to sit in jail and wait until I get out

1    of jail to go back to Georgia to represent him.

2         So I mean, I will leave that right there.  There is a lot.

3    There's a lot here.  I have been a lawyer for --

4    Q.   Mr. Calhoun --

5              THE COURT:  Mr. Calhoun, wait for the question,

6    please.

7              BY MS. SHERMAN-STOLTZ:

8    Q.   Sorry.  I know there's a little bit of delay and that when

9    I start to say something that I was interrupting you.  But

10   again, I want to try to keep your testimony just having to do

11   with what the judge's concerns were and what she initially posed

12   and then also what you've indicated and what you've indicated to

13   the Court that not all of those screen shots that they have, to

14   your recollection -- and you mentioned one specifically -- are

15   accurate to what you posted.  Is that correct?

16   A.   That one has absolutely been edited to change the entire

17   meaning of my post.  I can't state under oath that the other

18   ones were edited, although I don't know -- I haven't seen them.

19   I would have to really -- I'd have to compare them.  I'd have to

20   look at them.

21        But one thing is for certain, they contain none of the

22   conversations.  I'm replying in most of those posts.  You can

23   read those posts and tell I am replying to comments that have

24   been made to me.  Okay?  Where are those comments?  Why am I

25   saying what I said?  I'm saying those things in response to

1   things that have been said to me.

2       And again, you know, this was a lot of these people that

3   were saying if you defend the Second Amendment you're a white

4   supremacist.  I had two lawyers, of all things, telling me that

5   early on in this whole saga.

6   Q.   And Mr. Calhoun, were the majority of these posts prior to

7   you even having decided to go to Washington, D.C., on

8   January 6th?

9   A.    Absolutely.  I didn't know I was going to D.C.  If you

10  remember, we had this chain of events where we had the Texas

11  Supreme Court case which the Supreme Court could have really

12  diffused the situation, and they just looked at the case but

13  they didn't act.  And Georgia was a firestorm of election fraud

14  allegations, and it was kind of slow moving.  Some of the other

15  states were slow moving.  But there were legislators who had

16  written to Vice President Pence, and they asked him -- from the

17  swing states and different numbers depending upon which state,

18  but they basically told Pence, "We've got problems with our

19  electoral votes.  Send them back to us.  Let us fix them.  And

20  then we will send them back to you."  Of course, Pence refused

21  to do that.

22      That was the trigger, that and some tear gas from the

23  police, as far as I can tell.  Those were the trigger points

24  that made the crowd rush up those steps and go into the Capitol.

25      Now, I was across the lawn.  You can see -- now, this is on

1    Facebook, I think, Your Honor, or Parler, one or the other.
2    It's when I was across the lawn from the steps that go back
3    towards the Washington Monument, those steps right there with
4    the scaffolding.  I was across the lawn, and I posted, "It looks
5    like we're going in."  Again, I'm using the narrative form
6    saying, "It looks like we're going inside."  Again, at the time
7    I didn't mean necessarily as in me, but I could see from 100
8    yards away the crowd was about to go up those steps.
9         And there were no police there to speak of.  I mean, the
10   few that were there ran off.  My friend and I went over there to
11   check it out.  By the time we got there, the crowd was rushing,
12   was already rushing up the steps, and the police were gone.
13        And so --
14   Q.   And Mr. Calhoun --
15   A.   -- that was a spontaneous thing is what I'm saying.  The
16   whole -- there was no planning, nothing about going to the
17   Capitol on my end of things.  I mean, it was all spontaneous.  I
18   just followed --
19   Q.   Mr. Calhoun --
20             THE COURT:  Mr. Calhoun, you've got to wait for a
21   question.
22             BY MS. SHERMAN-STOLTZ:
23   Q.   Mr. Calhoun, let's refocus.  This is about bond
24   reconsideration.  We will have an opportunity to be able to give
25   information regarding your charges, but this is specifically

1    with the danger to the community, the safety of the community,

2    threats of violence, and things along those lines.  So --

3    A.   All right.  If I could just finish my answer to your

4    question, I filed for a leave of absence some time in late

5    December for January 5th, 6th, and 7th.  Okay?  That was when I

6    made the decision to go to Washington.  I think it was on

7    December 28th when I filed it.  So that's how late my actual

8    "I'm going to Washington" decision was made.

9         I'm sorry.  I forgot what your last question was.

10   Q.   Well, just as a reminder of what we're focusing on for bond

11   reconsideration, what the judge said at the very beginning.

12        MS. SHERMAN-STOLTZ:  And Your Honor, I have

13   additional, I can say, arguments as to your, you know, beginning

14   directive of how to focus the proceedings.  But I understand

15   that since I've called a witness, that the government attorney

16   may have questions.  So I would like to see how you would like

17   to proceed on that, Your Honor.

18        THE COURT:  Of course, the government attorney will

19   have a chance to cross-examine Mr. Calhoun.  But I want to make

20   clear to you, Ms. Sherman-Stoltz, to the extent you want to ask

21   Mr. Calhoun questions regarding the health condition or anything

22   else that I haven't focused on, I'm not in any way limiting the

23   evidence you can produce.  I was just for purposes of argument

24   trying to direct you to what I'm most interested in.  But by all

25   means, feel free to probe whatever other areas you would like to

1    probe.

2              THE DEFENDANT:   I can summarize my medical condition.

3              THE COURT:   You need to respond to questions your

4    attorney asks.

5              BY MS. SHERMAN-STOLTZ:

6    Q.   Mr. Calhoun, your medical diagnosis of having prostate

7    cancer, when did that take place?  When did that occur?

8    A.   I believe that was back in April of 2019.

9    Q.   And have you been receiving care for your cancer, care and

10   treatment ever since?

11   A.   Yes, I have.  They said at first they were going to watch

12   it.  I said, I'm like, "Are you sure?"  And they're like, "Yes,

13   we're going to watch it."  That was back when I was first

14   diagnosed.

15        Then I went to Emory, because Emory is the best cancer

16   treatment place in the state.  And I got to Emory a little bit

17   later.  It took a few months because of the COVID thing, and I

18   was a little delayed from that.  But I got to Emory, and

19   basically after I had had the diagnosis for a year, at Emory, my

20   doctor said that they're not watching it anymore, they're going

21   to do something.  And they gave me three options.

22   Q.   And by that, you mean -- is it correct to say "do

23   something," is that treatments that you were being given?

24   A.   Correct.  It was getting bigger.  The cancer was growing.

25   So I had three different options.  One of them was removing the

1    prostate.  One was 28 days' worth of radiation.  The other one

2    was two days, separated by a couple of weeks, of very intense

3    radiation.  All had the same chance of success.  So I opted for

4    the two-day intense radiation.  I had that done.  I want to say

5    that was maybe in September and October of 2020.  The medical

6    records will reflect exactly when.

7         I had a follow-up in December.  And then basically they

8    said that it will be -- we want you to come back in April, it

9    will take that long for you to heal up, and then we can assess

10   everything at that point.

11        So that's what I'm due for in April is a follow-up to the

12   cancer surgical procedure to see if -- what my status is and

13   whether I'm -- do it or got something else that needs to be

14   done.  I have no idea.

15        But I don't really think that the -- I'm very uncomfortable

16   with the idea of changing horses midstream in the middle of this

17   cancer thing.  There's no cure for prostate cancer.  You either

18   catch it in time or you don't.  And I think they caught it in

19   time.  They should have.  But that's not for me to say.  I don't

20   know that.  I have to go back up there to find out.

21   Q.   Is it your understanding that the appointment that's

22   supposed to occur in April is to see how the effects of the

23   high-intensity radiation treatment affected the cancer?

24   A.   Correct.  They said it would take that long for me to fully

25   heal up, and then they can -- they've got some testing they can

1    do that will be accurate once you're healed, you know.

2    Apparently, you have to get healed up to get the accurate

3    testing and then go from there.

4    Q.   And have you been under the care of the same doctor at

5    Emory University?

6    A.   Yes, Dr. Ogan.  He's a urologist.

7    Q.   Okay.

8    A.   O-g-a-n is how you spell his name.  I think Kenneth is his

9    first name.

10   Q.   Mr. Calhoun, you're aware of the firearms that were

11   confiscated from you by the government; is that correct?

12   A.   Yes, yes, all legal.

13   Q.   Are those the only firearms that you own and possess or had

14   in your home?

15   A.   There's an old antique gun barrel, 16-gauge, and there's an

16   old antique single-shot .410 that I believe are at my sister's

17   house in Andersonville.  But other than that, they should have

18   gotten everything.  I believe they got it all.  Two of those

19   guns I inherited from my father, you know.  There were two other

20   shotguns, nothing fancy, just regular shotguns.  And then I had

21   three AR-15s, an AR-10, but again all legal.

22        When they came into my house -- they came to Macon and

23   said, "Do you have any firearms?"  And I said, "Yeah, right

24   there in the bedroom.  Don't shoot the dog."  And there was no

25   problem.  I was totally cooperative with them.

1    I'm not -- again, I keep going back to, I am a lawyer.  I'm

2  not going to commit a felony, and I am not going to -- I've got

3  way too much to lose here.  I've got more to lose than most of

4  these defendants.  And already my law practice is getting

5  dangerously in trouble at this point.  I've got continuing legal

6  education I need to do this month.  I'm not going to jeopardize

7  my law license by violating the Court's bail order or doing

8  anything else that is illegal that would get me in trouble.

9    Like I said, I think this case can be resolved --

10 Q.   Mr. Calhoun, we'll talk about the resolution of your case

11 at another time.

12 A.   But I'm just saying --

13         THE COURT:  Mr. Calhoun, you have to stop.  There has

14 to be a question posed for you to answer.

15         THE DEFENDANT:  I'm sorry.

16         BY MS. SHERMAN-STOLTZ:

17 Q.   I'm just making sure that while I have you under oath prior

18 to the government getting an opportunity to question you that

19 there is nothing else I want to ask you.

20 A.   One other thing --

21         THE COURT:  Mr. Calhoun, you may not speak --

22         THE DEFENDANT:  I'm sorry, Your Honor.  It's hard

23 to --

24         THE COURT:  I understand that you want to be your own

25 lawyer, but you can't in this setting.

1          MS. SHERMAN-STOLTZ:  Mr. Calhoun, I don't have any

2   additional questions for you that I think would be pertinent to

3   the purposes of this hearing.

4          THE COURT:  All right.  Mr. Alexander?

5          MR. ALEXANDER:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7          BY MR. ALEXANDER:

8   Q.   Good afternoon, Mr. Calhoun.  My name is Adam Alexander.  I

9   am an Assistant United States Attorney in Alaska detailed to

10  D.C. to assist with your case and some other cases.

11         Before I start, I know that you know as a practicing

12  attorney as well that I have an ethical obligation as an officer

13  of the court to give what's called a "target warning" just to

14  advise, and I certainly hope that it's not the case, that you

15  not make any false statement as you are under oath.

16         Okay, sir?  Do you understand that?

17  A.   Yes.

18  Q.   Okay.  And the federal statute, United States Code Section

19  1621, criminalizes anybody having taken an oath and making any

20  declaration to any fact that you know is not true.  Okay?

21         It's my hope and my intention to avoid any situation, I'm

22  not going to ask you any questions that are tricks.  If at any

23  point you want to talk to your defense attorney, please let me

24  know.  Okay?  It's a little awkward because we're all on video

25  here.  In normal times, you would be able to lean over and talk

1    to your attorney or take a break.  So let me know or let me know

2    if any of my questions are confusing or if you can't hear me.

