```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,        .
                                        .  Case Number 21-cr-116-1
 4               Plaintiff,             .
                                        .
 5          vs.                         .
                                        .
 6     WILLIAM MCCALL CALHOUN, JR.,     .  March 9, 2021
                                        .  12:39 p.m.
 7               Defendant.             .
       - - - - - - - - - - - - - - - - -
 8

 9                  TRANSCRIPT OF MOTION HEARING, VOLUME III
                    BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                       UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:

13     For the United States:      ADAM ALEXANDER, AUSA
                                   United States Attorney's Office
14                                 222 West Seventh Avenue
                                   Anchorage, Alaska 99501
15

16     For the Defendant:         JESSICA SHERMAN-STOLTZ, ESQ.
                                   Sherman-Stoltz Law Group, PLLC
17                                 P.O. Box 69
                                   Gum Spring, Virginia 23065
18

19

20

21     Official Court Reporter:   SARA A. WICK, RPR, CRR
                                   333 Constitution Avenue Northwest
22                                 U.S. Courthouse, Room 4704-B
                                   Washington, D.C. 20001
23                                 202-354-3284

24
       Proceedings recorded by stenotype shorthand.
25     Transcript produced by computer-aided transcription.
```

P R O C E E D I N G S

(All participants present via video conference.)

COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-116-1, the United States of America versus William Calhoun, Jr.

If I can have the parties identify themselves for the record, beginning with the United States.

MR. ALEXANDER:  Yes, Your Honor.  Adam Alexander for the United States.

THE COURT:  Good afternoon.

MS. SHERMAN-STOLTZ:  Jessica Sherman-Stoltz for the defendant, Your Honor.  Good afternoon.

THE COURT:  Good afternoon, Ms. Sherman-Stoltz and Mr. Calhoun.

I received both of the parties' supplemental filings, and I have reviewed them.

COURTROOM DEPUTY:  Sorry to interrupt, Your Honor.  I want to let you know we also have Pretrial Services on the line, and we have the witness, Ms. Mary Calhoun, on the line as well.

THE COURT:  Thank you.  I apologize for keeping everyone waiting.  Before I get into my ruling on the matter, let me just say for the record this is a video conference hearing being conducted pursuant to the Chief Judge's standing order relating to the pandemic, that Mr. Calhoun has consented to appear by video conference, and this is a continuation of the

1    earlier hearing held this week.

2         As I said, I have reviewed the parties' supplemental

3    filings.  I do have -- this is a particularly busy day for me.

4    So again, I'm sorry to keep you waiting.  I'm going to have to

5    issue my ruling and then in all likelihood come back, take a

6    brief break to handle another matter and then come back.

7         I know, Ms. Sherman-Stoltz, that you do have another matter

8    at some point.  Can you remind me what time that is?

9              MS. SHERMAN-STOLTZ:  It's at 1:30, Your Honor, and I'm

10   already on location.  So I just have to walk into the

11   courthouse.

12             THE COURT:  Okay.  In that case, Mr. Hopkins, I think

13   we are going to have to have you move the -- or change to

14   another date the other matter at this point.

15        I thought you had until 2:00, Ms. Sherman-Stoltz.  That is

16   not the case?

17             MS. SHERMAN-STOLTZ:  No.  I'm sorry.

18             COURTROOM DEPUTY:  I will let them know we will

19   continue the matter.

20             THE COURT:  All right.  Okay.  Thank you.

21        All right.  Any additional points either side wants to

22   make?  I have reviewed your brief.  I think this is fully

23   briefed at this point.  I am happy to hear any additional points

24   that you want to raise.

25             THE DEFENDANT:  I would like to apologize.

1          THE COURT:  I'm sorry.  Is that you, Mr. Calhoun?

2          THE DEFENDANT:  Yes, Your Honor.

3      I just wanted to apologize to the Court and to

4  Mr. Alexander for being difficult.  It is very difficult to

5  prepare somebody for this process, and I just -- if I had to do

6  it over again, I would not have gone into the Capitol.  I know

7  that I messed up doing that.

8      But I apologize for being difficult.  Thank you.

9          THE COURT:  Thank you, Mr. Calhoun.

10      Anything else, Mr. Alexander or Ms. Sherman-Stoltz?

11          MR. ALEXANDER:  Your Honor, may I just ask a question?

12  If the Court's ruling is for release, will there be an

13  opportunity for the parties to address conditions?

14          THE COURT:  Yes.  Well, I tried to do that yesterday

15  somewhat.  Can you give me a heads-up what issues you want to

16  discuss?

17          MR. ALEXANDER:  Yes, Your Honor.

18      Again, not conceding the government's concerns regarding

19  both risk of flight and danger to people who are involved in

20  this investigation, essentially, it remains our perspective that

21  those merit detention, but should the Court find that there are

22  conditions or some combination of conditions that will

23  reasonably assure the safety of the community and Mr. Calhoun's

24  presence at future hearings, our very strong request would be

25  for GPS monitoring, as mentioned yesterday.

1        And in addition to that, I think it would be appropriate,

2    given the unique circumstances here, that Mr. Calhoun be

3    restricted from Internet-enabled devices.  It sounds like he is

4    able to continue his practice, if permitted to do so by the

5    Court, through telephone and personal appearance.

6        Again, the government has very serious concerns about what

7    are perceived as legitimate threats made by Mr. Calhoun against

8    other individuals in the run-up to the Capitol riots

9    investigation and his participation there and --

10            THE COURT:  All right.

11            MR. ALEXANDER:  -- trying to start retaliation against

12    people in the community who he thinks may have cooperated with

13    law enforcement.

14            THE COURT:  Of course, the Court does share your

15    concerns as well.  Mr. Alexander, you will recall one of the

16    issues I raised yesterday was whether Mr. Calhoun would consent

17    to a ban on social media, which I understand he has agreed to,

18    and he also has agreed to computer monitoring of social media.

19        Does that satisfy the government's concerns?  Recognizing

20    you think he should be detained, but if I were to disagree with

21    you, does that take care of the concern?  I imagine as a lawyer,

22    he does have research he needs to do, and if he is restricted on

23    the Internet, it's difficult to do legal research.

24        So does that take care of the concern you are expressing?

25    I share it 100 percent.

1          MR. ALEXANDER:  There's a potential middle ground or

2     compromise in my mind that may address Mr. Calhoun's employment

3     needs and the needs of his clients, as well as the government's

4     concerns here, and that may be no mobile Internet-enabled

5     devices.  If Mr. Calhoun has got an office computer that he's

6     got set up for work purposes, I think that should hopefully be

7     sufficient.  I think a lot of the social media posting at issue

8     here was probably done via Mr. Calhoun's Internet-enabled cell

9     phone, and I think that's again one of the concerns here.

