#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No.: 1:21-cr-116 (DLF) |
| | : | |
| v. | : | |
| | : | |
| **WILLIAM MCCALL CALHOUN,** | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' POST-TRIAL BRIEF

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial, addressing the admissibility of certain evidence, and discussing the disputed legal issues. The government introduced evidence at trial that proves the elements of the charged offenses beyond a reasonable doubt, and accordingly requests the Court return guilty verdicts on all counts.

### BACKGROUND

This case is before the Court after a two-day bench trial that took place on March 1-2, 2023. At trial, the government presented two witnesses: (1) Captain Carneysha Mendoza; and (2) Special Agent Timothy Armentrout. Through its witnesses, the government presented overwhelming evidence of the defendant's guilt on all charges, which included: (1) open-source and surveillance footage of the defendant on January 6, 2021 (Exhibits 302-308, 311); (2) the defendant's social media posts leading up to and on January 6th (Exhibits 400-423, 500-512); (3) videos, photos, and chats obtained from the defendant's cellphone corroborating his movements on January 6th and why he traveled to Washington, D.C. for January 6th (Exhibits 600-632); and (4) the defendant's testimony from the March 5, 2021 bond review hearing (Exhibit 209). The defense presented one witness: the defendant, William McCall Calhoun.

The defendant does not contest that he was inside the Capitol on January 6th, ECF No. 154 at 3, and prior to trial appeared to concede at least Count Two, charging a violation of 18 U.S.C. § 1752(a)(1), Ex. 209 at 45:14-15, 58:10, 89:14-15.  The defendant now claims that he thought he was permitted to enter Capitol grounds.  ECF No. 154 at 1; ECF No. 157 (Transcript of March 2, 2023 Bench Trial) at 230:19-21.  The defense also disputes that the defendant went inside the Capitol to stop the electoral vote certification.  ECF No. 157 at 298-299.

Even without the defendant's incredible and self-serving testimony, the government proved the charges beyond a reasonable doubt.  The defense claims are belied by the government's evidence and the defendant's own testimony.  In this brief, the government will (1) address the admissibility of exhibits on which the Court withheld ruling; and (2) discuss the core issues in dispute, including the impact of the defendant's testimony.[1]

I.     **ADMISSIBILITY OF CERTAIN GOVERNMENT EXHIBITS**

At trial, the defense objected to and the Court reserved ruling on the admissibility of the following exhibits: 300, 301, 310, 505-507

A. **Exhibits 300 and 301**

Defense objected to government's exhibits 300 and 301, which are the 22-minute United States' Capitol Police ("USCP") montage video and the montage video of the congressional record respectively.  The defense argued that only the portions of the videos that took place when the defendant was inside the Capitol are relevant.  ECF No. 156 (Transcript of March 1, 2023 Bench Trial) at 47.  The government disagrees.  Both 300 and 301 introduce facts that—although not

---

[1] This brief does not address all of the elements of all of the charges in the Indictment.  Instead, the government focuses on the issues that appeared to be in dispute at trial.  Should the Court want a more fulsome discussion of each charge and accompanying elements, the government is happy to file supplementary briefing or address the charges more fully in oral argument.

2

specific to this defendant—are nonetheless relevant to the charges.  For example, exhibit 301 lays out the timeline of the Joint Session, when the House and Senate Chambers recessed after the breach, and when the sessions resumed.  Exhibit 300 similarly provides background as to what was happening outside and inside the Capitol on January 6th, which certainly meets the low bar of relevance for any number of reasons.  To name a few: (1) the exhibits contextualize the circumstances that caused the defendant to enter the Capitol; (2) Exhibit 300 shows the movement of Vice President Mike Pence on January 6th, which bears on 1752(a)(1); and (3) certain portions depict events, such as the breach of the Senate Wing Door, that occurred close in time to the defendant's entry into the Capitol and allow the Court to infer that the defendant either observed or heard the breach.

The government acknowledges that the Court and parties are well aware of the background facts of January 6th.  But to ensure the integrity of its case and any resulting convictions, the government must ensure the record is clear, and that the case stands independently from other January 6th cases the Court may have heard.  Thus, exhibits 300 and 301 should be admitted in their entirety to ensure that even the undisputed elements of the charges are clearly established in the record (e.g., the occurrence of the Joint Session).