3         Sir, just because there appeared to be a little bit of

4    confusion, you testified that you were at the Capitol on

5    January 6th.  That's correct; right?

6    A.   Correct.

7    Q.   And I believe it was your testimony earlier that you had

8    put in for leave on or about December 28th to take the 5th, 6th,

9    and 7th off?

10   A.   I believe, yeah, it was around -- it was at the end of

11   December, and it was on very short notice, you know, for a leave

12   of absence, but that was actually when the decision was -- I was

13   going at that point, whenever that got filed.

14   Q.   Sir, it sounded like that was in reaction to some of the

15   events that were occurring around the election.  You talked

16   about a case in Texas and maybe cases in Georgia as well.

17   A.   The Electoral College process.  December 12th was a big

18   deadline, I think, on the Electoral College.  Of course, then

19   there was -- Christmas was there.  That sort of, I guess, took

20   things out of focus for a minute.  But it wasn't -- I can't

21   remember -- there may have been some early discussion in

22   December about Trump having a rally on the 6th.  Again, you

23   know, which I was in favor of, of course, but when I actually

24   knew I was going, I mean, it was when I filed for that leave of

25   absence.

1  Q.   Understood, sir.  And you had some concerns at the time

2  regarding the legitimacy of the election, it sounds like from

3  your testimony?

4  A.   Yes.

5  Q.   And sir, it sounds from your testimony like you had been

6  posting on your social media accounts, Facebook, as well as

7  Parler?

8  A.   What --

9  Q.   Sorry.  To be clear, I'm not asking about specific posts

10  yet.  I'm just saying --

11  A.   I had a Facebook account.  I started getting -- there was

12  obviously -- it was obvious to me anyway.  There was a lot of

13  censorship going on on Facebook.  And a bunch of us who kept

14  getting, you know, restricted for talking about -- for example,

15  if you mentioned Hunter Biden, you could get restricted.  If you

16  mentioned, you know, Pelosi, you might get restricted.

17       So we started going to alternative platforms.  At first, I

18  went to Twitter.  I only was there about a week, and at that

19  point I was kind of frustrated.  I did my level best to get

20  kicked off Twitter by posting inflammatory comments, which I

21  did.  I've never been able to get back on that.  And then I went

22  to Parler, and I think that's it.

23  Q.   So, sir, I know it's hard because you're in custody

24  currently and you don't have these exhibits in front of you, but

25  I do want to try to clarify what you believe may have been

edited or changed in terms of the government's exhibits.  Okay?

You had a -- following your return to Georgia, sir, do you remember being interviewed by the *Atlanta Journal-Constitution*?

A.   Yeah.  They got some things wrong.  I can't remember specifically.  Like for one thing, they said that I broke into the Capitol.  That was totally made up.  I didn't break into the Capitol.  He was trying to spin things unfavorably against me.  He paid some lip service towards trying to be balanced.  But none -- that article, you know, it was not entirely accurate.  I can't give you specifics because I can't remember the article.  It was a long time.  He did use my photograph.  I took that photograph that was in it.  And he did say that we entered the Capitol and we entered the Capitol for love of country.  I did say that.

Q.   Sir, I'm going to ask you some specific questions about the article.  It quotes you as saying -- or it quotes one of your Parler posts.  "The deep state cannot stop us.  They learned that today when we stormed the Capitol and took it.  The word is we're all coming back armed for war."

You don't dispute the accuracy of that post in the article; is that correct?

A.   I think that should say "the word on the street" is my recollection.

Q.   Okay.  But otherwise, it's accurate; correct?

A.   What was it?

1    Q.   You're quoted as saying, "The deep state cannot stop us.

2    The learned that today when we stormed the Capitol and took it.

3    The word is we are coming back armed for war."

4         That quote was also in an exhibit that was used against you

5    in your detention hearing on January 21st.  Sir, I am just going

6    to continue and give you a couple other things and an

7    opportunity to respond.

8    A.   You want to know if that is accurate?

9              THE COURT:  Mr. Calhoun, wait for the question, sir.

10             BY MR. ALEXANDER:

11   Q.   So sir, it then continues to quote you directly as stating,

12   "This was civil disobedience.  Anyone who claims it was anything

13   other than civil disobedience was not there.  They did not see

14   it, and they do not know."  It quotes you as referring to the

15   riot that left five dead, including a Capitol police officer and

16   a Kennesaw woman who was crushed to death in the crowd.

17        The article continues --

18   A.   The police --

19             THE COURT:  Mr. Calhoun, wait for the question.  He

20   hasn't finished.

21             BY MR. ALEXANDER:

22   Q.   The article continues that for months prior to the rally

23   you took to social media to express your ire at Democrats and

24   Antifa and warned of a coming civil war.  It's quoting a number

25   of your Parler posts.  And then the article asks you about a

post that you made referencing hanging the current president.
"When asked about the tweet, Calhoun was dismissive that "Trump
voters say that all the time.  We're just ornery.""

    You didn't tell the journalist that any of these had been
made up or doctored or altered; is that right?

A.   Any of what?

Q.   Any of the quotes that were used, any of your prior
statements that were used in this article.

A.   Yeah, I can forward you to a whole slew of Facebook posts
where I said something about some Democrat or Biden and then,
like, people go "hang him" or "give him the firing squad" or
whatever.  It's all rhetorical hyperbole.

    Look, why were regular, normal Americans entering the
Capitol?  That's the question.  We're not going to be turned
into criminals.  We're not criminals.  What did the government
do to make us enter the Capitol?  That's what really I would be
asking.  I mean --

Q.   I'm curious.  So what did the government do to make you
enter the Capitol?

A.   Well, apparently, 80 percent of Republicans think they
stole the election.

       MS. SHERMAN-STOLTZ:  Mr. Calhoun, he's asking you
specifically.

       THE DEFENDANT:  That's what they did.  They stole the
election.  I think there's a mound of evidence that shows it was

1    stolen.

2          BY MR. ALEXANDER:

3    Q.   Is it fair to say, sir, then, you were in the Capitol that

4    day to delay the certification of the election?

5    A.   No.  Look, when you -- the people -- I think 20,000 people

6    went into the Capitol that day, at least 10, not all at once but

7    10- to 20,000 people went into the Capitol, and more would have

8    gone in if they could have.  You had too many people out there

9    in front of the Capitol.  You probably had 100,000 of them right

10   up in front of the Capitol trying to get inside of it.  These

11   people were at their utmost last moment of desperate need.  The

12   government failed them.  Okay?  This is their belief.  That

13   entire crowd had that belief.  It was civil disobedience.

14         Now, I've seen the same footage on CNN of a few people

15   breaking things and that sort of thing.  I didn't see that.  I

16   didn't see anybody breaking anything.  I know that the police,

17   from what I've been told from people who were there, and I came

18   up as it was ending, the police told these people that had heart

19   attacks from throwing flash grenades back into the crowd -- they

20   weren't even throwing them at the crowd.  They were throwing

21   them back into the crowd.  And they thought people who had heart

22   attacks -- I didn't see anybody assaulting.  I didn't attack

23   anybody.  You know what I'm saying?

24   Q.   Sir --

25   A.   I saw the police -- I saw people bleeding from the neck

where they had been shot by a pepper ball, and I saw somebody

who had been shot through the face with a rubber bullet.  I

mean, you know, but none of us did anything.  I'm sure you could

cherry-pick people there that did some violent things, but I was

not one of them.  I am not violent, and I am not one of these --

Q.   Sir, I just wanted to give you a chance as well to

address -- because I'm still trying to figure out, your attorney

has represented to the Court that some of these social media

posts that were labeled Government's Exhibit 1 through 35-A and

attached to the government's opposition to your bail appeal in

this case as Exhibit 2, there's a bunch of what look like both

Facebook and Parler posts.

You reference one in particular, sir, about banning -- D.C.

banning guns.  That was labeled Government Exhibit 3 in the

original bail hearing, your detention hearing and preliminary

hearing that was in Georgia.  It reads as follows:  "Headed to

D.C. to give the GOP some backbone to let them know this is

their last chance to stop the steal or they're going to have

bigger problems than these coddled Antifa burning down their

safe places.  D.C. announced it is banning guns when we storm

the Capitol tomorrow.  LOL.  Guns are already banned in D.C.

Very illegal.  Whether the police can enforce their gun laws

depends on how many armed patriots show up.  Ironically, in the

long list of firearms and weapons banned by the D.C. ordinance,

tomahawks are not mentioned, meaning there's no prohibition

against carrying a tomahawk as long as it's not used

offensively.  The tomahawk revolution is real 1776."

That is your posting; right, sir?  That is one you were

referring to?

A.   That's more humor.  I went into great detail reading the

D.C. list of all the weapons that are banned in D.C., but guess

what?  Tomahawks are not banned.  I didn't see a single tomahawk

in D.C.  I didn't bring one.

Q.   Got it.  I'm just trying to understand what you did write

and what you didn't write, because your attorney represented

that there may be --

A.   Some of this and what I said there, the part about -- the

first part, all right, about you're going to have bigger

problems, tell me which part of that is not true.  Okay?  Also,

that is the one that is missing the middle sentence.  Okay?

It's missing the middle sentence, totally edited out.  Okay?  It

changed the entire meaning of that post.  Again, it should have

said, "The D.C. mayor announced they are banning guns for

January 6th.  Guns are already banned in D.C.  Very illegal."

They took out the middle sentence to make it look like I was

calling the D.C. gun ban very illegal.  I was not doing that.  I

was --

Q.   Sir, I know it's hard because you can't see this.  So I

will move on here in a moment, but the sentence "whether the

police can enforce their gun laws depends upon how many armed

patriots show up," you wrote that?

A.    I did write that.  Because there was a question -- as you know, a lot of people came with guns.  I was not one of them.  I specifically read the D.C. ordinance, and I'm like, you know, there is no way in hell I'm bringing a gun to D.C., because they are so illegal here that is opening a can of worms.

We didn't know what was going to happen.  Okay?  We didn't know -- I'm answering the question.  We didn't know what was going to happen when we got up here.  I didn't know if there were going to be people walking around with AR-15s.  I didn't know if it was going to be like it was, which was basically unarmed people who still had -- there was this air of determination.  I can't quite, you know, impress upon you how determined this crowd was.  They were at their last desperate moment.  The country had let them down.  They were there for their country.  I know you don't understand that, but trust me, we were there for our country.  That is why we were there.

Now, I did not tell anybody to bring guns.  If anything, I discouraged people to bring guns because I pointed out how highly illegal they are in D.C.  Now, I don't think you can make a case that anybody started attacking people with tomahawks.

Q.    Sir, that's not the question.  I think you were asked about -- or at least the judge, sir, asked your attorney about a passage marked Government's Exhibit 5 at your detention hearing that is a part of Government's Exhibit 2 for purposes of this

hearing where you write, "And get this, the first of us who got
upstairs kicked in Nancy Pelosi's office door and pushed down
the hall towards her inner sanctum, the mob howling with rage.
Crazy Nancy probably would have been torn into little pieces,
but she was nowhere to be seen.  Then a swat team showed, and we
retreated back to the Rotunda and continued our hostile takeover
of the Capitol building."

    You did write that section; correct?

A.   Now, you know good and well that none of that happened.
You have seen the video.  I was --

       THE COURT:  Mr. Calhoun, answer the question.

       THE DEFENDANT:  Yes, I think I did write that.  I was
trolling my Facebook stalkers.  Again, you've got to understand
the humor here.  These people are so vicious.  They are so
communistic.  They are so -- they're the cancel culture.  Yes, I
was trying to needle them every way I could, but I was not
breaking the law doing it.