10          Mr. Calhoun, in his own testimony, described kind of an

11     escalating pattern of engagement in social media platforms over

12     the past couple years.  I think that can be kind of a difficult

13     cycle to get out of, especially when you've got the temptation

14     right there in your hand.

15          I'm not comparing Mr. Calhoun, but most of my caseload is

16     child exploitation defendants.  In those cases where the

17     rebuttable presumption for release is found, there is, at least

18     local practice, a ban on mobile-enabled devices and some

19     allowance made for work or educational purposes.  It may be that

20     there is -- that compromise is possible here as well.

21          THE COURT:  All right.  Mr. Alexander, you raise some

22     important points.  What I am going to do is I am going to rule

23     and take a break.  The problem we have is Ms. Sherman-Stoltz is

24     up against a hard deadline.  I wish you would have raised this

25     yesterday because it would enable Pretrial to explore some of

1    this.

2         But anyway, let me rule, and I will take a brief recess and

3    give Ms. Sherman-Stoltz an opportunity to talk to Mr. Calhoun

4    and give me an opportunity to talk to Pretrial Services about

5    that.  All right?  Okay.

6         Before the Court is the defendant's motion for

7    reconsideration of detention.  Magistrate Judge -- oh, can I ask

8    everyone to mute your phones, because I am getting some

9    background noise, Pretrial as well, and any phone lines that are

10   open should be muted.  I think the court reporter also is

11   unmuted.  All right.

12        Magistrate Judge Charles Weigle in the Middle District of

13   Georgia previously determined that Calhoun should be held

14   without bond pending trial, finding that no combination of

15   conditions could reasonably assure his appearance and safety of

16   the community if he was released.

17        Calhoun seeks revocation of that decision, contending that

18   release to his sister's residence in Georgia under third-party

19   supervision, GPS monitoring, and home confinement would

20   reasonably assure his appearance and the safety of the

21   community.

22        I have reviewed the entire record, including arguments

23   raised in the briefs and during the hearings held on March 5th

24   and March 8th, as well as the exhibits presented before this

25   Court, the transcript of the preliminary hearing and detention

hearing held before Magistrate Judge Weigle, and his order of detention.

This case arises from the storming and breach of the U.S. Capitol on January 6, 2021.  The indictment alleges that Calhoun participated in the January 6th events in an attempt to obstruct congressional proceedings mandated by the U.S. Constitution.

During his testimony at the March 5 hearing, Calhoun described himself as an active user of social media and an influencer before his arrest.  According to Calhoun, at one point, he had as many as 5,000 followers on one social media platform alone.  He used various social media accounts to post commentary related to political events.  Screen captures offered into evidence by the government show that Calhoun's rhetoric was at times shockingly disturbing and violent.

In fall 2020, Calhoun posted on social media that he intended to travel to Washington to protest the 2020 election results.  On October 20, 2020, he stated, "Patriots, be ready to storm Washington.  If you're willing to go to Washington in November to peacefully protest with AR-15 in hand, upload this." That's Government Exhibit 2-19.

He also testified that in late December 2020, following an announcement by President Donald Trump, he requested leave to travel to Washington, D.C., to join what he called a "Stop the Steal rally," and in the days leading up to January 6, Calhoun encouraged his followers to join him at the rally, emphasizing

that being physically present in Washington on January 6th is of key importance because, in his view, there was no other realistic opportunity to communicate their unwavering intent to demand fair elections.  Government Exhibit 2-2.

In another post, he indicated that he intended to give the GOP some backbone, and he put them on notice that if they did not stop the steal, they would have bigger problems than Antifa burning down their spaces.  Government Exhibit 3.

That same post emphasized that while guns are already banned in D.C., whether the police can enforce their gun laws depends upon how many armed patriots show up.

On January 6, 2021, following the president's rally, Calhoun posted a photo in front of the Capitol stating, "We're going to get inside the Capitol before this ends."  Government Exhibit 4.

From here, the parties disagree about what happened. Several of Calhoun's posts narrate events from inside the Capitol in the first person, and the government contends that they accurately describe Calhoun's conduct.  Calhoun, on the other hand, testified that he used the collective "we" in these posts to refer to the entire group of individuals who had entered the Capitol.

Regardless, in at least one post, Calhoun specified that "my buddy Andy Allen and I were in the first 200 to rush up the steps and in the inside after the vanguard clashed hard with the

police."  Government Exhibit 6.  Video footage and photograph
exhibits show Calhoun inside the Capitol building.  At various
points, these videos and images demonstrate that Calhoun entered
deep into the Capitol, passing through the crypt, hallways, and
Rotunda.  In the videos provided by the government, Calhoun is
positioned several rows behind the head of the crowd.  In two of
the videos, he appears to be narrating the events to his
followers.

　　　None of the videos show that Calhoun engaged in any acts of
violence or property destruction during the riot.  Based on the
evidence gathered to date, the government does not allege that
Calhoun engaged in any acts of violence or property destruction
in or around the Capitol on January 6th, nor does the government
allege that Calhoun was armed, and he denies being armed when he
entered the Capitol.

　　　On January 12, 2021, U.S. District Court for the District
of Columbia Magistrate Judge Zia Faruqui approved a complaint
charging Calhoun with entering a restricted building without
lawful authority in violation of 18 U.S.C. Section 1752(a);
violent entry or disorderly conduct on the Capitol grounds, 40
U.S.C. Section 5104(e)(2); and forcibly entering and remaining
in the Capitol in order to obstruct an official proceeding,
18 U.S.C. Section 1512(c)(2)(K).

　　　Subsequently, on February 12, 2021, a federal grand jury in
the District of Columbia returned an indictment charging these

offenses.  The government secured a warrant for Calhoun's arrest.

On January 13, 2021, according to both Calhoun and the government, Calhoun was then present in court defending clients on that day.  The government then followed Calhoun to his residence but determined that he had left without their noticing.  According to Calhoun, he left his residence in Americus, Georgia, after receiving numerous threatening calls and e-mails following an interview that was reported in the *Atlanta Journal-Constitution*.

Calhoun was arrested on January 15 at his sister's residence in Macon, Georgia.  At the time, he had numerous firearms and a large quantity of ammunition in his possession. Calhoun surrendered to law enforcement without resisting any directive given as to the firearms, each of which was lawfully owned and registered to him.