### B.  Exhibit 310

Government's exhibit 310 is a 29-minute recording of a phone call between Sumter County District Attorney Lewis Lamb and the defendant.  Given the length of the recording, the government did not play the call in full at trial.  *Id.* at 167 (playing exhibit 310 from the beginning and stopping at 5 minutes and 50 seconds, and starting again from 8 minutes and stopping at 9 minutes 29 seconds).  However, the government sought to admit the entirety of the call into evidence.  The defense objected to admitting the full call on relevance grounds.  *Id.* at 164:23-24.

The entire call is plainly relevant. As explained at trial, *id.* at 165, during the call the defendant acknowledged going inside the Capitol Building on January 6th, but appeared to want to convey that he was not involved in any violent acts. *Id.*; Ex. 310. The defendant attempted to walk back his social media statements, claiming that he embellished the story, and was merely "trolling" people. Ex. 310. Segments of the call are more probative to the defendant's guilt and credibility than others. But because of how the conversation progressed, excluding parts of the call would remove necessary context for subsequent portions of conversation. The entirety of the call should therefore be admitted because it is relevant and contextualizes statements that bear on his culpability and credibility.

To the extent the defendant argues, or the Court inferred an argument, that portions of the call are more prejudicial than probative, the government posits that, in a bench trial, the probative versus prejudicial calculus has little impact on admissibility. *United States ex rel. Morsell v. NortonLifeLock, Inc.*, 567 F. Supp. 3d 248, 258 (D.D.C. 2021) ("Although Federal Rule of Evidence 403 provides, in relevant part, that a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, Fed. R. Evid. 403, this portion of the Rule has a highly limited application, if any at all, to bench trials.") (internal citation omitted).

### C. Exhibits 505-507

The Court also reserved ruling on government's exhibits 505-507, which defense objected to on authenticity grounds. ECF No. 156 at 117. Notably, these three Facebook posts were not contained in the Facebook returns received by the government. Despite their absence, the government has properly authenticated the exhibits and they should be admitted.

4

Federal Rule of Evidence 901(a) governs the authenticity of evidence, and states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 47 (D.D.C. 2016) ("As the Government points out, Federal Rule of Evidence 901(a) governs the authentication or identification of evidence.")  Further, the "threshold for the Court's determination of authenticity is not high" and "the proponent's burden of proof for authentication is slight[.]" *Id.* at 48 (internal citation omitted).  The government has met its low burden.  Notably, Agent Armentrout testified that the Facebook posts contained in exhibits 505-507 were sent to law enforcement by multiple individuals.  ECF No. 156 at 135.  It is apparent that the three posts came from the same account as the posts that were authenticated (i.e., exhibits 500-504, 508-512) because they contain the same profile picture and username.  Further, the defendant admitted to using that account in his prior testimony, *see* exhibit 209.  The posts also contain other indicia of authorship that favor admissibility: (1) the photo posted in exhibit 505 was found on the defendant's cellphone; (2) the rhetoric used in exhibit 506 is consistent with other, authenticated Parler and Facebook posts, including terms such as "Vanguard" (exhibit 414), "Democrat Communists" (exhibit 402), and "we're all coming back armed for war" (exhibit 414); (3) exhibit 506 refers to his co-defendant, Andrew Nalley; and (4) exhibit 507 states that "these were first 200 or so of us to actually get inside the Capitol", the same number posted in exhibit 506.  *See United States v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) ("Those e-mails that are not clearly identifiable on their own can be authenticated under Rule 901(b)(3), which states that such evidence may be authenticated by comparison by the trier of fact (the jury) with specimens which have been [otherwise] authenticated—in this case, those e-mails that already have been independently authenticated

5

under Rule 901(b)(4).") (internal citation omitted).  Most dispositive is the defendant's agreement on cross examination that he wrote exhibit 506, which not only supports admissibility of 506, but 505 and 507 per the reasoning articulated in *Safavian*.  ECF No. 157 at 288:24-289:6; 435 F. Supp. 2d at 40.

Finally, any issues with authentication of exhibits 505-507, similar to a gap in chain of custody, go to the weight and not admissibility of the exhibits.  *See Hassanshahi*, 195 F. Supp. 3d at 48.

## II.  DISCUSSION

### A. The evidence leaves no doubt that the defendant knew he was not allowed to be on restricted Capitol grounds or in the Capitol Building on January 6th.