    Now, you know I didn't kick in Nancy Pelosi's door.  You
know the mob wasn't howling with rage, because you've seen the
videos.  So you're not being candid -- having candor with the
Court in pretending otherwise.  Now, you know these things.  I
did not kick in Nancy Pelosi's door.  I didn't see her door
kicked in.  I don't know anything about her door being kicked
in, and you know it, because you've seen the video.

       BY MR. ALEXANDER:

1   Q.   Sir, you did write those words?

2   A.   Again, it sounds like what I wrote, but I was trolling my

3   Facebook cyber stalkers.

4   Q.   Sir, what about -- I believe the Court may have mentioned

5   this one --

6   A.   If I told you --

7          THE COURT:  Mr. Calhoun, Mr. Calhoun, you have to wait

8   for the question.

9          THE DEFENDANT:  All right.

10          BY MR. ALEXANDER:

11  Q.   Sir, I believe the Court referenced this passage as well

12  when you wrote, "These were the first few hundred or so of us to

13  actually get inside the Capitol.  There was a group outside who

14  made the initial break-through not shown, and a few of them got

15  hurt pretty good, but it didn't matter.  Those of us took the

16  ranks and pushed on through and headed to the next barricade

17  without stopping.  That's what you're seeing here."  And you

18  include a photograph.

19       That's not trolling; correct?  That's what happened?

20  A.   If I told you I was the king of England, would you believe

21  it?  If I told you I ran through the Capitol with an AK-47,

22  would you be trying to prosecute me for it?  Yes, I was trolling

23  them.  I thought the federal government was a cut above Facebook

24  and would not fall for it.  Stop falling for it.

25  Q.   So sir, in addition to your own Facebook posts and Parler

1   posts, there was also video that you filmed, and that was

2   transcribed for the purposes of your detention hearing.  That

3   was marked Government's Exhibit 35-A, and it says, "Calhoun,

4   Capitol, the crowds really are taking it back."  There's

5   background noise.  Calhoun at 49 seconds, "It looks like we're

6   about to push through these cops.  We'll see what happens.

7   Crowd's really pissed."  Background noise.  And pardon my

8   language.  "Fuck the deep state.  We'll fucking go to war."

9        That's a transcript of an audio -- or audio from a video

10   that you took and posted to Facebook; correct, sir?

11   A.   Look, I posted every video that I took on Facebook.  I

12   don't know what you people did with them.  I don't know what

13   that is you just said.  I posted photographs, and I posted

14   videos because I did not do anything wrong.  Okay?  Maybe I

15   trespassed.  Big deal.  Don't steal elections next time.

16        THE COURT:  Mr. Alexander, does the defense have a

17   copy of this video?

18        MR. ALEXANDER:  Your Honor, the video, I'm not sure

19   about.  I do not.  I would have to get that from the Middle

20   District of Georgia.  But I can do that and provide it.  I

21   believe it's clear, Your Honor, that predecessor counsel before

22   Ms. Sherman-Stoltz had it for the purposes of the detention

23   hearing that was conducted on January 21st.

24        THE COURT:  All right.  Any exhibits that were a part

25   of that hearing I would like to be able to review as well.  That

includes photographs, videos, documents.  Anything from the

government or the defense I should have before me now too.

MR. ALEXANDER:  Your Honor, I believe the majority of

those you should have as Government's Exhibit 2 in this matter,

which is that compilation .pdf document of photographs marked

Exhibits 1 through 35-A.  And then the Court also should have

Government's Exhibit 4, which is a transcript of the entire --

THE COURT:  I have the transcript, but were there

videos that were offered into evidence?

MR. ALEXANDER:  Your Honor, I believe it was the still

images that were offered into evidence.  And I also did attach

the exhibit list from that hearing, which I'm reviewing now.

THE COURT:  We can clear this up later.  But to the

extent there are exhibits that the government or the defense

proffered, I would like to review them as well and, obviously,

any additional evidence.

MR. ALEXANDER:  From my review, just so the Court is

aware, there were Exhibits 34 and 35 that were offered and

admitted at that January 21st hearing that I don't believe the

Court has.  Those are labeled Exhibit 34.  It's just

labeled "video."  And then Exhibit 30, which the Court does

have, is labeled "screen shot of 34 video."  And then Exhibit 35

is labeled "Mr. Scott's video, contains Calhoun's video."  And

35-A, which is what I read for the Court, is labeled "transcript

of 35 audio."

1     So the Court only has the derivative evidence of those two

2     exhibits.  I will get those and get those filed with the Court.

3          THE COURT:  All right.  Thank you.

4          MR. ALEXANDER:  Other than those, Your Honor, the

5     Court should have everything in Government's Exhibit 3 that was

6     referenced at the January 21st detention hearing.

7          THE COURT:  Thank you, Mr. Alexander.  You may

8     proceed.

9          BY MR. ALEXANDER:

10    Q.   I want to ask you a few questions about your January 21st

11    hearing.  That was your preliminary hearing in Georgia and as

12    well as your detention hearing where many of these items were

13    discussed.

14         Do you remember that, sir?

15    A.   Yes.

16    Q.   So I'm not asking you about any communications you had with

17    your attorney.  Do you understand that?

18    A.   Sure.

19    Q.   But you are an experienced attorney; is that correct?

20    A.   Correct.

21    Q.   And there is no mention in your detention review where your

22    attorney got to cross-examine the FBI agent of any potential

23    alterations of your social media posts, not a single reference.

24         If you thought that one of your social media posts that

25    were used in evidence against you for that hearing had been

1   altered, you would have told your attorney that; correct?

2   A.   Have you ever been in detention?

3   Q.   Yes.

4   A.   Have you been in detention for a week?

5   Q.   No.

6   A.   Okay.  If every prosecutor and every judge spent a week in

7   federal detention before they started judging, the world would

8   be a much better place.  Okay?

9   Q.   That does not answer my question.

10  A.   I was not privy to all of the documents my attorney had.  I

11  was in the Jones County Detention Center in these bizarre COVID

12  lock-down restrictions getting what information I could get when

13  I could get it.  I am telling you beyond any doubt that post,

14  that middle sentence was cut out.  It was edited.  That's false

15  evidence.  Now that you know that it's false, stop using it or

16  do something about it.

17  Q.   There's nothing else in those posts that are false, though,

18  based on your testimony --

19  A.   I don't know that; I don't know that.  I'm not going to say

20  that.  The entire context is false because the conversations are

21  edited out.  How can you judge the answer if you don't know the

22  question or the conversation that prompted that comment?  You

23  can't.

24  Q.   Your words may be accurate but that they lack the

25  surrounding context?

1    A.   That is certainly a large part of the problem, yes.

2    There's one post there where -- you can tell I'm responding.   I

3    called Pelosi a commie hag.   Well, was she?   I mean, I don't

4    know.   I can't remember what the conversation was.   What did she

5    say to make me say that?

6    Q.   Understood, sir.   So it's your testimony that you were

7    provoked to say the things that you said online?

8    A.   No, that's not my testimony.   My testimony is, you are

9    using exhibits that are incomplete, that do not present the full

10   context because they do not have the entire conversation.   That

11   makes them fake evidence, certainly unauthenticated and

12   inaccurate.

13   Q.   But sir, if they were unauthenticated and inaccurate, why

14   did your attorney argue to the magistrate in the Middle District

15   of Georgia that they were true and that you said those things?

16   A.   That hearing -- I don't use this term lightly, because I --

17   these proceedings have shook my confidence in the federal courts

18   to the very foundation.   I am still hoping that truth and

19   honesty will prevail.   But that judge was so biased against me.

20   I had 37 affidavits for good character, but that didn't matter.

21   He didn't care.   He didn't care that I was a member of the state

22   bar with no criminal history.   He didn't care.   He audibly

23   winced when they mentioned that I had a camouflage backpack.   I

24   mean, Alaska can't be that different from Georgia.   I mean,

25   everybody's got camouflage.   There are people that go hunting

1    all the time.

2         There is reality, and then there's Facebook.  Okay?  It's

3    important for us to come down to earth, to reality.  Facebook is

4    not reality.  I was trolling these people.  I did a damn good

5    job of trolling them.  Apparently, I did too good of a job

6    because now I've got to convince you that I'm not some scary

7    person.

8         Well, look at my record, the real record.  A person's past

9    behavior is the best indicator of future conduct.  I'm a model

10   citizen.  I don't like Communists.  I've never liked Communists.

11   That's not illegal.  I'm never going to quit advocating for the

12   Second Amendment and the First Amendment.  That is not illegal.

13   That is my right.  These people that you're using their

14   information, they think they have the right to suppress opinions

15   they disagree with.  I'm more like in the Voltaire school.  I

16   may disagree with what you say, but I defend with my life your

17   right to say it.  Now, we're either going to live in a free

18   country or we're not.  Okay?  I'm fighting for a free country.

19   I'm not going to jail -- I'm already in jail.  I'm not going to

20   stay in jail because of what I said in Facebook.  If you think I

21   threatened somebody, show me who I threatened, give me a name,

22   give me a date, give me a post.  If you think I did something

23   dangerous, give me a time, date, and place and ask me about it.

24   I have done nothing dangerous.  I have done threatening, not in

25   my entire life, and that's just something you're going to have

1    to come to terms with.

2    Q.   Sir, is it fair to say, then, that from your perspective

3    you are kind of a victim here of this situation?

4    A.   Scribes, Pharisees, and hypocrites.  You ever read the

5    bible?  Yes, I'm the victim.  I'm the victim of a cyber stalker

6    who has manufactured a stack of evidence and had it ready to go

7    the minute that this thing happened and sent it up to D.C., and

8    lo and behold, here I am.  And the person I was with who did not

9    have a cyber stalker, he's not in jail.

10   Q.   I guess I'm just confused.  I'm wrapping up, Your Honor,

11   now with this question.  This is my last question, and my

12   confusion is this:  You've said that you're really good at

13   trolling people, and you've said you had a lot of things on the

14   Internet --

15   A.   I did not say that.

16   Q.   Sir, you did say --

17   A.   I said I'm very good at trolling these people, and I was

18   more successful than I should have been.  I'm not a gratuitous

19   troll.  Okay?

20   Q.   Understood, sir.  So you're not a gratuitous troll, but

21   you're very good at trolling these people, and at the same time,

22   you're saying that your comments were manufactured by a cyber

23   stalker.  So I'm trying to figure out how to reconcile those two

24   arguments.

25   A.   All right.  My comments, I'm using satire.  Okay?  I'm

using -- it may be acidic wit.  I am using satire.  I don't care
if I make a little cry-baby Communist cry.  Okay?  I don't care
about that.  That's not a crime.  I am not going to threaten
anybody.  I have not threatened anyone.  I am not going to do
anything dangerous.  I am not going to commit any felonies.  I
have been very meticulous to have a felony-free record for the
past 30 years, longer than that, because I wouldn't even have
become a lawyer 30 years ago if I wasn't.  So you might as well
say my entire life I've got no felonies; right?  All right.
I've been a good citizen.  Okay?

These people are -- they are plowing new ground.  Do you
understand this?  They are trying to suppress speech they don't
agree with.  Do you understand this?  They are doing that in
this instance by removing half of the conversation and
cherry-picking comments in some instances, at least one or two
of them editing them to change the entire meaning.  Now, that is
lying.  That is misrepresentation.  That's a fraud on this
court.  Your entire case is based in part on a fraud.  Where is
the rest of the conversation?

Why don't you look at the reality.  What have I done in my
past?  Nothing.  You're going by what Facebook stalkers are
trying to present as a false picture.  You know this.