Before Magistrate Judge Weigle, the government moved to detain Calhoun on the grounds that he presented both a risk of flight and a serious risk that he would obstruct or attempt to obstruct justice.  On January 25th, Judge Weigle issued an order of detention pending trial.

On March 1, Calhoun was arraigned before this Court and indicated that he intended to file the instant motion.

If a defendant is ordered detained by a magistrate judge under the Bail Reform Act, the defendant may file with the court

having original jurisdiction a motion for revocation or

amendment of the order, 18 U.S.C. Section 3145(b).  The Court

then reviews the magistrate judge's determination de novo.  See

*United States v. Chrestman*, 21-mj-218, 2021 WL 765662 at 5

through 6; *United States v. Henry*, 280 F.Supp.3d at 125, two

D.D.C. cases.

   The District court is free to use in its analysis any

evidence or reasons relied upon by the magistrate judge and may

hear additional evidence and rely on its own reasons. *United

States v. Hubbard*, 962 F.Supp.2d 212.

   Because an order of detention may only be issued if the

case satisfies one of the circumstances enumerated by the Bail

Reform Act, the district court must also analyze whether the

magistrate judge correctly determined that the case falls into

one of those circumstances.  See *U.S. v. Singleton*, 182 F.3d at

9, D.C. Circuit 1999 case.

   For at least three decades, the D.C. Circuit has recognized

that the Bail Reform Act creates a two-step process for

evaluating the government's motion for detention.  First, the

Court asks whether the case is one in which the Act permits the

government to seek detention, and second, if the case is one in

which the Act permits the government to seek detention, the

Court determines whether any condition or combination of

conditions will reasonably assure the defendant's appearance and

protect the public. *Singleton*, 182 F.3d at 9.

1    The Act restricts the government's ability to move for

2    detention of a defendant to seven categories of cases, including

3    a case that involves the charged offense falling into one of

4    five enumerated categories or any case where the defendant poses

5    a serious risk of flight or of attempting to obstruct justice or

6    threaten, injure, or intimidate a witness or juror.

7    The government must make a threshold showing that the case

8    is one that falls within the seven enumerated categories before

9    it is permitted a hearing on the question of detention.

10   *Singleton*, 182 F.3d at 15.

11   The D.C. Circuit has not addressed the standard the

12   government must show that it is entitled to a detention hearing,

13   but other courts have consistently held that the government must

14   establish by a preponderance of the evidence that it is entitled

15   to a detention hearing.  *U.S. v. Watkins*, 940 F.3d 152 at 158.

16   This threshold requirement serves to limit the types of

17   cases which detention may be ordered prior to trial.

18   If the government makes a threshold showing that a hearing

19   is appropriate, a judge shall order the detention of a defendant

20   before trial if, after a hearing in consideration of all the

21   available information concerning the enumerated factors, the

22   judicial officer finds that no condition or combination of

23   conditions will reasonably assure the appearance of the person

24   as required and the safety of any other person in the community.

25   *U.S. v. Howard*, 2020 WL 5642282 at 2.

1    In determining whether to detain or release a defendant,

2   the Court must consider four statutory factors:  The nature and

3   circumstance of the offense charged, the weight of the evidence,

4   the history and characteristics of the person, and the nature

5   and seriousness of the danger to any person or the community

6   that would be posed by the person's release.  18 U.S.C. Section

7   3142(g).

8    The government bears the burden of proving by a

9   preponderance of the evidence that the defendant poses a risk of

10  flight and by clear and convincing evidence that the defendant's

11  dangerousness warrants detention.  *U.S. v. Simpkins*, 826 F.2d

12  94, 96.

13    The Court conducts its review in light of the principle

14  that in our society, liberty is the norm and detention prior to

15  trial is a carefully limited exception.  *Salerno*, 41 U.S. at

16  755.

17    The government moves to detain Calhoun on two bases, first

18  that there's a serious risk that he will obstruct or attempt to

19  obstruct justice or threaten, injure, or intimidate or attempt

20  to threaten, injure, or intimidate a prospective witness or

21  juror.  Second, the government argues that he presents a serious

22  risk of flight.

23    Having reviewed all of the evidence and arguments, the

24  Court concludes that the government has failed to establish as a

25  threshold matter that Calhoun presents a serious risk of

obstruction in this matter.  On this point, the magistrate made
no threshold findings to the risk of the obstruction, and the
Court finds that Calhoun's alleged obstructive conduct is
insufficient to show that he poses a serious risk of obstruction
in this case.  See *United States v. Mullins*, 21-mj-233, a D.D.C.
case, March 2nd, 2021, denying detention of a defendant charged
with obstruction and assaulting a Capitol police officer because
the government failed to make a threshold showing that the
defendant posed a serious risk of flight or obstruction.

To be sure, the rhetoric in Calhoun's social media posts is
highly offensive and at times shocking and violent in nature,
but the government has not charged Calhoun with a threat-related
or incitement of violence offense, nor does it argue that any of
his posts constitute such offense.

The government also does not contend that Calhoun deleted
any social media posts or altered any evidence relevant to this
case.  The government concedes that there's no evidence that
Calhoun has ever threatened a witness or juror, obstructed any
court proceeding, and it acknowledges that Calhoun is at least
as of now a member of the Bar in good standing.

Consistent with the rulings of other judges in this
district, the Court concludes that the government has not met
its burden of showing as a threshold matter that there's a
serious risk that Calhoun will obstruct these judicial
proceedings.  See *U.S. v. Mullins*, 21-mj-233.  See also

*U.S. v. Fanyo-Patchou*, 426 F.Supp.3d, 779 at 782, a Western District of Washington case holding that the government failed to show serious risk that the defendant would obstruct justice where it failed to show he had threatened the present proceeding.

But the Court does note as to dangerousness, the government has not alleged that Calhoun has a prior felony criminal record or has ever committed any physical acts of violence, even on January 6th. Nor has the government alleged that he carried a weapon onto the Capitol grounds, and Calhoun has denied that he carried a weapon on January 6th.

The government has not asserted that Calhoun took steps to plan or lead the riot. Calhoun's social media posts on which the government relies suggest that Calhoun was not a part of the vanguard that initially clashed hard with the police on January 6th, and the video evidence appears to confirm Calhoun's account, at least based on the evidence the Court has so far.

Though Calhoun was clearly present during the clashes with police, the video evidence shows him positioned several rows back, appearing to record and narrate the events rather than fight the police.

Calhoun was arrested with numerous firearms in his possession, each of which was legally owned and registered, as I've noted. Those firearms have now been seized, and Calhoun would not have access to any firearms on release.