The defendant does not dispute that he went inside the Capitol on January 6, 2021.  Ex. 209 at 34:3-6, 36:13.  Prior to trial, the defendant acknowledged that he trespassed and that it was wrong.  Ex. 209 at 45:14-15 ("Maybe I trespassed.  Big deal.  Don't steal elections next time."), 58:10 ("I probably committed a misdemeanor trespass and I know that was wrong . . .").  The defendant now appears to contest whether he knew he was not supposed to be on Capitol grounds or in the Capitol building.  *E.g.,* ECF No. 156 at 230:20-21 ("I thought that was like, where you were supposed to walk through."), 231:5-6 ("I didn't see any signs that said do not enter.  Besides, there were hundreds of thousands of people inside that area.  I thought that's where we were supposed to go . . .").  The evidence, including the defendant's own testimony, leaves no doubt that he *knew* he should not have been there.

Barriers, signage, and police officers were in place on January 6th that conveyed the area was closed to the public.  Ex. 700; ECF No. 156 at 19:17-24.  Captain Mendoza testified that those measures were conspicuous.  ECF No. 156 at 23:9-19 ("I would say it was very noticeable").  Additionally, smoke, police officers, alarms, and other context clues were apparent as the

defendant made his way up the West side of the Capitol grounds and through the Senate Wing Door.  Videos and photos taken by the defendant on his cellphone show smoke rising up from the West side of the Capitol grounds and rioters covering their faces in reaction to an apparent substance in the air.  *Id.* at 152-153; Ex. 602-03, 616-17.  In exhibit 603, the defendant continues to walk toward the Capitol—and the smoke—and remarks, "We just gained access to the second floor.  They've stormed across the barricade.  You can see it right up here.  There's a surge of people on the steps.  They're taking it, they're taking the Capitol."  As he approached the Capitol building, the defendant posted on social media acknowledging the presence of police and the use of mace.  Ex. 411 ("The cops are using mace on us at the front of the Capitol"), 511.  As the defendant entered the Capitol through the Senate Wing Door, an alarm was sounding and the door's broken glass was visible.  Ex. 605.

      The defendant's rhetoric also shows that he knew he was not supposed to be there.  In his videos, the defendant used language such as "stormed" and "they're taking the Capitol."  Ex. 603.  As the defendant approached the Senate Wing Door he said, "This is it.  This is it.  We're storming the Capitol."  Ex. 604.  Once inside, the defendant came face to face with a line of police officers, Ex. 607, who were ultimately overrun by the rioters, ECF No. 156 at 52:15-16 ("Yes.  They got overrun by the crowd.").  Again, the defendant's statements as he and other rioters stared down police is illuminating: "Looks like we're about to push through these cops.  We'll see what happens.  The crowd is really pissed."  Ex. 607.

      The government's case alone establishes that the defendant knew he was not supposed to be on the Capitol grounds, or inside the Capitol.  But the defendant's testimony further supports that conclusion.  As an initial matter, the defendant has practiced criminal defense for decades.  ECF No. 157 at 208:21-23.  He has litigated a variety of state level offenses, ranging from

misdemeanors to homicides. *Id.* at 257:17-22. The Court should view his testimony in light of that experience. His insistence—despite ample evidence to the contrary—that he thought he was allowed to be at the Capitol is even more incredible when viewed against his legal background.

During his direct testimony, the defendant stated multiple times that he saw barriers and/or fencing as he approached the Capitol. *Id.* at 230:15-16 ("[T]here were some – the bike barriers that had been described. But there were, like, sections that were removed . . ."), 275:23-24. Defendant also saw police using mace and a "flash bang grenade", but attempted to exculpate himself by arguing that those crowd control measures were taking place in another section of the crowd. *Id.* at 233:25-234:7. Further, the defendant's description of the crowd's entry into the Capitol signals that he knew he was not permitted. *Id.* at 236:14-20 ("[T]here were just a tiny handful of police officers on the steps . . . but at some point, there were no police officers in sight. I mean, they just all of a sudden – they were gone. And the crowd started just rushing up those steps."). The defendant claims, despite video evidence to the contrary, that he did not notice that the Senate Wing Door was broken and windows shattered. *Compare id.* at 238:9-12 *with* Ex. 605. In more self-serving testimony, the defendant claimed he did not trespass because he was "watching the police" and saw a police line at the bottom of the stairs, which "tells [him] that you're not supposed to go past that" but "15 minutes later[], there's no police there[.]" ECF No. 157 at 248:18-249:6. The defendant concluded that he "wasn't sure whether [he] was trespassing or not[.]" *Id.* at 249:8. But then later stated: "You know, as far as the entry into the Capitol, you know, I thought that I, you know, could have been trespassing, like, in the common law sense." *Id.* at 251.