Q.   Sir, my last question is, you remember talking about people
burning and looting over the summer?  I think you were
referencing BLM or Antifa.  Do you remember --

1    A.    Both of them.

2    Q.    -- on direct examination -- I'm sorry.  Go ahead, sir.  Do

3    you remember that?

4    A.    You're framing the question as if that didn't really

5    happen.  I mean, do you think it happened?

6    Q.    You talked burning and looting --

7            THE COURT:  Mr. Calhoun, he is asking the questions,

8    not you.  Answer his questions.

9            THE DEFENDANT:  Okay.

10           BY MR. ALEXANDER:

11   Q.    And sir, that was exactly my question.  You said, "You

12   can't lay siege to a federal courthouse."  I think that's what

13   you were about to say.

14   A.    Right.  That happened.

15   Q.    Right.  And just like when you entered the Capitol building

16   on January 6th?

17   A.    No, no, not just like.  The federal courthouse in Portland,

18   there are marshals who are blinded for life from lasers.  They

19   were throwing Molotov cocktails at the courthouse trying to burn

20   down the federal courthouse.  They were assaulting police

21   officers.  Officers died.  They had to go to the hospital.

22           Do not dare say we are like Antifa and that what we did was

23   in any remote way, shape, form, or fashion like what happened at

24   the federal courthouse.  We walked in an open door.  We didn't

25   try to burn the place down like they did out west.  Do you

1    follow me?  We walked in an open door while the police watched.

2    We didn't lay our hands on anybody.

3              MR. ALEXANDER:  Your Honor, I don't have any further

4    questions.  Thank you.

5              THE COURT:  All right.  Thank you.

6         Ms. Sherman-Stoltz, any redirect?

7                         REDIRECT EXAMINATION

8              BY MS. SHERMAN-STOLTZ:

9    Q.   Mr. Calhoun, I want to keep this very briefly, please.

10   A.   Sure.

11   Q.   The various Facebook posts that have been referenced, have

12   you had the opportunity to have those posts in your possession

13   to review each and every one of them or compare them to your

14   Facebook account?  Have you had that opportunity yet --

15   A.   No.

16   Q.   -- to either compare them or see them for any length of

17   time?

18   A.   No, and I probably won't have that opportunity because I

19   have been banned, and they have deleted my account.

20             THE COURT:  Mr. Calhoun, have you had a chance to

21   review them?

22             THE DEFENDANT:  No, I have not.

23             BY MS. SHERMAN-STOLTZ:

24   Q.   Prior to your bond hearing in January, had you had the

25   opportunity to see that evidence in advance of the hearing and

1    read it and discuss it with your attorney?

2    A.    The 18 exhibits?

3    Q.    The government's exhibits that the government submitted.

4    A.    I did have a pretrial meeting with my attorney.  I know I

5    conveyed to him my concerns about the lack of context, the

6    conversation that was missing.  The one particular blatant

7    editing job where the middle sentence was missing, I don't know

8    if that was specifically discussed.  I think it was.

9         But there was so much going on at the preliminary hearing,

10   it was just -- that was like nothing.  That was a side show at

11   that point.

12   Q.    Were you able to see the videos that were presented prior

13   to them being presented in court?

14   A.    I don't think any videos were presented in court, by my

15   recollection.  I have not seen any videos from the government's

16   side.  All I know is I took three videos, and I posted three

17   videos on Facebook riding home from D.C.

18        Who knows what they got.  These videos are on -- I've heard

19   they're on YouTube.  It's out there people cutting and pasting

20   and doing whatever they want.  I mean, it's just insane.

21        No, I haven't seen -- I don't know what the government

22   video evidence is.  Let me put it that way.  I mean, I've got an

23   idea, but who knows if it's been edited or what they've got.

24   Q.    Okay.  After your pretrial meeting with your attorney in

25   Georgia, were you allowed to keep any of those exhibits and

review them prior to the bond hearing, take a closer look at

them or anything?

A.   I think I received a copy of the -- I think at the bond

hearing, and I do not have them currently in my possession

because during this saga of federal detention I've gone to six

different places, I think.  I've been to Oklahoma.  And I had

to -- at one point I had to drop them in the mail to myself, I

think actually when I was in Virginia someplace; otherwise, I

was going to lose them.  So I had them mail them to myself.  So

all that stuff got -- all the documents I had from the first

court proceeding have been mailed back to my office in Georgia,

which I wish I had them here, but I don't.

Q.   Is it fair to say that you can't remember them exactly?

A.   Remember exactly what?

         MR. ALEXANDER:  Your Honor, at this point I have to

object to leading questions.

         THE DEFENDANT:  I can't remember.  Certainly, I can't

remember everything that was said at a hearing on the 21st of

January, and I did not say that I remembered everything.  But

I'm pretty sure they did not play any videos at that hearing.

They played the audio of the threats that were made against me

from my answering machine.

     And they tried to say I was fleeing even though I had made

two court appearances that week.  I mean, I don't know how the

law is in Alaska, but when somebody is making court appearances,

they are not fleeing.  Okay?  That's the way that works where
I'm from.  So I was going to court.  I went to court Monday.  I
went to court Tuesday.  I had court on Wednesday.  I missed that
court date because my assistant was so scared of the death
threats she had quit the week before.  So I had to make a case
announcement with the assistant DA on Wednesday, and that was
Sumter Superior Court, and that was fine because they were
taking written announcements anyway due to COVID.  Thursday, I
stayed in Macon at my sister's house making phone calls, and I
got arrested Friday.

So, you know, yes, they thought I was fleeing.  I said no,
I've talked to the sheriff and judge in two different counties
on two different days.  So I'm saying the Macon hearing was
biased.  That right there is proof of how biased it was.  People
do not --

THE COURT:  There is not a question pending.  Anything
else, Ms. Sherman-Stoltz?

MS. SHERMAN-STOLTZ:  No, Your Honor, not for -- no
questions for Mr. Calhoun.

THE COURT:  Anything more from the government with
regard to --

MR. ALEXANDER:  No, Your Honor.

THE COURT:  Okay.  Mr. Calhoun, I have a question.
Did you have a tomahawk with you that day?

THE DEFENDANT:  No, Your Honor.  I did not have any --

1    I had no weapons whatsoever with me in Washington, not even a

2    pocket knife.

3        THE COURT:  You testified this may not have been the

4    best idea, but as you sit here now, do you have any remorse

5    whatsoever?

6        THE DEFENDANT:  If I had it to do all over again, I

7    would probably have not gone into the Capitol.  On the other

8    hand, you know, this is -- this was civil disobedience.  And by

9    that, I mean I know I didn't commit a felony.  I know I didn't.

10   I probably committed a misdemeanor trespass, and I know that was

11   wrong, and I feel like I've already been punished for that.  I

12   accept punishment for that.  I would plead guilty to that.

13       But I am not a dangerous person.  I'm not who they are

14   trying to make me out to be.  There were -- what we did was for

15   love of country.  Now, it was not to commit any violence.  We

16   didn't do violence.  I didn't do any violence.  I just didn't.

17       THE COURT:  All right.

18       THE DEFENDANT:  I'm sorry that I'm here.  I regret

19   that this is -- obviously, this is a terrible situation for a

20   lawyer to be in, and I don't -- on the other hand, I know in my

21   heart that I did not do anything morally wrong.  I engaged in

22   civil disobedience that at the time and place I felt like it had

23   to be done, and I accept that -- I accept whatever comes from

24   that.  But I know I did not commit a felony.

25       THE COURT:  All right.  Anything further,

1    Ms. Sherman-Stoltz?

2             MS. SHERMAN-STOLTZ:  No additional witnesses, Your

3    Honor.  I do have argument that would relate to your initial

4    question as far as the factors that you have to evaluate in

5    making your decision.

6             THE COURT:  Mr. Calhoun, if I could have you mute, if

7    you're able to do so, your computer, so that the background

8    noise is removed.  Thank you.

9         Before we do this, let me just check, the court reporter

10   may well need a break.  Why don't we take a brief recess to give

11   her a chance to take a break, and we will come back.

12            MR. ALEXANDER:  Your Honor, would five minutes be

13   okay, or should I stay at my desk?

14            THE COURT:  Mr. Hopkins, how are we on time with the

15   room?

16            THE COURTROOM DEPUTY:  Let me see.  I had it set for

17   two hours, which we are at two hours here.  There may not be

18   anything set after us.  I have to check to see.  Bear with me

19   just a moment, Your Honor.

20        It looks like we're good.  They have they're going to be

21   cleaning the room afterwards, and I don't see a hearing set in

22   this room after this hearing.  So we should be pretty good.

23            THE COURT:  All right.  Mr. Hopkins -- let's take a

24   five-minute break, and while we're doing that, Mr. Hopkins, can

25   you just follow up just to make sure that we're not going to get

1    cut off for the cleaning or any other reason.

2              THE COURTROOM DEPUTY:  Absolutely, Your Honor.

3              THE COURT:  All right.  Thank you.  So we will take a

4    five-minute break for the court reporter.

5         (Recess taken from 3:04 p.m. to 3:12 p.m.)

6              THE COURT:  Ms. Sherman-Stoltz, if you would like to

7    continue with your argument.

8              MS. SHERMAN-STOLTZ:  Thank you, Your Honor.

9         I will just briefly point to some of the issues in the

10   government's exhibits that would relate to my argument.  The

11   government -- it's Attorney Alexander's Exhibit 2, but it

12   references Exhibit 3.  So I'm just going to refer to Attorney

13   Alexander's exhibits to make it a little bit easier for the

14   Court.

15        Mr. Calhoun specifically acknowledges and points out that

16   illegal firearms -- or that firearms are illegal in D.C., and he

17   complied with that law.  He states that he, along with other

18   rioters, had no weapons.  In pictures that were submitted, he

19   appears to be calmly walking through the Capitol building.  He's

20   clearly unarmed.  His posts show observations of the events of

21   the day, including when he is said to be speaking in a video,

22   and nothing is indicated which says anything about any type of

23   violence.

24        In Exhibit 2 of Attorney Alexander's, specifically pointing

25   to pictures that are labeled Exhibit 31 and 32 from

Mr. Calhoun's first bond hearing, those show pictures of weapons and ammunition. Those were Mr. Calhoun's that he legally owned. He did not take them to the Capitol. Those pictures were taken inside of a residence. They were confiscated. That picture only shows possession of legal firearms. It doesn't show any type of intent to do harm. It doesn't show any type of past harm that's been done.

I think Mr. Calhoun had a very good point when he said that his past activities, his past history is a good representation of his future actions. He has no criminal history. The charges in which he is facing right now have nothing to do with the posts from summer and fall of 2020. The charges that he has been faced with have to do strictly with the events of January 6th at the Capitol building or in the Capitol building in Washington, D.C., nothing to do with any type of conversation, argument, anything along those lines having to do with 2020 and Parler and Facebook and arguments that he was getting into with other individuals. This has nothing to do with the charges that he is facing.

What matters as far as the charges that he's facing in bond, which is the subject that's before Your Honor now, is threat and danger to the community, and there's been absolutely no evidence presented to Your Honor that he is a threat or danger to the community, because he is not. He never has been. He has continued, as he said, to go to court, to represent his

clients.  He wants to be able to continue to do that.  He is
going to be in a courthouse on a regular basis in front of
judges, law enforcement, just as he has been for the past 30
years.  He has not done any harm to anyone.  The affidavits
should speak for themselves in the high esteem that he is held
by those that he is close with, those that know him most.