1    Even so, the Court finds the magistrate did not err in

2  holding a detention hearing, because the government has shown a

3  serious risk that Calhoun might flee absent conditions on his

4  release.  The government proffers that Calhoun missed a court

5  appointment on the day on which the government intended to

6  arrest him, and he slipped FBI surveillance and relocated from

7  his residence to his sister's house armed with numerous

8  firearms.

9    Calhoun disputes this account and offers a plausible

10  explanation for his actions.  Calhoun testified that he went to

11  his sister's house because he received threatening e-mails

12  following the events of January 6th.  He testified that one of

13  his staff members quit his practice because of these threats.

14  Several of these threatening calls and messages have been

15  submitted into evidence.  Concerned for his safety, Calhoun says

16  he left his home on Wednesday, January 13, to stay with his

17  sister.

18    He also testified he notified the Sumter County Assistant

19  District Attorney as to his absence, and when the police arrived

20  at his sister's home two days later, he surrendered immediately

21  and directed police to his belongings, notifying them that he

22  had firearms in the bedroom.

23    Regardless whether Calhoun did, in fact, seek to evade law

24  enforcement agents and thus presents a serious risk of flight,

25  the government has failed to meet its burden to show that no

1    condition or combination of conditions set forth in Subsection C

2    of the Bail Reform Act can reasonably assure his appearance.

3        In assessing whether any conditions can reasonably assure

4    Calhoun's appearance, the Court must consider the factors

5    outlined in 18 U.S.C. 3142(g), with a particular view toward the

6    nature of the offense, the weight of the evidence, and the

7    history and characteristics of the defendant.  See *United*

8    *States v. Bikundi*, 47 F.Supp.3d 131 at 137, a D.D.C. 2014 case.

9        In evaluating the risk of flight, barring exceptional

10   circumstances, the nature and seriousness of the danger the

11   defendant's release would present to the community has no

12   relevance.  See *United States v. Viau*, V-i-a-u.  That's 2019 WL

13   3412920 at 3, a 2019 D.D.C. case.

14       Here, though, Calhoun's charges do not raise a rebuttable

15   presumption of intention.  He is charged with one felony count

16   that carries a maximum penalty of 20 years' imprisonment, in

17   addition to two misdemeanor offenses.

18       The government's evidence as to each of these offenses

19   appears to be strong.  The government has produced multiple

20   exhibits that show Calhoun inside the Capitol building on

21   January 6th.  The exhibits demonstrate that he participated in

22   the breach of the Capitol and celebrated its aftermath, and the

23   government has made a strong proffer that Calhoun entered the

24   Capitol with intent to disrupt Congress's proceedings.

25       Make no mistake, these are serious charges, and the

circumstances of the offense are appalling.  Calhoun accompanied a violent mob into the United States Capitol.  As a result, the nature of the offense and the weight of the evidence both cut in favor of detention.  Again, *U.S. v. Bikundi*.

Even so, any incentive Calhoun has to flee does not render him an unmitigable flight risk -- see *Munchel*, 2021 WL 620236 at 5, citing *U.S. v. Hanson*, 613 F.Supp.2d 85 at 90 through 91, a D.D.C. case -- particularly in light of his history and his characteristics.

Calhoun is a 57-year-old attorney who resides in a small town and has an active law practice assisting criminal defendants.  He regularly appears in local courts and needs to do so to continue to earn a livelihood.

He has three prior arrests for misdemeanor offenses, but for each offense, the charges were either dismissed or resulted in a small fine.  One arrest involved trespassing at age 18 following the Florida versus Georgia football game.  The second involved driving under the influence at age 26.  And the final one involved possession of less than one ounce of marijuana over a decade ago.  These misdemeanor offenses occurring decades ago do not suggest that Calhoun will flee.  Instead, it appears he complied with the court system in each instance.  Further, the government has produced no evidence that Calhoun in his many years of practice has ever violated an order of the court.

He has lived in Georgia his entire life, and his family

lives in Georgia, establishing strong ties to the community and decreasing the likelihood of flight. He does not have a passport, and it appears he would not have the financial means to flee the country. See *Munchel*, 2021 WL 620236 at 5.

Though Calhoun's recent behavior and his social media activity in particular is very disturbing, it appears based on the numerous character letters submitted on his behalf that he continues to have support in his home community.

Finally, Calhoun has prostate cancer and is receiving treatment at Emory University Medical Center in Atlanta. His health risks and his need for continued treatment strengthen his ties to his home state. See *United States v. Hassanshahi*, 989 F.Supp.2d 110 at 116.

For all these reasons, the government has not shown by a preponderance of the evidence that Calhoun presents a risk of flight that cannot be addressed by any condition or combination of conditions of release. The law requires reasonable assurance that a defendant will appear. It does not demand absolute certainty. See *U.S. v. Alston*, 420 F.2d 176 at 178, D.C. Circuit case.

To mitigate any potential risk of flight, the Court will place Calhoun on a number of strict conditions of release, including GPS monitoring and home confinement.

Because the Court's determined that detention is not warranted, the Court will not address the other arguments

Calhoun raises in his brief, including the argument for
temporary release under 18 U.S.C. 3142(i).

In conclusion, Calhoun is charged with serious offenses,
and his rhetoric surrounding the political divisions of our time
are deeply disturbing.  But the charges he faces do not raise to
a presumption of detention under the Bail Reform Act, and he has
not been charged and the government does not argue that he has
committed a crime of violence or destroyed any property, nor
does it argue this case falls in any of the bases for detention
under 18 U.S.C. Section 3142(f)(1).

Because of Calhoun's long history of compliance with court
orders as a criminal defense attorney in good standing, his lack
of any history of physical violence or felony convictions, and
in light of his extensive ties to the community, the Court
believes there are conditions that can assure his appearance and
protect the public if he is released.

So based on a consideration of the evidence and the factors
set forth in 18 U.S.C. 3142(g), the Court does find that the
government has failed to show that no condition or combination
of conditions will reasonably assure Calhoun's appearance and
the safety of the community if he were released.  Accordingly, I
will grant his motion.

And I do want to give the parties, at least
Ms. Sherman-Stoltz, an opportunity to talk to Mr. Calhoun in a
separate room.  Mr. Hopkins, if you can facilitate that.  And I

1    will reach out to Pretrial Services and rejoin this call.

2              COURTROOM DEPUTY:  Your Honor, do you want me to put

3    you and Ms. --

4              THE COURT:  No, that's all right.  I will call her on

5    another line.

6              COURTROOM DEPUTY:  Okay.

7              THE COURT:  Thank you.

8              COURTROOM DEPUTY:  You're welcome, Your Honor.

9         (Recess taken from 1:08 p.m. to 1:19 p.m.)