On cross examination, the defendant—seemingly unconvinced by his own self-serving arguments as to his trespass—stated, "I mean, that's up for the Court to decide. I mean, I accept

the Court's decision on that." *Id.* at 270:14-17.  As to the indicators that he should not have been at the Capitol (e.g., smoke, barricades, police, alarms), the defendant consistently hedged his answers, and in one stunning instance, denied walking in a video that he took in which he and his co-defendant are clearly moving through a crowd and passing other rioters.  *Id.* at 271:2-25 (A: "That smoke way off?  Yeah.  In  the distance . . . Q: Now, the smoke that you said was far off into the distance, is it fair to say in this video you're walking toward it?  A: No, I'm not walking.")

When questioned further about exhibit 603 and his statement in the video "they've stormed across the barricade", which contradicted his testimony on direct, the defendant began defining what the term "barricade" meant to him:

> You got to know that – barricades – and this is – we say barricades – you know, that's a loose term I'm using.  I mean, that – were there – to my mind, a barricade is something that is typically going to involve some type of fencing or something, although not necessarily because at times it was just maybe officers standing there with not any fence.

*Id.* at 272:15-273:1.  After being showing exhibit 414, in which he posted, "We overran multiple police barricades and busted through" and asked whether he wrote the post, the defendant responded: "That's on the exhibit, yeah."

The government then asked whether the defendant saw cops using mace.  *Id.* at 273:8-9. The defendant provided a roundabout answer: "I saw cops using some mace – I'm not sure.  When mace is used on a crowd, typically if you're trying to push the crowd back, mace is used at the front of the crowd to push it back.  But these officers that I saw were throwing it back behind the crowd to push them forward."  *Id.* at 273:10-17.  After being confronted with exhibit 411, in which he wrote, "the cops are using mace on us at the front of the Capitol" the defendant responded: "Yes.  But not me personally.  But, yes."  *Id.* at 273:22.  When asked to confirm that he did, in fact, see people maced, the defendant asked, "what do you mean?"  *Id.* at 274:1-2.  And after the

9

government followed up with, "Why else would you write, the cops are using mace on us at the front of the Capitol?", the defendant refused to answer directly, stating: "Well, yeah.  Like, again, if you were – you got to remember – okay.  There were very few police there for some reason." *Id.* at 273:3-7.  After being pushed *again* to answer whether he saw the use of mace, he said "They were using mace on the crowd at some certain places, yes.  But not me." *Id.* at 273:10-12.  A few minutes later, the defendant was asked "whether the fact that cops were using mace was an indicator to [him] that [he] w[as] not supposed to be there." *Id.* at 276:1-6.  The defendant backtracked and said: "You couldn't see where the mace was being used . . ." then finally answered, "I mean, it's – I guess, you know, it's a factor to consider." *Id.* at 276:18

       The defendant similarly disassembled when asked about the presence of police at the Capitol.  As an initial matter, when answering questions about barricades the defendant testified that in certain places on the perimeter there were police officers instead of barricades.  *Id.* at 272:25-273:1.  Moreover, the defendant saw police officers when he entered through the broken Senate Wing Door, but apparently their presence did not cause him to pause because "everybody was just walking in, and the police were watching them." *Id.* at 276:18-19.  The government inquired specifically about the faceoff between police and rioters in the Crypt, which the defendant captured on video. *Id.* at 277; Ex. 607.  When shown the video and asked to confirm that "there's a line of police officers there", he responded: "I don't know that it's a line." *Id.* at 277:10.  The government followed up with, "there appears to be an area where the rioters are and then where the police are, and there's no rioters behind them?" and the defendant replied, "I don't – you will have to show me that.  I don't know.  I don't see that right there."  During this exchange, the defendant continued to deflect, refuse to provide responsive answers, and ultimately, when asked

10

to clarify whether it was "[his] testimony that those officers were not confronting [him]", he said: "they weren't confronting me because I wasn't confronting them." *Id.* at

Given the overwhelming evidence presented in the government's case-in-chief, and the defendant's unconvincing, evasive, and contradictory testimony, there is no doubt that the defendant *knew* he was not allowed on restricted Capitol grounds on January 6th.