His strong ties to his community in Georgia, he has been
there his entire life.  He does have severe medical conditions
that he needs to receive appropriate and proper medical
treatment for by a doctor who is aware of his medical history
and is aware of the type of treatment that he has been given and
the type of results that they are looking for.

He indicated under oath, Your Honor, that he knows his
responsibility of complying with Pretrial.  He knows the
importance of following the Court's order if he is given bail.
He has spent his whole life following the law, doing what he is
supposed to do.  He is not going to do anything that's going to
put him at a risk of not only having his bail revoked, but
potentially facing even worse or additional charges than what he
is currently facing.

I still stand behind the fact that everything that's been
submitted by the government as far as social media posts has not
been authenticated by Facebook, by Parler as having been
directly from his account.  Mr. Calhoun hasn't had ample
opportunity to study those or to even see them side-by-side as

to what a search warrant from Facebook or Parler might return.

There's no illegal or violent action that was taken by Mr. Calhoun while he was in Washington, D.C., or inside of the Capitol.  There is nothing.  He is right in that there's video, and if there were video that showed him doing something other than what he is currently being charged for, then he would be facing additional charges for that.

His representation of what was going on was, as he testified to, done in a narrative format where he is explaining to his followers what he is seeing, what he is hearing, what he believes to be the overall environment.  That does not make him a threat or a danger to his community.  We're not talking about an individual who has prior convictions, failure to appears, has prior violent convictions or convictions having to do with assault or improper use of firearms.  He has nothing like that.

The evidence that's been provided by the government doesn't surround, doesn't have anything to do with the charges in which Mr. Calhoun is facing.  We would ask Your Honor to, in evaluating bail for Mr. Calhoun, understand that.  The evidence that was provided by the government has to do with things in which he was not charged for, things that were in the past, and, as he stated, did not drive him to come to the Capitol on January 6th.  He stated that when he put in for a leave of absence, at that point that's when he knew that he was going to go to the Capitol.  Anything prior to when he put in for the

leave of absence wouldn't relate to or have any merit as to his charges.

He would be able to be supervised by probation in Georgia. There would be no issue of his supervision.  He would be compliant with all of the terms that the Court would set forth.

He's presumed innocent, Your Honor, and again, all of the firearms have been confiscated from him.  So any concern that the government might have would be null and void at this point because the government knows that they're not in his possession anymore.

He is not a flight risk.  He says here under oath that he is ready to take responsibility for his actions.  He's not a flight risk.  He is not going anywhere.

He does not deserve to be detained.  His case has been extremely delayed as it is just from his transport from Georgia to Washington, D.C.  It took several weeks.  His case has taken quite a long time to even get docketed, and this is further delaying his opportunity to be able to have resolution of his case.

Your Honor, we ask that you consider all of the evidence, all of Mr. Calhoun's testimony, his lack of criminal history, the fact that he is an upstanding attorney in Georgia.  He's got a law firm with clients that are waiting for him.  He has a strong family support system, and he has said under oath, Your Honor, that he will comply with every term.  You're not going to

1    have an issue with Mr. Calhoun meeting your requirements as far

2    as bail is concerned.

3              THE COURT:  All right.  Thank you, Ms. Sherman-Stoltz.

4         Mr. Alexander, before you make your argument, can you

5    clarify for me whether the government is seeking detention based

6    on one of the categories of enumerated offenses that are listed

7    in 3142(f)(1), or is it simply seeking detention because it

8    alleges that the defendant possesses a serious risk of flight or

9    that he will obstruct or attempt to obstruct justice?

10             MR. ALEXANDER:  Both, Your Honor.

11             THE COURT:  All right.  And tell me how any of these

12   charged offenses meet one of the categories of the enumerated

13   offenses.

14             MR. ALEXANDER:  Yes, Your Honor.

15        Enumerated offenses referred to by the Court in (f)(1),

16   (f)(1)(A) refer to crime of violence, a violation of Section

17   1591, or an offense listed in 2332b(g)(5)(B), as well as for --

18   just one moment, Your Honor.

19        So Your Honor, I believe the guidance that we've received,

20   in cross-referencing (f)(1)(A) where it defines a crime of

21   violence, a violation of Section 1591, or an offense listed in

22   Section 2332b(g)(5)(B) for which a maximum term of imprisonment

23   of 10 years or more is prescribed, as is the case for the

24   obstruction, the 1512(c)(2), Your Honor, that is one of the

25   counts of the indictment.  Cross-referencing then to

1    2332b(g)(5)(B), there's a long list of enumerated offenses under

2    that subsection.

3         If the Court will give me a moment.  Your Honor, I

4    apologize.  In the interest of time, I would have to look more

5    closely at that subsection.  I'm happy to argue the other

6    grounds for detention in this case, in Mr. Calhoun's matter.

7              THE COURT:  All right.  I would like -- because I want

8    to see this additional evidence that I mentioned in terms of the

9    video, whatever other exhibits were before the magistrate in

10   Georgia, as well as the full chain of social media posts, to the

11   extent the government has them, I do want to see that evidence.

12        So I will ask both sides to address this issue in some

13   supplementary briefing because it's not clear to me how the

14   government is proceeding, whether it's proceeding in both ways.

15   You say yes, but you're not arguing that obstruction of an

16   official proceeding is itself a crime of violence, are you?

17             MR. ALEXANDER:  I am cautious on that point, Your

18   Honor, because I believe there's some guidance from our office

19   that I would want to clarify prior to making a representation to

20   the Court on that point.  I am -- I apologize.

21             THE COURT:  I would like some supplemental briefing on

22   that to make sure I understand your position.

23             MR. ALEXANDER:  Understood.

24             THE COURT:  But putting that aside for a moment,

25   Mr. Alexander, this is certainly very different than many cases

1    in which the government is seeking detention in the sense that

2    there's no evidence before the Court that Mr. Calhoun was armed.

3    There's no evidence before the Court that he assaulted a police

4    officer.  There's no evidence before the Court that he was a

5    leader or organizer.  Granted, he has these highly inflammatory

6    social media posts.  But so far as I can see, the government is

7    not alleging that he orchestrated the group, that he encouraged

8    specific people to attend, or that he was in charge that day in

9    terms of meeting the group that broke through the barricades

10    that were set up by the police.

11        Am I correct?

12        MR. ALEXANDER:  Your Honor, I do think I would

13    respectfully disagree with some of that characterization.  I

14    would point out the fact that Mr. Calhoun, in his own testimony

15    here today, discussed the number of followers that he had on

16    Facebook, which I believe -- and I'm quoting from my own notes,

17    obviously not from a transcript, but I believe what he described

18    as over 5,000.  So I think there's fair grounds where reasonable

19    people could disagree about at least the role that Mr. Calhoun

20    believed he played as a social media influencer in the context

21    of this particular event.

22        THE COURT:  All right.  But aside from the posts, do

23    you have any other evidence of him planning, coordinating with

24    folks ahead of time other than the posts that encouraged people

25    to come to D.C.?  Is there anything more specific than that?

1          MR. ALEXANDER:  No, Your Honor.  At this point the

2     posts that are in evidence before the Court as Government's

3     Exhibit 2, which are the exhibits, the paper copies of the

4     exhibits that were introduced for Mr. Calhoun's detention

5     hearing in Georgia on the 21st, are the universe of

6     communications that the government is aware of.

7          And I want to make a point here.  I'm sure Mr. Calhoun is

8     aware of this as well.  Given the nature of his employment as an

9     attorney, search warrant and the review of search warrant

10    returns in this case mandates, obviously, the approval of OEO,

11    PSEU, and a filter protocol, which takes more time than it would

12    otherwise were Mr. Calhoun's employment different and there

13    wasn't the concern for potential privileged attorney-client

14    communications existing in any of these data sets.  So the

15    situation here is a little bit different in terms of the

16    execution of search warrants for these media accounts.

17         I would argue, Your Honor, that there is certainly

18    circumstantial authentication for his authorship of the posts

19    that are before the Court today, indeed by his own admission.

20         But with the Court's permission, I would like to take a

21    step back and just summarize the government's perspective on the

22    legal posture that we are in currently in terms of this

23    proceeding.

24         And just briefly, it's my understanding that we're

25    operating under either 3142(f)(2)(B), which allows a hearing for

detention to be reopened at any time before or after a
determination by a judicial officer if the judicial officer
finds that information exists that was not known to the movant
at the time of the hearing and has a material bearing on the
issue for whether there are conditions of release that will
reasonably assure the appearance of such person and the safety
of any other person in the community.

As a threshold matter, it is the government's position that
the Court has not heard today information that did not exist at
the time the detention was initially ordered by the magistrate
judge in the Middle District of Georgia.  That doesn't
foreclose, obviously, release for Mr. Calhoun.  The defense also
cited to 3142(i) in the motion styled "Reconsideration of Bail,"
and that would permit temporary release for compelling purposes.
Those are the two pathways, the two legal pathways that at least
to the government's understanding are available to Mr. Calhoun
at this point in the proceedings.

So just as a threshold matter, it's the government's belief
that there has not been new information provided to the Court
here that would justify not only reopening proceedings but then
having a hearing on the factors that were considered by the
magistrate previously.  Again, obviously --

THE COURT:  But Mr. Alexander, you don't disagree that
my review is de novo, do you?

MR. ALEXANDER:  I do not.  I was just about to say,

1    Your Honor, the government completely, obviously, concedes the

2    fact that the Court here has de novo review regardless.  But

3    just in terms of the posture and our position for the record on

4    whether or not the defendant has met his burden under

5    3142(f)(2)(B), we assert that he has not, leaving available the

6    3142(i) compelling purpose for temporary release.  That's also

7    not the proposal before the Court.  The proposal is for

8    indefinite release, which just does not at all comport with the

9    standard or the justification for release under 3142(i).

10         That leaves us, given the Court's de novo review of the

11   review of the 3142(g) factors, which from the government's

12   perspective not only remain unchanged but perhaps are even

13   starker and more important than they were when they were ruled

14   upon by the magistrate in the Middle District of Georgia.  That

15   ruling is the subject -- and I think it is worth noting, because

16   as the Court points out these are unusual cases, and there are

17   certainly some instances in which individuals are detained after

18   comparatively cursory proceedings.

19         I think it is important to note here, Your Honor, even

20   though the Court does not owe any deference to the decision of

21   the magistrate in Georgia, that there was a six-page written

22   order that issued following a lengthy both preliminary hearing

23   at which probable cause was found and a detention hearing at

24   which point a number of exhibits were introduced, were discussed

25   by the parties.  Critically, the discussion and the tenor by

defense counsel in that proceeding did not imply that there were

any concerns regarding the authentication or the ownership of

the social media posts that were submitted into evidence.

That is further reinforced again by the interview that took

place several days earlier between Mr. Calhoun and the

journalist for the *Atlanta Journal-Constitution* where, very

similar to here, Your Honor, Mr. Calhoun essentially admitted

all of the essential elements of the offenses for which he is

charged.  Debatably, 1512(c)(2) he reserved on and certainly did

not state that he went with the purposes of impeding the

certification.  But that's the very --

THE COURT:  Articulate for me the government's

evidence.  I have to consider the weight of the evidence.  I'm

sorry to interrupt, but if you could summarize for me the

government's case on that issue.

MR. ALEXANDER:  Yes, Your Honor.

From the government's perspective, the evidence was

extremely strong, as noted by the magistrate's written ruling

summarizing the evidence presented at the January 21st hearing,

which included all of these social media posts, including, as

the Court has pointed out, not only photographs of Mr. Calhoun's

participation in the January 6th Capitol riot, photographs taken

by himself but also videos and transcripts of audio from those

videos that were all introduced -- a very brief transcript, I

should say, Exhibit 35-A, that were introduced and considered by

1    the magistrate judge.