10             THE COURT:  Ms. Sherman-Stoltz, anything you would

11   like to add to -- in response to what Mr. Alexander recommended?

12             MS. SHERMAN-STOLTZ:  Your Honor, we would --

13   Mr. Calhoun is fine with all of the restrictions that Your Honor

14   has laid out and mentioned, with the exception of the actual

15   phone that accesses Internet that Attorney Alexander mentioned.

16        Mr. Calhoun mentioned that in a lot of the courts he goes

17   into, there's not WiFi.  So the only way that he has the ability

18   of checking and responding to e-mails or doing research while he

19   is in court waiting for dockets to be called is on a phone that

20   acts as his Internet.

21             THE COURT:  They allow cell phones in the courtroom?

22             MS. SHERMAN-STOLTZ:  Yes.  He's nodding emphatically.

23             THE COURT:  What about if his use is restricted for

24   work purposes only?  Would he agree to that?

25             MS. SHERMAN-STOLTZ:  Yeah, I believe that he would.

1    Mr. Calhoun -- that's what he has indicated he needs WiFi or

2    Internet usage for is for work purposes.

3            THE COURT:  Do you agree to that condition,

4    Mr. Calhoun?

5            THE DEFENDANT:  (Nodded head.)

6            THE COURT:  You're not on mute.

7            THE DEFENDANT:  Am I on mute?

8            THE COURT:  Now you're not.

9        You do agree to that condition?

10            THE DEFENDANT:  I would say, Your Honor, I was under

11    the impression I would be disallowed from social media, but

12    Internet is my library of --

13            THE COURT:  I understand the need for you to do your

14    legal work.  So I'm not inclined to do that, but I'm wondering

15    whether you agree -- you've talked about wanting to get off

16    social media and stopping this, whether it's not a good idea to

17    restrict the use of the Internet-accessible devices to -- for

18    work purposes?

19            THE DEFENDANT:  Well, there is -- well, all I want to

20    be able to do on the Internet is two things.  One, I want to go

21    to do whatever type of research or communication I have to do

22    for the law practice or for work, because I also play music on

23    the side.  I didn't discuss that with my attorney.  I also won't

24    be able to keep up with current events and access news and know

25    what's happening in the world.  I do not care to be on social

media.

THE COURT:  Mr. Alexander, I think I do have to be careful in setting too broad of a condition here.  I share your concern about social media.  I think we can set conditions in terms of computer monitoring for that.  And certainly, I will revisit this issue if you were to come back to me and say he is posting things from his phone.  I'm just concerned about too broad of a condition here.

MR. ALEXANDER:  That's reasonable, Your Honor.  I have concerns as well about potential monitoring software to the extent it may capture inadvertently privileged communications, attorney-client communications between Mr. Calhoun and his clients.  So I'm not recommending from our perspective the use of monitoring software.

THE COURT:  You're not?  Okay.

MR. ALEXANDER:  No, Your Honor.  I believe that was perhaps Probation's recommendation.

THE COURT:  I think I had posed a question, and I think you did agree to that, that it would be monitoring simply for social media.  I'm certainly sensitive to the fact that the conditions should be no broader than is reasonably necessary to assure his appearance.

MR. ALEXANDER:  Your Honor, if I may, it sounds like there's at least broad agreement as to no access to or communication through social media applications.  I think if

that's something that Mr. Calhoun is agreeable to, I think that
addresses -- at least goes somewhat towards addressing our
concerns.

That would mean, at least from the government's
perspective, that Mr. Calhoun couldn't use social media
applications to view the news; right?  He would have to do that
through other outlets.  But hopefully, that would address at
least to some degree the equities of all the parties.

THE COURT:  Ms. Sherman-Stoltz, I'm sensitive to the
timing here for you.  You've got another court appearance in
five minutes.  I'm interested in how you think this language
should be crafted.  I am interested in prohibiting the kinds of
posts that I understand he agrees he shouldn't be doing, and
he's consented to a ban on that.  So I'm interested in the
wording of that condition, what you think is sufficiently, you
know, broad to capture that but not too broad.

But in terms of your schedule, what do you suggest?

MS. SHERMAN-STOLTZ:  I'm fine, Your Honor.  My
paralegal notified the common law attorney and the court that I
have to go to that I may be a couple minutes late, but I'm
on-site.

THE COURT:  All right.  In terms of the specific
language that he had consented to, he would be prohibited from
using social media?

MS. SHERMAN-STOLTZ:  (Nodded head.)

1          THE DEFENDANT:  Let me ask, if I may, YouTube is not

2     social media?  There's a lot of how to, like if you want to know

3     how to do something, how to garden, how to build a homemade

4     wheel or whatever.  Whatever you want to do, you can go to

5     YouTube and find out how to do it.

6          MR. ALEXANDER:  Your Honor, if I may, I think

7     Mr. Calhoun raises a good point.  I think the government's

8     concerns would be posting or commenting on social media

9     applications.

10         THE COURT:  And I think that's what I initially

11    proposed, posting or commenting.

12       Are you comfortable with that?

13         MS. SHERMAN-STOLTZ:  Yes.

14         THE DEFENDANT:  Your Honor, I will post on nothing.  I

15    also like Steve Bannon.  His channel, I think, is on YouTube.

16    Again, is that social media, or is it news?  I think it's news.

17         MS. SHERMAN-STOLTZ:  I think it's pretty clear, he's

18    fine with not posting, commenting.  Any type of social media

19    platform is absolutely fine and agreeable to.  I wouldn't

20    consider YouTube to necessarily be a social media platform.

21         THE COURT:  All right.  I'm inclined to draft a

22    condition that he is prohibited against -- based upon his

23    consent here as well, he is prohibited from posting or

24    commenting on social media platforms.  And we can revisit this

25    if this creates issues.  But based on everything that he has

1    stated in this proceeding, the sense of the Court is that he is

2    stopping this sort of thing because he recognizes that it has

3    created a problem for him.  And if he is agreeable and there's

4    an extra incentive for him to stop doing this, I'm happy to

5    provide it.

6        Is that right, Mr. Calhoun?  He is nodding affirmatively.

7            THE DEFENDANT:  Yes, Your Honor.  I sincerely

8    apologize.  I did not mean to get myself into this situation.  I

9    would never enter the Capitol again.  I certainly didn't intend

10   to create this kind of uproar.

11       No one can understand what this is like until you've gone

12   through it.  You got my attention; you got my attention.

13           THE COURT:  All right.  I do want to speak to your

14   sister, and we want to have both you and your sister sworn to

15   the conditions.