### B. The defendant knew the electoral certification was occurring on January 6th, and that is why he entered the Capitol.

The second issue at trial is whether the defendant obstructed an official proceeding. The government will focus on the two elements that appear to be in dispute: whether the defendant (1) acted with the intent to obstruct or impede the official proceeding; and (2) acted corruptly.

### i. The government's evidence proves beyond a reasonable doubt that the defendant went to the Capitol on January 6th to stop the electoral vote count.

In its case-in-chief, the government presented social media posts, the defendant's prior testimony, and cellphone videos, which prove that the defendant's intent was to stop the electoral vote count. The defendant made his intent to "stop the steal" clear on Parler and Facebook prior to January 6th. *E.g.,* Ex. 402 ("We have a communist revolution happening before our very eyes to steal this election – it's obvious. Americans get ready to rise up and kill the democrat communists before they do it to us."), 405 ("Stop The Steal: Biden lost . . ."), 406 ("See you in Washington on Jan. 6!"), 407 ("Being physically present in Washington on January 6 is of key importance. We the People have no other realistic option to communicate our unwavering intent to demand fair elections now and forever – or else[.]"), 408 ("Headed to D.C. to give the GOP some back bone – to let them know this is their last chance to Stop the Steal[.]"), 503 ("The VP isn't just performing a clerical function, judgment and discretion has to be exercised where the votes are contested. That's under the 12th Amendment.").

11

His intent was also clear when he posted on the day of January 6th.  For example, on Parler and Facebook he said: "If this steal doesn't get fixed there's talk of Patriots coming back – this time fully armed for war."  Ex. 414, 508.  After "storming" the Capitol, he wrote on Facebook, "We occupied the Capitol and shut down the Government – we shut down their stolen election shenanigans."  Ex. 506.  The evidence clearly establishes that the defendant knew the electoral vote count was happening, that he aimed to "Stop the Steal", and "stormed" the Capitol to "shut down their stolen election shenanigans."

Although the Court need not look past the government's case to establish proof beyond a reasonable doubt as to why the defendant went to the Capitol, the defendant's testimony confirms his intent to stop the certification.  At trial, the defendant claimed that, as he walked from the Trump rally to the Capitol, people in the crowd said that Pence had certified the vote and the defendant thought "at that point the whole thing may have been over with, [] because they had certified the vote."  ECF No. 157 at 235:23-236:3.  Despite learning that information and thinking the "whole thing may have been over with", the defendant continued to the Capitol.  When asked by his attorney why he continued to the Capitol if he believed the certification to be over, the defendant did not directly answer and instead noted that there was little police presence and entered because he wanted to "witness this."  *Id.* at 236:11-237:2.

During cross examination, the defendant stated that he knew the certification was happening on January 6th.  *Id.* at 264:1-4.  But when asked whether he went to Washington, D.C., not just for the Trump rally, but because of the certification of the vote, the defendant evaded.  *Id.* at 264:13-265:3 ("Q: But the rally wasn't your sole purpose, right?  A: That was my – no.  That's incorrect.  Q: So it had nothing to do with the fact that the electoral certification was going on on January 6th?  A: Well, the whole – that's – that was – well, what exactly are you asking me?  Q:

Your reason for going to D.C. on January 6th was not just the Trump rally; it was also because that was the day the certification of the electoral vote was happening; is that right?  A: Well, they were both happening on the same day"). The defendant also conveniently forgot that he previously testified before this Court that he entered the Capitol because of the "stolen" election. *Id.* at 266:4-8 ("Q: And at a hearing before this Court on March 5th of 2021, you again reiterated that the reason that you entered the Capitol on January 6th was because the election was stolen, right?  A: I don't think I said that."). After being confronted with that prior testimony, the defendant claimed that he "though [the government] was asking me about what I said in Cordele in court." *Id.* at 267:8-9. When faced with exhibit 408, in which the defendant wrote that it was the GOP's "last chance to stop the steal", the defendant explained that the certification was the last chance to "fix the problems with the election." *Id.* at 265:19-266:3. Despite his demonstrated knowledge of the certification, *e.g.,* Ex. 503, the defendant then claimed that he did not know the certification was happening at the Capitol building, ECF No. 157 at 267:18-23, which led to the following exchange:

> Q: [Y]ou testified on direct that you're a historian, right?
> A: I have a master's degree in history. I don't know if that makes me a professional historian, but yes.
> Q: All right. A master's degree in history. And do you know where the seat of the legislature of the United States is located?
> A: You talking about the Congress?
> Q: Yes.
> A: It is my understanding that the Senate meets sometimes in the place called the Hartman [sic] Building. I don't know where that is. But I know that, often, it meets in the Capitol.
> Q: All right. So you know Congress meets in the Capitol?
> A: Sure.
> Q: All right. And you knew that the electoral certification – that was an act that was happening before Congress, right?
> A: Yes.
> Q: So would it be fair to say that if you knew something was happening before Congress that it was happening in the Capitol building?
> A: No.
> Q: It wouldn't be fair to say that?

13

> A: It doesn't always happen in the Capitol, does it?

*Id.* at 268:2-25. The defendant was confronted with exhibit 503—a long post during which the defendant discussed the 1800 election and electoral certification. He ultimately conceded that he knew both the Senate and House are located inside the Capitol building. *Id.* at 270:2-4.

### ii. The government's evidence established that the defendant used unlawful means, acted with an unlawful purpose, and with consciousness of guilt when he obstructed the electoral vote count.

The government must also show that the defendant acted corruptly in obstructing or impeding the official proceeding. ECF No. 133 at 3; *see* 18 U.S.C. § 1512(c)(2). As defined in the Court's proposed jury instructions, "corruptly" means "the defendant must use unlawful means or act with an unlawful purpose, or both" and act with "consciousness of wrongdoing." ECF No. 133 at 3.

The defendant's social media posts prior to January 6th foreshadow his unlawful means and purpose. The defendant envisioned a violent takeover of the Capitol, and consistently used violent and alarming rhetoric in his posts. Ex. 402 ("Americans get ready to rise up and kill the democrat communists before they do it to us."); Ex. 404 ("Or we show up at the Capitol with guns like we've done in GA!"); Ex. 408 (" . . . [O]r they are going to have bigger problems than these coddled Antifa burning down their safe spaces . . . Whether the police can enforce their gun laws depends on how many armed Patriots show up."); Ex. 409 ("Patriots v. Traitors"); and Ex. 500 ("[T]he communists are trying to steal the election-it's obvious . . . We are on the verge of civil war [a]nd [sic] the battleground will be ATL. We're going to go door to door and execute the fucking communists. I want to make that clear.").

On January 6th, the defendant followed through with his planned "hostile takeover" of the Capitol. Ex. 506. His unlawful entry onto restricted grounds and into the Capitol building is

14

sufficient to establish unlawful means. *United States v. Sandlin*, 575 F. Supp. 3d 16, 33 (D.D.C. 2021) (explaining that a forcible breach of the Capitol building, assault on police officers and encouraging stealing of government property "is both independently criminal, and inherently malign[.]") (internal citation omitted).

Further, the defendant acted with unlawful purpose when he went to the Capitol to stop the certification by physically occupying the Capitol and "shut[ting] down the Government." Ex. 506 ("We occupied the Capitol and shut down the Government"), Ex. 509 ("We too[k] [sic] the Capitol in hostile hand to hand confrontation with police."), Ex. 414 ("Patriots have taken the Capitol building. We overran multiple police barricades and busted through . . . we retreated back to the rotunda and continued our hostile take over of the Capitol Building."); *United States v. Reffitt*, 602 F. Supp. 3d 85, 93 (D.D.C. 2022) ("Reffitt acted with an unlawful purpose to physically overthrow Congress, a sentiment he expressed numerous times before, during, and after January 6."). The defendant not only "occupied" the Capitol, but walked by members' offices "looking for people" as rioters yelled and banged on doors and walls. Ex. 609. At the end of the video, the defendant remarks: "It's on." *Id.*