2         To the extent that Mr. Calhoun's state of mind was in any

3    doubt on January 25th regarding his motivations for his

4    participation in the Capitol riot on January 6th, that doubt

5    should be gone at this point given the free-ranging exposition

6    provided by Mr. Calhoun both in his direct examination and on

7    cross-examination where he discussed at length his motivation

8    and, as the Court, I think, noted, his complete lack of remorse

9    for the events that occurred.

10        Mr. Calhoun, to be blunt, believes himself to be a

11   political prisoner, and that speaks directly to his history and

12   characteristics.  Respectfully, I disagree very strongly with

13   Attorney Sherman-Stoltz, her assertion that the earlier social

14   media posts are irrelevant or subsequent conduct is irrelevant.

15   His history and characteristics, Mr. Calhoun's motivation, his

16   state of mind is of direct relevance to the Court here in

17   assessing whether or not to adjust the conditions of release

18   that were previously set.

19        And I think the Court, from the government's perspective,

20   at least, has had a very unique insight into the mind-set of the

21   individuals like Mr. Calhoun who decided to take part in some of

22   the more serious conduct that occurred at the Capitol.

23   Mr. Calhoun, by his own statement and his own admission, was

24   more than a casual tourist.  Mr. Calhoun has pointed out that

25   his co-defendant, who from the perspective of the government was

1    not as culpable and does not pose the same degree of risk to the

2    community, has been released.

3            THE COURT:  And Mr. Alexander, on that point, is the

4    distinction between the two exclusively the social media

5    postings?  Is there something more about his conduct that day

6    that distinguished the two?

7            MR. ALEXANDER:  And Your Honor, there is a

8    distinguishing factor from my perspective and the perspective of

9    the AUSA in Georgia who covered the bail hearing for Mr. Nalley,

10   the co-defendant.  Your Honor, I think we may be minimizing

11   Mr. Calhoun's statements by considering them just social media

12   posts.  These aren't just social media posts.  These are

13   Mr. Calhoun's contemporaneous narrative of his state of mind as

14   he committed the offenses that he is alleged to have committed,

15   including his state of mind leading up to it and in the

16   immediate aftermath.

17       And the Court was posed, I think, with a very significant

18   tension between the argument that some of these statements were

19   fictions or altered or edited and Mr. Calhoun's obvious pride in

20   his ability to troll those people or the people that are

21   deserving that.  And so it does seem clear, it was clear at the

22   initial hearing, and it's clear from the government's

23   perspective here today that Mr. Calhoun authored the statements

24   that he made describing his state of mind prior to the Capitol

25   riot, during the time of the Capitol riot, and then in the

1    aftermath, and that state of mind evidences a violent

2    insurrectionary attitude, which --

3         THE COURT:  Mr. Alexander, I haven't seen the video,

4    which I would like to see.

5         MR. ALEXANDER:  Yes, Your Honor.

6         THE COURT:  Does the video show him doing anything

7    violent?  Does it show him pushing police officers?  Where is he

8    relative to the rest of the crowd?  Summarize, if you will -- I

9    will watch it, but for my benefit now, what does it show?

10        MR. ALEXANDER:  Yes, Your Honor.  I have not seen the

11   videos, to be very clear.  I'm operating off of the same summary

12   and description that I've been providing to the Court.  I have

13   communicated with the AUSA in the Middle District who is

14   forwarding those to me, and they will be provided to the Court

15   and to the defense in due part.

16        Looking at the exhibit list, there are screen shots from

17   the video that are provided.  Looking at, Your Honor, for

18   example, Government's Exhibit 6 at the detention hearing, which

19   would be 2-6 for the exhibits for this hearing, there's

20   photographs within the Rotunda and no indication, for example,

21   of proximity to, as Mr. Calhoun said, the woman who was shot and

22   killed or any attacks on the police officers.  But that is also

23   not any conduct that Mr. Calhoun, as Ms. Sherman-Stoltz pointed

24   out, that he is charged with.

25        THE COURT:  Understood.  But I don't know,

Mr. Alexander, how many of these cases you're handling now, but my understanding from what I've read of other decisions from this court, judges are often drawing a distinction between those in the violent mob who were actually overturning barricades and assaulting police officers and armed and the like and those who were meandering through the Capitol, taking photographs, et cetera, not that both didn't trespass, but they're drawing a distinction between those two classes.

And as I look at this case, based on the evidence before me, it's very difficult to see where Mr. Calhoun falls.  On the one hand, even if I credit everything in these social media posts, he says things like, you know, as he puts it, the vanguard that clashes with police or the vanguard that overran the barricades, and then we came in.  He does admit to being a part of the first 200.  But I don't have a sense as to how many people it took to overrun the barricades.

So I'm asking you, to what extent is he a part of that front-line aggressive pack as opposed to the rest of the pack who was trespassing?  And he talked about admiring the art on his social media posts.  It's very hard for me based on these posts alone to determine what his role was.

So I'm wondering, what other evidence aside from his social media posts -- he does use "we" a lot, we did this, we did that.  But does the government have any evidence that shows he took any of these more aggravated steps?

1          MR. ALEXANDER:  That's a fair question, Your Honor,

2     and it's certainly a granular and individual analysis.  I only

3     have been assigned five of these cases.  So speaking from that

4     universe, Mr. Calhoun is on the more serious side of the

5     spectrum, which is why we are making, after undertaking an

6     independent review, or having filed our opposition.

7          And to answer the Court's particular question, Your Honor,

8     I don't think there's any reason not to credit Mr. Calhoun's

9     assertion, as the Court has pointed out, in Exhibit 28, so 2-28,

10     when he said "these were the first 200 of us or so to actually

11     get inside the Capitol."

12          THE COURT:  I will credit that, but does the

13     government have independent evidence that suggests that the

14     first 200 were all running over police officers and assaulting

15     police officers, or were there a smaller batch that were on the

16     frontline and a really enthusiastic batch behind that that maybe

17     started after 20 or 50 or 75, I don't know, and does the

18     video -- not the video that we're referring to where it shows a

19     picture of him, but do you have a sense from videos that show or

20     don't show him how many people were overrunning the barricades

21     and stomping on police officers and that kind of thing?

22          MR. ALEXANDER:  And Your Honor, I can't.  I can't

23     represent to the Court that I have again a granular

24     understanding of not only Mr. Calhoun's alleged actions but the

25     alleged actions of the mob around him.  I think that is

absolutely a fair question to ask.  I don't necessarily from the government's perspective believe it should be the determining question -- Mr. Calhoun's precise position within what he described as the first 200 should necessarily be determining the threshold question for the purposes of whether or not to lift the detention order.

THE COURT:  It sounds like you have no independent evidence with regard to him talking violently to police officers, assaulting police officers, you know, talking to other individuals he was with; you don't have any additional evidence other than what he is posting in realtime.  Is that correct?

MR. ALEXANDER:  That's correct, Your Honor, but again, just to point out, he is not charged and we did not allege or infer that he has assaulted any police officers.  It's definitely not the argument that the government is making here.  And Ms. Sherman-Stoltz is correct.  If we had that evidence, we would have charged him with the more serious offenses to be sure.

THE COURT:  I don't mean to interrupt.  I want to move to the potential flight issue.  If you're not done with the danger on the Capitol invasion, I'd like to hear --

MR. ALEXANDER:  Your Honor, there is an exhibit that is in evidence before the Court, 35-A, which is a brief transcript of one of the videos that we discussed briefly where Mr. Calhoun apparently says, "Looks like we're about to push

through the cops.  We'll see what happens.  The crowd is really

pissed," and then background noise and words to the effect --

and I don't know if these were from Mr. Calhoun, but the words,

"Fuck the deep state.  We will fucking go to war."

So I do think there is a reasonable grounds in evidence in

the record before the Court, as it was before the magistrate in

the Middle District of Georgia, to assess Mr. Calhoun's

intentions.  And I think that even though there's some

evasiveness on the part of Mr. Calhoun's testimony here today,

obviously and understandably self-interested, there is a clear

grounds for the Court to assess the dangerousness of

Mr. Calhoun.

And that's further reinforced, I would submit -- and this

was something that I think was obviously picked up on the part

of the Court as well, but it is relatively rare that we have a

defendant who believes themselves in sincerity, as I believe

Mr. Calhoun does and has demonstrated, to be a political

prisoner and to not think that he committed anything other than

a simple trespass in the interest of civil disobedience.

And it's that fundamental disjunction between the conduct

and the seriousness of the conduct that Mister -- the

overwhelming weight of the evidence supports that Mr. Calhoun

even by his own admission committed.  Again, there's no debate

that he was inside the Capitol and participated in the early

stage of the Capitol insurrection.  There's a disjunct between

that reality and Mr. Calhoun's perspective on it.  And when
somebody believes themselves so sincerely to be a martyr or a
political prisoner, the Court can have no assurance that he is
going to take conditions that are imposed by the Court seriously
if he doesn't believe that there's any merit whatsoever to the
criminal case that's been lodged against him.  That is a very
serious concern on the part of the government.

THE COURT:  Mr. Alexander, with respect to the risk of
flight grounds that the government has also argued, can you
elaborate more on what specific facts support that argument?

MR. ALEXANDER:  Your Honor, I would only refer to the
written findings of the magistrate in the Order of Detention.
That was attached as Exhibit 1 where the magistrate there ruled
that "Mr. Calhoun showed that his intentions were more than mere
fantasies when he participated in the violent invasion of the
United States Capitol during a joint session of Congress
during" -- "defendant indicated that he intended to participate
in further armed acts of violence, and at the time of his
arrest, defendant was evading law enforcement and was heavily
armed."

And so --

THE COURT:  Do we know what the evidence of evading
law enforcement was?

He has presented a plausible explanation that he and his
family were getting threats and he went to his sister's and he

1    missed court dates because his assistant stopped working,

2    et cetera.   That's one explanation.

3         Were there agents surveilling his house and he slipped out

4    the back?  What more can you tell me about the circumstances of

5    his so-called flight?

6              MR. ALEXANDER:  Yes, Your Honor.  I am happy to do so.

7         If we take a look at the transcript of that January 21st

8    hearing and specifically the testimony of Special Agent

9    Armentrout, who was the FBI agent who testified for the

10   government both for the purposes of the preliminary hearing as

11   well as detention, there was extensive conversation both on --

12             THE COURT:  No, I've reviewed it, and it was not

13   entirely clear to me what exactly happened based upon the

14   agent's testimony.  I was hoping that you could clarify more

15   what provoked him --

16             MR. ALEXANDER:  Your Honor --

17             THE COURT:  -- to leave the house.  Was the agent

18   sitting outside the house?

19             MR. ALEXANDER:  Right.  And I don't have any

20   additional evidence.  I mean, I don't have a witness prepared to

21   testify today, Your Honor, or Special Agent Armentrout to speak

22   more fully to that question.  So at least for the purposes of

23   today's proceeding, we're relying on the transcript of his

24   previous testimony on this question.

25             THE COURT:  I'm sorry.  I'm going to have to step away

1    for just a moment.  I see that my computer battery is getting

2    low.  So I'm going to go get the power cord before it stops.  I

3    will be right back.

4          (Pause.)

5              THE COURT:  All right.  My apologies.

6    Mr. Alexander, anything more you can add on the flight

7    issue we were discussing?