16       Go ahead, Mr. Calhoun.

17           THE DEFENDANT:  For the past 15 years, I've been

18   playing, performing live music, sort of a dual career, law and

19   music.  And I was planning on transitioning over the next couple

20   of years into doing nothing but music.  I'm a freelance bass

21   player.  I'm also in a couple different bands.  The COVID thing

22   sort of killed live music temporarily, but it's coming back.

23   That's something I can do and actually get paid for and

24   recording an album, for example.

25       Whereas my law practice, I'm afraid my law practice, this

1    law practice is over.  Nobody's going to hire a lawyer with a

2    serious felony case, knowing that their lawyer might go to jail

3    some time in the next couple of months.  So I think I'm in the

4    shutting down the law practice mode and selling my office

5    building.  I think that's, as a practical matter, where it is.

6    Maybe in the future I could restart one, but I can't -- that's

7    really not going to be a viable project going forward other than

8    just kind of shutting it down, because there's too much

9    uncertainty in the future.

10        I can play music and make money some such as that is

11    available, which may be quite limited at this point as well.

12            THE COURT:  All right.  Mr. Calhoun, it sounds like

13    that's at this point aspirational and there's not at this point

14    a need to broaden the conditions we've discussed already.  But I

15    would certainly want to enable you to make a living in whatever

16    way you --

17            THE DEFENDANT:  If it's work-related, if I'm getting

18    paid to go do it, that's work.

19            THE COURT:  Understood.

20            THE DEFENDANT:  That would be permitted?

21            THE COURT:  Understood.  But the condition I was going

22    to impose was that you have permission to leave the home to

23    appear in court in this case or for other court appearances.  If

24    something else is developing, then you need to articulate and

25    file a motion, and I will consider a modification for that

1    purpose.

2            Okay.  Understood?

3            MR. ALEXANDER:  Your Honor, I apologize for

4    interrupting.  I'm very sensitive to Ms. Sherman-Stoltz's time.

5    There's one other issue I want to bring to the attention of the

6    Court.  The only other condition we feel strongly about is no

7    contact with witnesses or potential witnesses in this case.

8            THE COURT:  Yes.

9            MR. ALEXANDER:  I assume Mr. Calhoun is not going to

10   have a problem with that condition either, but I wanted to make

11   sure to flag it.

12       And that's the end of my comments.

13           THE COURT:  Okay.  All right.  So I am going to review

14   the order, the conditions in the order setting conditions of

15   release.

16       I will release Mr. Calhoun subject to these standards:

17   Conditions that he must not violate federal, state, or local law

18   while on release; he must cooperate in the collection of a DNA

19   sample if it is authorized; he must advise the Court or Pretrial

20   Services Office or supervising officer in writing before making

21   any change of residence or telephone number; he must appear in

22   court as required; and if convicted, he must surrender as

23   directed to serve any sentence that the Court may impose; and he

24   must appear, obviously, in this case at the U.S. District Court

25   for the District of Columbia if proceedings are not handled

1    remotely.

2        And let me go over the additional specific conditions of

3    release.  The defendant is going to be placed in the custody of

4    a third party, Mary Calhoun, and I am going to speak with her in

5    just a moment, who Pretrial Services has cleared as a suitable

6    custodian.  Mr. Calhoun must submit to supervision by and report

7    for supervision to the Probation Office for the Middle District

8    of Georgia.

9        Ms. Sherman-Stoltz, I meant to ask, have you talked about

10    arrangements for Mr. Calhoun to travel from D.C. to Georgia, and

11    if so, what are those plans?

12        MS. SHERMAN-STOLTZ:  He has two family friends.

13    They're in D.C., Your Honor.  They've been here since Sunday

14    night or yesterday morning to drive him back.

15        THE COURT:  So he will be driven back upon his release

16    directly to Georgia?

17        MS. SHERMAN-STOLTZ:  Yes, Your Honor.

18        THE COURT:  And assuming things go as we expect and he

19    is released today, they will leave tonight or tomorrow?

20        MS. SHERMAN-STOLTZ:  I believe tonight.

21        THE DEFENDANT:  I understand we would be leaving -- it

22    might take -- we might have to stop along the way to sleep or

23    whatever.  It's about a nine-, ten-hour drive just to get to

24    Georgia, and then I'm a good three hours -- and a half hours

25    south of that.

1      THE COURT:  Okay.  It sounds like you will be able to

2   report to Pretrial Services in the Middle District of Georgia

3   sometime late tomorrow, but I will say no later than March 11th.

4   So you report to the Pretrial Services -- Probation Office in

5   the Middle District of Georgia no later than --

6      THE DEFENDANT:  That's Thursday?

7      MS. SHERMAN-STOLTZ:  Thursday.

8      THE DEFENDANT:  Yeah, that's no problem.

9      THE COURT:  In addition, I would say surrender any

10  passport, but Ms. Sherman-Stoltz, he does not have a passport;

11  correct?

12     MS. SHERMAN-STOLTZ:  Correct.

13     THE DEFENDANT:  Just an expired one.

14     THE COURT:  You are not to obtain a new passport or

15  any other international travel documents.  You are to abide by

16  the following restrictions on personal associations, residence,

17  or travel:  You are going to stay at your sister's address for

18  residence, which I'm not going to put on the public record here,

19  but that will be in the order.  You will stay out of the

20  District of Columbia except for court appearances.

21     You are not to possess a firearm, destructive device, or

22  any other weapon.  You are not to unlawfully possess a narcotic

23  drug or other controlled substance unless prescribed by a

24  licensed medical practitioner.

25     You are to -- you are restricted to your residence except

1    for medical necessities and court appearances or other

2    activities specifically approved by the Court in the future.

3         You are to submit to GPS location monitoring as directed by

4    the Pretrial Services Office or supervising officer and comply

5    with all of the program requirements.  You must pay all or part

6    of the cost of the program based on your ability to pay as

7    determined by the Pretrial Services Office or supervising

8    officer.

9         As we discussed, you should report as soon as possible to

10   the Pretrial Services Office or supervising officer -- sorry.

11   You should report every contact with law enforcement personnel,

12   including arrests, questioning, or traffic stops.

13        You may travel to and from the courthouse in the Middle

14   District of Georgia for work purposes as a lawyer and here to

15   Washington, D.C., for your appearance in court.  The Court must

16   approve all other travel.

17        And as we've discussed, you're going to report to the

18   Middle District of Georgia and have the GPS installed.

19        And also as we've discussed, you are prohibited from

20   posting or commenting on social media platforms.  And I can't

21   recall whether I said it already, I think I did, but I will

22   repeat it, that you are not to have contact with potential

23   witnesses in this case.