The defendant's posts on January 6th confirm that he knew his actions were wrong and show the requisite "consciousness of wrongdoing." The defendant wrote: (1) "We[] [sic] have busted through into the Capitol and taken it", Ex. 412; (2) "Patriots have taken the Capitol building. We overran multiple police barricades and busted through . . . Then we stormed upstairs through the rotunda . . . The first of us who got upstairs kicked in Nancy Pelosi's office door . . . then a swat team showed, and we retreated back to the rotunda and continued our hostile take over[.]", Ex. 414; (3) "Somebody yelled 'push through', so we did and the shock of our momentum brushed them aside – some people we[]re [sic] bleeding pretty badly by that point", Ex. 508. Moreover,

the defendant previously testified and acknowledged his wrongdoing: "Maybe I trespassed. Big deal. Don't steal elections next time." Ex. 209 at 45:14-15

In posts he wrote after January 6th, the defendant attempted to walk back his role in the riot and what he witnessed. On Parler he wrote in response to a news article: "I would disagree with the part that says we 'broke into' the Capitol." Ex. 423. In another instance, he claimed that no one in the Capitol did anything violent and "[t]he crowd was not there to destroy[.]" Ex. 420. All of those statements are belied by the record in this case, including the defendant's contemporaneous statements from January 6th. The Court should weigh the veracity of the statements the defendant made after January 6th—when he undoubtedly knew rioters had been arrested and that he was being investigated. Moreover, the mere fact that the defendant attempted to cover up the nature of what he participated in and witnessed on January 6th supports his consciousness of wrongdoing – he walked it back because he knew it was wrong.

Again, the Court need not look further than the government's case-in-chief to find the defendant acted corruptly. However, the defendant's testimony at trial only buttresses this element of obstruction. The defendant testified that he went to the Capitol on January 6th to because he believed the election was stolen. ECF No. 157 at 267:13-16. Although evasive at times, he acknowledged seeing barricades (*id.* at 272:15-273:1), police using mace (*id.* at 273:4-17), smoke (*id.* 270:21-271:8), flashbangs (*id.* at 296), and alarms (*id.* at 303:10-11), yet continued up the West side and into the Capitol. He acknowledged seeing confrontations between the police and rioters, *id.* at 233:25-234:7, but incredibly would not acknowledge his own confrontation with a police line, *id.* at 277:8-10 ("Q: Now what we're seeing in this frame, there's a line of police officers there, right? A: I don't know that it's a line."), 278:17-20 ("Q: . . . [I]s it your testimony that those officers were not confronting you? A: They weren't confronting me because I wasn't

16

confronting them."). The defendant's intent to use unlawful means to obstruct the certification was also apparent when he said he would "storm the Capitol." *E.g.,* Ex. 408 ("D.C. announced it is banning guns when we storm the Capitol tomorrow."). The defendant's lack of credibility was no more obvious than when he testified about his use of that phrase. On cross, he claimed that by "storm the Capitol" he meant Washington, D.C.:

> Q: Now, it was your testimony that you didn't know before January 6th that you were going to go inside the Capitol; is that right?
> A: Correct.
> Q: Okay. But on January 4th, you wrote, D.C. announced it is banning guns when we storm the Capitol tomorrow.
> A: This is the Capitol. Washington, D.C. is the Capitol.
> Q: So it's your testimony that when you say, Capitol, you were just talking about Washington, D.C. and not the building?
> A: Yes.

*Id.* at 290:2-11. This explanation is belied by the record, including exhibit 604 in which the defendant filmed himself walking toward the Capitol saying, "We're storming the Capitol."

All of the above demonstrates that the defendant acted with an unlawful purpose (stopping the certification), unlawful means (entering the Capitol grounds when he knew he was not permitted), all the while knowing what he was doing was wrong.

## CONCLUSION

The government has proved every element of every charge against the defendant, William McCall Calhoun, beyond a reasonable doubt. For the above reasons and any articulated during oral argument, the government asks the Court to return verdicts of guilty on all counts.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By: *s/ Sarah Martin*
SARAH MARTIN
D.C. Bar No. 1612989
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20001
Sarah.Martin@usdoj.gov
(202) 538-0035

*s/ Christopher Brunwin*
CHRISTOPHER BRUNWIN
California State Bar No. 158939
Trial Attorney, Detailee
312 N. Spring Street
Los Angeles, California 90012
Christopher.Brunwin@usdoj.gov
(213) 894-4242