8              MR. ALEXANDER:  Yes, Your Honor.  I think the flight

9    issue relates directly and most pressing from the government's

10   perspective, as I said, and I won't belabor the point, to the

11   fact that Mr. Calhoun believes himself to be a martyr in this

12   case.  And so I think that decreases the amount of confidence

13   the Court can have that he is going to take seriously the

14   conditions that are set by the Court should he be released.

15             THE COURT:  What does that have to do with flight,

16   that he thinks he's a martyr?  I guess that it's telling in many

17   ways, but in terms of evading.

18             MR. ALEXANDER:  Your Honor, I think there's reference

19   to this in Mr. Calhoun's testimony, that if he does not think

20   that these proceedings before this Court are legitimate or that

21   there's an adequate basis for his detention or being held on

22   conditions of release -- or released, rather, on conditions, I

23   don't know how necessarily the Court could find -- again, the

24   ultimate question when an individual is released on conditions

25   is the faith that the Court is placing in the individual to

abide by those conditions.  And that faith in large part and in most cases is predicated on the assumption that the defendant understands the seriousness of the situation.

Here, we're in a little bit of a, I believe, unusual circumstance where Mr. Calhoun has extremely strong opinions about the legitimacy of the case that was brought against him and, as he stated, the role of the federal judiciary in presiding over these cases.

So I think that does raise unique and legitimate concerns regarding not only the safety of the community but risk of flight as well.  I don't dispute Ms. Sherman-Stoltz's assertion that he is a long-time resident of the community where he was arrested.  This is not a situation where, you know, Mr. Calhoun is a citizen of another country to which he could flee, but he does not believe that he can be legitimately prosecuted for the offenses that have been alleged in his own country.  And that again just raises very serious concerns about how predictable his behavior is going to be on release.

I think there is pretty substantial sworn testimony at the detention hearing discussing in detail not just some of the communications that we've discussed today, but directly relevant to the history and characteristics under 3142(g) for Mr. Calhoun is how some of these initial reports came in.  Respectfully, Your Honor, some of that seems to conflict a little bit with Mr. Calhoun's testimony.  The testimony at the January 21st

hearing is that there were such significant concerns about
Mr. Calhoun's activity and his statements that the police chief
in the community in which he lives alerted the FBI.

So again, I don't think it's necessarily accurate -- and
I'm not saying I think this is what the Court is doing, but I
don't think it would be accurate to minimize the social media
posts as Mr. Calhoun is obviously now arguing --

THE COURT:  I am not minimizing them, to be clear.
I'm just trying to probe whether the government has additional
evidence separate and apart from the social media posts that
supports the way in which you're saying I should interpret them.
That's all.

MR. ALEXANDER:  Yes, Your Honor.  I think one section
of the proceedings on the 21st referenced threatening
communications that had actually been reported to a tip line in
November of the previous year.  And I'm quoting from page 10 and
11 of the transcript that was introduced as Exhibit 4 in this
matter where Mr. Calhoun apparently makes statements along the
lines of "some of you will live long enough to be exterminated
with extreme prejudice.  It's going to be hard to buy a beer
when Democrats are being shot on sight.  We're going to kill
every last Communist who stands in Trump's way."

Again, understanding Mr. Calhoun's argument now after a
month in custody that he didn't really mean it the way he said
it and that he's just good at trolling those people even though

he hates Communists, I don't think that that is a credible

rationalization or explanation for the statements that were made

in the context of these activities.  And those statements are

disturbing, and they are more than mere puffery or trolling,

because Mr. Calhoun took concrete steps to actually act on the

sentiments that he expressed both before, during, and after the

Capitol riot.

THE COURT:  And yet, when the police arrived at his

sister's home, he did voluntarily surrender, right, and he had

firearms in his house; right?

MR. ALEXANDER:  That is correct, Your Honor.  There

was not a shoot-out.  There was not a use of force.  That is

correct.

THE COURT:  Do you have any evidence -- aside from the

deleted postings on his social media accounts, do you have any

additional evidence that would suggest that he destroyed

evidence relating to this January 6th event?

MR. ALEXANDER:  Not at this time, Your Honor, no.  We

are not making the argument that Mr. Calhoun has destroyed

evidence, and he has not been charged with that offense.

THE COURT:  All right.  Anything more, Mr. Alexander?

MR. ALEXANDER:  Your Honor, yes.  Again, I would just

note that the chief of police in Mr. Calhoun's community sent

the FBI the Facebook screen shot that was labeled Exhibit 1, so

Exhibit 2-1 for the purposes of this proceeding, that depicted

1    an original video inside the Capitol building titled "after we

2    forced our way in but before the cops were..." and then the

3    partial word "route."  Exhibit 2 is describing -- Mr. Calhoun

4    stating being physically present in Washington on January 6th in

5    a December 29 posting, consistent with his testimony here that

6    he put his leave in December 28th.

7         Again, all of these statements and actions leading up to

8    the Capitol riot on January 6th are relevant as far as the

9    history and characteristics and the dangerousness that

10   Mr. Calhoun poses to the community, given his perspective on

11   these issues.

12        On or about January 4th or 5th, posts that are quoted in

13   part of the record on page 13 of the transcript of the

14   January 21st proceeding, "Headed to D.C. to give the GOP some

15   backbone and let them know this is their last chance to stop the

16   steal or they are going to have bigger problems than these

17   coddled Antifa."

18        There's again the post that we discussed regarding banning

19   guns in the capital, the reference in -- I don't believe that

20   Mr. Calhoun disputed this, of whether the police can enforce

21   their gun laws depends on how many armed patriots show up.

22   Although certainly the government is not asserting that

23   Mr. Calhoun was armed, but he was certainly rationally

24   self-interested and aware enough as a practicing attorney not to

25   break the law to that extent.

1        But the statement "we're going to get inside the Capitol

2    before this ends" is in evidence before the Court, and

3    Mr. Calhoun was true to his word.  These are not just puffery on

4    the Internet.  It's not just Mr. Calhoun saying -- trolling

5    things on the Internet.  This is not an indictment of his

6    political perspective.  We're talking about his actions, the

7    actions that are undisputed, in the context of his very clear

8    perspective on those actions.

9        Mr. Calhoun references law enforcement retreating.  And

10   again, the line about the mob howling with rage in the section

11   that the Court quoted here, as well as, I believe, the Court in

12   the magistrate's decision saying that "crazy Nancy would have

13   been torn into little pieces," it just frankly is not credible

14   or Mr. Calhoun's explanation now is not credible that, oh, I was

15   maybe talking about what other people were talking about or it's

16   just a joke we make a lot, we make a lot of jokes about people

17   being harmed.

18       Those aren't jokes, Your Honor, in the context of actual

19   actions being taken to fulfill the statements and

20   representations that he's made in the context of his social

21   media postings.  Mr. Calhoun, in Exhibit 6, so 2-6, there's

22   testimony that he wrote, "We physically took control of the

23   Capitol building in a hand-to-hand hostile takeover."  These are

24   again Mr. Calhoun's statements.  These are statements that are

25   made in the context of his actions the same day.

1        And Your Honor, if Your Honor believes that in hindsight

2   that based on Mr. Calhoun's testimony that it was basically all

3   a joke or that he was exaggerating everything, then that

4   certainly speaks to, you know, the necessity of detention.  It's

5   the government's perspective based on what we believe to be

6   overwhelming evidence of his conduct that day and the context

7   for it that those weren't jokes.

8        So I guess it is ultimately, Your Honor, a credibility

9   determination for the Court whether or not to credit

10   Mr. Calhoun's explanations today.

11        THE COURT:  What would be really helpful for me to

12   figure that out is to have video and photograph evidence of what

13   actually happened and witnesses, and that's what I'm struggling

14   with, because there's not a lot of that in front of me now.

15   There are a lot of social media posts, and it would be helpful

16   to have more of the actual footage and photographs of what

17   actually was happening.

18        MR. ALEXANDER:  May I make just one last --

19   understood, Your Honor, and as I said earlier, I've already

20   e-mailed the AUSA in the Middle District of Georgia, and we will

21   make every effort to get those video exhibits that are

22   referenced in Government's Exhibit 3 in this matter filed for

23   the Court's review.

24        I would point to Government Exhibit 30 in Government

25   Exhibit 2, so 2-30, is described as a screen capture from one of

1   those videos, and I think it's fair to describe it as a scrum, a

2   densely packed crowd.  That's my characterization, obviously.

3   It's the Court's determination.  But this is more than casual

4   trespassory tourism in an otherwise kind of vacant building.

5   The video evidence that was submitted to the magistrate in

6   Georgia and the screen shot of it that is in evidence before the

7   Court here is consistent with Mr. Calhoun's own statements about

8   being in the early group of individuals who breached the

9   Capitol, pushing their way past police.

10          THE COURT:  All right.  So Mr. Alexander, you are

11   going to give me a supplemental brief on the government's bases

12   for detention and the reasoning that supports that.

13       Do you concede that the rebuttable presumption does not

14   apply here?

15          MR. ALEXANDER:  I do, Your Honor.

16          THE COURT:  All right.  Anything else, Mr. Alexander?

17          MR. ALEXANDER:  Your Honor, if I could reserve that if

18   I get different guidance on that subject, subject to my own

19   ignorance, but I do.

20          THE COURT:  Ms. Sherman-Stoltz?

21          MS. SHERMAN-STOLTZ:  Yes, Your Honor.  Thank you.

22       Just to respond to some of the government's statements and

23   arguments that he just presented, the government has not

24   presented any evidence at either bond hearing as to the

25   defendant being charged with anything that relates to posts,

1    actions, or behavior prior to January 6th.  So the charges that

2    the defendant is being faced with arise solely out of the

3    offense date of January 6th.  He is not being charged with

4    anything having to do with social media posts from summer and

5    fall of 2020.  There's no crime that was committed.  Whether the

6    government attorney agrees with the statements that were being

7    made, believes them to have been too aggressive or

8    inappropriate, that's the government's opinion, but nothing

9    unlawful was done.  Otherwise, he would have been charged for

10   it, but he's not.

11       What he is being charged for is his actions and conduct,

12   alleged actions and conduct out of January 6th.  They have not

13   shown any evidence that the defendant has done anything other

14   than trespass.  The defendant admitted that himself, that he

15   trespassed.  There has been no evidence that he went anywhere

16   other than even the Rotunda area.

17       If Your Honor looks at the screen shot that the government

18   referenced, I believe it was one of the pictures, 2-6, I

19   believe.  I guess it's a continuation of 2-6 and then 7, and it

20   shows where he is.  The screen shots, I guess, of a video, 2-1,

21   Government Exhibit 2-1, shows where he is.

22       There's been no evidence that he went anywhere beyond the

23   Rotunda area, no evidence that he was even anywhere close to

24   Nancy Pelosi's office even if he was not narrating what was

25   going on or restating what he was hearing.

1          THE COURT:  I'm not following that.  What's your

2     point?  Are you saying he was not in Speaker Pelosi's office?

3          MS. SHERMAN-STOLTZ:  No.  There's been no evidence

4     that's shown that he has.  So the government referenced the

5     screen shot that was provided in their Exhibit 2 where he

6     indicates the "mob howling with rage, crazy Nancy probably would

7     have been torn into little pieces but she was nowhere to be

8     seen," the government hasn't provided any evidence that he was

9     even anywhere close to Nancy Pelosi's office or anywhere outside

10    of the Rotunda.  Because the evidence that they've shown only

11    shows that he was in one particular area of the Capitol, and

12    there's nothing else that indicates he was anywhere else.

13         If he had been anywhere else, if he had done anything else,

14    he would have been charged with it.  The government has all of

15    the footage.

16         THE COURT:  It's difficult to accept the suggestion

17    that he didn't anticipate getting into the Capitol, given his

18    social media postings.  Do you rebut that?