24            THE DEFENDANT:  Yes, Your Honor.  Three other things

25   real quickly.  I can report to various superior courts or going

1    to court for clients?

2          THE COURT:  You may.  I understand you may appear in

3    more than one court.

4          THE DEFENDANT:  Also, I'm putting my law office

5    building up for sale.  That is going to involve going to, you

6    know, move furniture out of it and sort of make that place ready

7    to be sold.  I have some help with my other sister who lives in

8    Americus doing that.  But I think I'm going to have to go there

9    myself --

10          THE COURT:  Again, Mr. Calhoun, it sounds like a

11    condition that you should come to me for.

12          THE DEFENDANT:  Okay.  And the third thing is, I know

13    my friends are going to want to take me out tonight to dinner

14    for steak and a glass of wine.  Can I do that?

15          THE COURT:  You can eat dinner and proceed on your

16    way, yes.

17          THE DEFENDANT:  But I can drink alcohol?  I don't want

18    to get in trouble.

19          THE COURT:  Mr. Calhoun, you're prohibited from using

20    any controlled substances.  Obviously, you will need to be

21    careful to abide by all conditions of release, and if you drink

22    too much alcohol, you may not.  So I would caution that.

23          MS. SHERMAN-STOLTZ:  Your Honor, I do have a question.

24    I'm sorry.  I'm trying to think of things that I do on a

25    day-to-day basis.  Will he be allowed to go to his office to

 1    retrieve files, client files and things of that nature, to have

 2    them at his sister's house?  Because I wouldn't necessarily want

 3    any of my family members going and retrieving legal documents on

 4    my behalf.

 5              THE DEFENDANT:  And there's so many of them, I might

 6    have to go to the office to get them.

 7              THE COURT:  Mr. Alexander, what's your position with

 8    respect to him going to his former office -- or his current

 9    office?  It seems reasonable.  He needs to get his materials.

10    Does the government have concerns about that place in

11    particular?

12              MR. ALEXANDER:  Your Honor, I guess my concerns would

13    just be kind of a slippery slope in general getting us away from

14    home confinement and towards something much more loose.

15              THE DEFENDANT:  I don't want to be there.  That's also

16    the only high-speed Internet connection that I have immediately

17    available.  That can be dealt with.  I might have to grab files.

18    I've got to move all that stuff out of there anyway, but --

19              THE COURT:  I will permit you -- go ahead,

20    Mr. Alexander.

21              MR. ALEXANDER:  Just very quickly.  If we could

22    include a provision that would allow Mr. Calhoun a pass at the

23    discretion of the United States Probation for work-related

24    activities.

25              THE COURT:  Yes, yes, I will include such a provision.

1      But Mr. Calhoun, to be clear, I am not including this

2   provision for you to be peppering them on a daily basis, Can I

3   do this, can I do that.  You're on home confinement here, and

4   you're allowed to do some specific things in order to earn a

5   living and go certain places, restricted places.  So exercise

6   some discretion.  If this gets out of hand, then I'm going to be

7   arranging another status hearing to discuss what the need for

8   all this is.  They can't be answering on a moment's notice, Can

9   I go here, can I go here.

10      Obviously, there are emergencies that arise and specific

11   circumstances, and you should be able to work with them to make

12   exceptions, but generally, I'm looking for you to be at home --

13   or, rather, at your sister's residence and going to and from the

14   courthouse as necessary and to and from the office as necessary

15   to get files.

16      All right?  That's in general my expectation.

17          THE DEFENDANT:  I understand that, and that's why I

18   bring it up.

19          THE COURT:  So I will include that additional

20   provision that would give the Pretrial Services officer some

21   discretion to make adjustments for particular work-related

22   issues that arise.

23      I would like to talk to Ms. Calhoun.  Is she on the phone,

24   on the line?

25          MS. MARY CALHOUN:  Yes, ma'am, I'm here.

1          THE COURT:  Thank you for undertaking this obligation.

2   I know Mr. Calhoun must be very appreciative, and I am as well.

3   So I want to thank you for being willing to step up and serve as

4   a third-party custodian.

5          You just heard me review all of the conditions of release.

6   Do you have any questions about any of them?

7          MS. MARY CALHOUN:  No, I don't.

8          THE COURT:  As I've explained, your brother is going

9   to be restricted to your residence at all times except as

10  necessary for medical reasons or court appearances in his job as

11  a lawyer, or coming here or specific occasions in which he has

12  the approval of Pretrial Services to do something for his

13  employment, that is, go to his office to retrieve files as we

14  discussed.

15         Do you understand he is prohibited from possessing any

16  firearms, and he is also not allowed to post on social media?

17         MS. MARY CALHOUN:  Yes, ma'am.

18         THE COURT:  And you understand as a third-party

19  custodian, it is your obligation to notify the Court through

20  Pretrial Services in the Middle District of Georgia if he is not

21  abiding by these conditions or any other conditions that I've

22  reviewed, that I've stated today?

23         MS. MARY CALHOUN:  Yes, ma'am.

24         THE COURT:  And you are willing and able to perform

25  this role?

1          MS. MARY CALHOUN:  Yes, ma'am, I am.

2          THE COURT:  And you understand if you fail to inform

3     the Court of any violations of these conditions that you are

4     aware of, that you could be held in contempt of court?

5          MS. MARY CALHOUN:  Yes, ma'am, I do.

6          THE COURT:  Again, any questions for me or for the

7     Pretrial Services officer while we have you on the line?

8          THE DEFENDANT:  There is one thing, Your Honor.

9          MS. MARY CALHOUN:  The only thing that comes to mind

10    is, and this might be something that falls under the category of

11    the pass from the probation officer, but our 87-year-old mother

12    who lives in Sumter County, she does live in Americus, but I

13    wasn't sure -- it's hard for her to travel.  I wasn't sure if

14    maybe he might be able to see her in my home in Andersonville.

15    I go there quite often on the weekends.

16         I didn't know if that would be something to bring up now or

17    if that just needs to be addressed later.

18         THE COURT:  I think that needs to be addressed later

19    and probably to me.  This really is a home confinement.  It does

20    impede the ease at which he can live life like he was doing

21    beforehand.  I recognize that.  But these are stringent

22    conditions that I'm setting because of his conduct in this case.

23         MS. MARY CALHOUN:  Yes, ma'am.  I understand.

24         THE COURT:  So I am not going to authorize him to go

25    to and from your two houses, if that's what you're asking.