19         MS. SHERMAN-STOLTZ:  No, I don't, and I don't believe

20    the defendant did either.  He didn't -- you mean getting into

21    the Capitol prior to his arrival in D.C.?

22         THE COURT:  Maybe I misunderstood his testimony.  I

23    thought he was saying he didn't expect to go there until

24    something happened that day.

25         MS. SHERMAN-STOLTZ:  I understood that his testimony

1    was when he put in for leave from work is when he knew that he

2    would at least be going to D.C., when he took the days off.  I

3    don't recall him having testified -- I'm sorry.

4           THE COURT:  I'll read the transcript.  So you don't

5    dispute that that day he intended to get in the Capitol?

6           MS. SHERMAN-STOLTZ:  No, we don't dispute that he got

7    into the Capitol.

8           THE COURT:  That he anticipated getting into the

9    Capitol.

10           MS. SHERMAN-STOLTZ:  No, I'm not making a statement

11    that he anticipated it in advance of going inside.

12           THE COURT:  Remind me.  Was there not a media post

13    ahead of time saying "we're going to get into the Capitol,"

14    something to that effect?

15           MS. SHERMAN-STOLTZ:  I don't -- there were posts about

16    going to Washington, D.C.

17           THE COURT:  I thought there was a post about him

18    getting in the Capitol, but I will take a look at the record.

19           MR. ALEXANDER:  Your Honor, I apologize for

20    interrupting.  That may be Government's Exhibit 2-4, so Exhibit

21    4 in Exhibit 2.  There's a picture of the exterior of the

22    Capitol and a crowd and Mr. Calhoun writing "we're going to get

23    inside the Capitol before this ends."

24           THE COURT:  Okay.  But that was when he was at the

25    Capitol?

1          MR. ALEXANDER:  That's correct, Your Honor.

2          THE COURT:  All right.  Understood.

3          MS. SHERMAN-STOLTZ:  Government's Exhibit -- I guess

4   it would be Exhibit 3, and it has the list of all of the

5   exhibits that were entered in the January bond hearing.  And the

6   government here has referenced 35.  And I would just like to

7   address the situation again.  We are looking at something that

8   the description alone says "Mr. Scott's video" and then in

9   parentheses says "contains Calhoun's video."

10         So not having seen it, I'm not sure even what to take of

11  that.  Somebody else's video that contains Calhoun's video.

12  That's not saying and that's not alleging that he did anything

13  or went anywhere other than what the pictures have demonstrated

14  and what he under oath admitted to.

15         The same with the video that the government referenced, I

16  believe number 34 on the list, so it would be Exhibit 3-34, and

17  it just says "video."  Video of what?

18         And the government is saying that these are examples of

19  evidence that they have as to his, you know, behavior, as to his

20  actions, and none of that is indicating that he has done

21  anything other than what he admitted to, and that's trespass.

22         He has a right to take a position or to believe that he's

23  not guilty of something.  That doesn't go to his state of mind

24  as far as him being a flight risk that the government is

25  alleging that because he doesn't understand or he is not willing

to understand or comprehend the nature of the charges in front
of him, that that makes him a flight risk.  We would disagree
with that, Your Honor.  He understands the nature of the charges
that are facing him.  He understands that there is a felony
facing him.  He is able to take the position that he doesn't
believe that there's evidence that will support that, and he is
also able to take the position that he is not guilty of that.
That doesn't then make him a flight risk because he's taking
that position.

He was arrested, as you pointed out, Your Honor, peacefully
with no problems on Friday.  Thursday, he indicated that he went
to his sister's house.  Defense -- in the January bond hearing,
which can be seen in the transcript, so Exhibit 4 for the
government, page 5, the transcript, it lists all of the defense
exhibits, and it lists the voicemail messages which Mr. Calhoun
mentioned in his testimony of threats.

In our exhibit, Exhibit F, we provided affidavits from
individuals that heard those voicemails, and we also provided
mail and e-mail which indicates and shows that he was receiving
threats and threats of harm.  And that's why he left his house
and he went to his sister's house.

He went there on a Thursday.  He was arrested on a Friday.
He wasn't fleeing.  He was going somewhere where he believed he
would be safe, hoped that he would be safe.  He took his
firearms with him in order to have responsibility as he's

supposed to do as a firearms owner of protecting them to ensure that if his house was broken into nothing is taken, nothing is taken, used inappropriately, used to harm anyone.  He transported them to his sister's house, which was not unlawful, and then gave them over when he was asked, told them where they were.

He's done nothing but comply with the government and with the charges that have been presented in front of him.  He's not done anything that would indicate otherwise.

The last point that I would like to note on what the government addressed, and I believe it's their Exhibit 2 dash -- it looks like it might be 5 or a continuation of 5 or a part of 6, but it's the screen shot that would be in between -- one screen shot that has a yellow sticker that says "5" and then another screen shot that has a yellow sticker that says "6." And it says, "Today the American people proved that we have the power."  "We."  He is defining American people as "we" and also "we" as the American people.  And in the rest of that post, "We physically took control of the Capitol building," that was the "we" as the American people, not him, not himself.  He doesn't say, "I physically took control of the Capitol building."  He's referring to "we" as the American people, all of the people that were there.

That doesn't show that he did anything other than enter into the Capitol building like he said he did and remain in the

Rotunda area, which the government's evidence has shown nothing other than that, no harm, peaceful, admiring everything that was around him, and then exited and left.  He described 15 to 20 minutes to get out, so exited a period of time later.

That's all that his actions have shown.  That's all the evidence that's been presented before Your Honor.

THE COURT:  Well, to be fair, the posts that he wrote suggest he went more than to just the Rotunda.  Now, that depends upon whether I believe his testimony that that was just puffery, but his posts certainly suggest he went farther than the Rotunda.

MS. SHERMAN-STOLTZ:  Understood, Your Honor, and if the government is able to provide evidence that he did, then I will back off of that argument, but as of such, they have not. They have not entered any evidence which indicates otherwise.

THE COURT:  Ms. Sherman-Stoltz, if I were to entertain releasing Mr. Calhoun with restrictions, who would serve as the third-party custodian?

MS. SHERMAN-STOLTZ:  Any one of his sisters would, but one in particular who has offered that he can come and live with her and she also has a second residence.

THE COURT:  Is that the sister who testified at the hearing before the magistrate in Georgia?

MS. SHERMAN-STOLTZ:  If I may look at the transcript real quick, Your Honor, to confirm.

1    No, Your Honor.  The sister would be Mary Calhoun, and she

2    did not testify, I don't believe.  No, I don't see her at least

3    on the witness list.  I believe that the sister that testified

4    in Georgia was the one that he went to the house of, where he

5    was arrested, and no, that is not the same sister that is

6    providing two alternative locations which we noted in our

7    motion.

8         MR. ALEXANDER:  Your Honor, I don't mean to interrupt

9    Ms. Sherman-Stoltz.  This is just purely a point of

10   clarification, because I'm just not sure either.  There is a

11   Mary Calhoun who did testify.  Her testimony begins at page 82.

12   So is that -- I just offer that by way of asking if that's the

13   same individual or not.

14        THE COURT:  So it sounds like that might be.

15        MS. SHERMAN-STOLTZ:  It is, yes.  I apologize.

16        THE COURT:  So the same sister who testified is the

17   sister who would serve as a third-party custodian if he were to

18   be released?

19        MS. SHERMAN-STOLTZ:  Yes, Your Honor.  However, he has

20   two additional sisters that could also serve as custodian if the

21   Court would prefer, but that is the one that has volunteered her

22   home or she has a second home that she has volunteered as well.

23        THE COURT:  All right.  Understood.  Anything further,

24   Ms. Sherman-Stoltz?

25        MS. SHERMAN-STOLTZ:  No, Your Honor.

1          THE COURT:  Mr. Alexander?

2          MR. ALEXANDER:  No, thank you, Your Honor.

3     I did receive and will be filing the exhibits that the

4     Court asked about from the clerk in the Middle District of

5     Georgia.

6     And then my only other question would be what briefing

7     schedule the Court would like for our supplementary briefing --

8     or I guess my supplementary briefing.

9          THE COURT:  Well, I think time is of the essence at

10    this point.  So I would like to turn back to this on Monday.  So

11    to the extent, Ms. Sherman-Stoltz, you would like to address

12    this issue as well, I offer you the same opportunity, and that

13    is the issue I raised earlier about the government's bases for

14    detention here under the statute.

15    Can the parties file those by -- I'll ask you,

16    Mr. Alexander.  By Sunday at noon could you file a supplemental?

17    It doesn't need to be lengthy, but just something setting out

18    the government's position with regard to the grounds on which

19    you're seeking detention and the support from the statute.

20         MR. ALEXANDER:  Yes, Your Honor.

21         THE COURT:  And Ms. Sherman-Stoltz, again, you may do

22    the same.  And as soon as I can get that additional evidence

23    submitted -- Ms. Sherman-Stoltz, I will also offer you the

24    opportunity to the extent you want to to supplement anything you

25    provided with regard to Mr. Calhoun's medical records.  You're

welcome to do that as well.  But I would ask that you all file

that by noon on Sunday, which is the 7th, and then I would like

to set a follow-up hearing Sunday afternoon.

Mr. Hopkins, can you tell us what's available Sunday

afternoon?

THE COURTROOM DEPUTY:  Your Honor, Sunday afternoon?

THE COURT:  I'm sorry.  Monday afternoon, the 8th.

THE COURTROOM DEPUTY:  No problem, Your Honor.  We're

free.

THE COURT:  No, I mean for the room.

THE COURTROOM DEPUTY:  Oh, okay.  That makes a lot

more sense.  Let me see.

MR. ALEXANDER:  Your Honor, while Mr. Hopkins is

looking at that, if I could just ask perhaps to have a deadline

of 2:00 Eastern on Sunday, if that's agreeable to the Court?

THE COURT:  That's fine.  The same holds true for

Ms. Sherman-Stoltz, 2:00 Sunday.

MS. SHERMAN-STOLTZ:  And Your Honor, may I just

clarify?  You had mentioned previously about wanting all of the

exhibits that were in the bond hearing before the magistrate in

January.  Does that include the defense exhibits as well?

THE COURT:  Yes.  I should have everything before me

that was before that magistrate.  I don't understand why I don't

have that already.

MS. SHERMAN-STOLTZ:  Okay.  I will track down the

1   voicemail messages that were listed.  I believe I have

2   everything else.

3            THE COURTROOM DEPUTY:  Your Honor, it looks like for

4   the most part that it's actually a relatively --

5            THE COURT:  Would 3:00 work, Mr. Hopkins?

6            THE COURTROOM DEPUTY:  I think 3:00 can work.  I have

7   to -- I think 3:00 can work.

8            THE COURT:  Okay.  We will confirm this.  The parties

9   should assume that we will have a continuation of this hearing

10  on Monday, March 8th, at 3:00 p.m.  If there's an issue with the

11  time, the courtroom deputy will reach out to you to let you

12  know.

13       Is there anything else we need to address?

14            MS. SHERMAN-STOLTZ:  No, Your Honor, not for the

15  defense at this time.

16            MR. ALEXANDER:  No, Your Honor.

17            THE COURT:  Okay.  Thank you all.

18       (Proceedings adjourned at 4:20 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.


        Please Note:  This hearing occurred during the

COVID-19 pandemic and is, therefore, subject to the

technological limitations of court reporting remotely.



/s/ Sara A. Wick                     March 22, 2021

SIGNATURE OF COURT REPORTER          DATE