1          MS. MARY CALHOUN:  That's fine.  I understand.

2          THE COURT:  In a unique instance, I'm not saying he

3   can't see your mother.  That's not at all what I'm saying.  But

4   I don't want to address every conceivable possibility here

5   today.  He is on home confinement, and when there are specific

6   things that arise, you all should work with the Pretrial

7   Services officer and file the appropriate motion,

8   Ms. Sherman-Stoltz, if necessary.

9          MS. MARY CALHOUN:  Yes, ma'am.  I understand.

10         THE COURT:  And Ms. Calhoun, am I correct, I just want

11   to confirm, there are no firearms or explosive devices in your

12   home; correct?

13         MS. MARY CALHOUN:  No.  I did have some firearms, but

14   I've moved them.  They're no longer on the premises.

15         THE COURT:  All right.  And Mr. Alexander, I know from

16   the detention hearing that there were a couple of firearms that

17   were Mr. Calhoun's, an antique firearm and some other firearm,

18   that's in the hands of other family members.

19         Does the government seek, as I suggested, to have him

20   surrender those, and if so, how might he do that?

21         MR. ALEXANDER:  I defer to the Court, Your Honor, if

22   there are antique firearms.  I think as long as the conditions

23   are clear to the extent that for the period that Ms. Calhoun is

24   acting as Mr. Calhoun's third-party custodian there can't be any

25   firearms in that residence, I think that satisfies the

1    government's concern in that regard.

2            THE COURT:  All right.

3            MR. ALEXANDER:  Your Honor, I'm sure the Court already

4    mentioned it, but I just missed if the GPS monitoring condition

5    was also imposed.

6            THE COURT:  I did.  Ms. Schuck will speak up if I did

7    not, but I'm fairly confident I read the GPS monitoring, and I

8    did say that he would pay the cost if Pretrial determines he has

9    the ability to pay.

10        Mr. Hopkins, if you can have Ms. Calhoun swear to the

11    conditions.

12        (Ms. Mary Calhoun sworn to abide by her responsibilities as

13    third-party custodian.)

14            THE COURT:  Mr. Hopkins, we also need to do the same

15    for Mr. Calhoun.

16            COURTROOM DEPUTY:  Absolutely, Your Honor.

17        (Defendant sworn to abide by his conditions of release.)

18            THE COURT:  The ruling I made earlier constitutes my

19    ruling.  I will not be putting out a written opinion here.  I

20    will be posting a minute order granting the motion, and I will

21    also be posting the order setting conditions of release.

22        Any questions from either side?  Mr. Alexander?

23            MR. ALEXANDER:  No, Your Honor.  Thank you.

24            MS. SHERMAN-STOLTZ:  No, Your Honor.  Thank you very

25    much.

1              THE COURT:  Oh, I'm not going to go through setting

2      the trial date because I think that's a longer conversation, and

3      you don't have the time, Ms. Sherman-Stoltz.

4          What do you all suggest?  A status hearing in the next 14

5      days or 30 days to discuss next steps?  What do the parties

6      propose?

7          I do need to make a finding under the Speedy Trial Act.

8      Mr. Alexander, I assume you're still producing discovery.

9              MR. ALEXANDER:  Yes, Your Honor.  We're still at an

10     early overall stage, but our request would be 30 days, for a

11     status hearing in 30 days out for kind of a meaningful

12     opportunity.

13             THE COURT:  Ms. Sherman-Stoltz, do you agree that

14     makes sense at this stage?

15             MS. SHERMAN-STOLTZ:  Yes, Your Honor.  I believe

16     Mr. Calhoun is nodding his consent as well.

17             THE DEFENDANT:  (Nodded head.)

18             THE COURT:  Could we set a date of April 7th?  Does

19     that work for the parties, 11:00 a.m. on April 7th?

20             MS. SHERMAN-STOLTZ:  One moment, Your Honor.  I'm

21     checking.  11:00 a.m. on April 7th?

22             THE COURT:  And that would be a video conference

23     unless the defense objects, given that Mr. Calhoun is

24     presumably -- he should be in Georgia, and I think with the

25     pandemic situation, we are encouraged to do video hearings as

1    much as possible.

2            MS. SHERMAN-STOLTZ:  I apologize, Your Honor.  I'm not

3    available at 11:00 a.m.

4            THE COURT:  All right.  What time are you available

5    that day?

6            MS. SHERMAN-STOLTZ:  I have a hearing at 10:00 a.m.,

7    and that's it, but I imagine it will go at least two hours.  So

8    I could do something before or after.

9            THE COURT:  All right.  Mr. Alexander, do you have a

10   preference?  I can do either 9:00 a.m. or 2:00 p.m.

11           MS. SHERMAN-STOLTZ:  Oh, he would probably prefer 2:00

12   because he's four hours behind us.

13           THE COURT:  Oh, yes, okay.  I won't do 9:00 a.m.

14           MR. ALEXANDER:  Thank you, Your Honor.

15           THE COURT:  Does 2:00 p.m. work for you?

16           MR. ALEXANDER:  Yes.

17           THE COURT:  All right.  We will return on April 7 at

18   2:00 p.m.

19       Do you agree, Ms. Sherman-Stoltz, to video conference?

20           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

21           THE COURT:  Do you also agree that time should be

22   excluded under the Speedy Trial Act?

23           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

24           THE COURT:  All right.  I do find it is in the

25   interest of justice to exclude time in order to enable the

1    defense to get the remaining discovery and review it.  So I do

2    find the ends of justice outweigh the best interests of the

3    defendant and the public in a speedy trial.  I will exclude time

4    from today until April 7th in calculating the date for a speedy

5    trial, April 7, 2021.  And I will see you all back for a video

6    conference at 2:00 p.m. on that date.

7         Does Pretrial Services have any concerns with the review of

8    the conditions of release or anything else?

9              COURTROOM DEPUTY:  Ms. Schuck, you're on mute if

10   you're speaking.

11             PRETRIAL SERVICES OFFICER:  Thank you.  No, Your

12   Honor.  Thank you.

13             THE COURT:  All right.  I think that covers it.  Thank

14   you, all, and sorry for the delay today.

15             MS. SHERMAN-STOLTZ:  Thank you, Your Honor.

16             MR. ALEXANDER:  Thank you, Your Honor.

17         (Proceedings adjourned at 1:51 p.m.)

18

19

20

21

22

23

24

25

```
 1                   CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7          Please Note:  This hearing occurred during the

 8    COVID-19 pandemic and is, therefore, subject to the

 9    technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                  December 8, 2022

13    SIGNATURE OF COURT REPORTER       DATE

14

15

16

17

18

19

20

21

22

23

24

25
```